**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAMIE SHILLER, BRIAN KORNRUMPF, HALSEY RICHARTZ, AMNON MELZER, RYAN TREAT, GEOFF FRINK, JEREMY GRAINGER, RANDY CORAN, BRIAN DUBS, GUY ZILBER, CURTIS HALE, DIRK WEILER-THELEMANN, DARRELL SMITH, CHAD MIELKE, and ROBERT CHRISTIANSEN,

Plaintiffs,

v.

CHAD BARRAFORD, JOHN-PAUL THORBJORNSEN, and NINE REALMS, INC.,

Defendants.

C.A. NO. 1:25-CV-10287-MKV

**JURY TRIAL DEMANDED**

**SECOND AMENDED COMPLAINT**

Plaintiffs Jamie Shiller, Brian Kornrumpf, Halsey Richartz, Amnon Melzer, Ryan Treat, Geoff Frink, Jeremy Grainger, Randy Coran, Brian Dubs, Guy Zilber, Curtis Hale, Dirk Weiler-Thelemann, Darrell Smith, Chad Mielke, and Robert Christiansen (collectively, "Plaintiffs"), by their undersigned attorneys, hereby allege as follows:

**NATURE OF THE ACTION**

1. For well over a year, since January 24, 2025, Defendants John-Paul Thorbjornsen ("Thorbjornsen"), Chad Barraford ("Barraford"), and Nine Realms, Inc. ("Nine Realms") have barred Plaintiffs from accessing their collective approximately $11.1 million in digital assets. Between 2022 and 2023, Plaintiffs entrusted their digital assets to Defendants on the cryptocurrency protocol, THORChain, based on Defendants' unequivocal statements that they would always be accessible to Plaintiffs. Defendants knew those statements were false at the time, but made them anyway, knowing Plaintiffs would rely upon them.

2. In addition, Defendants have diminished the collective value of Plaintiffs' assets by unilaterally converting them into another type of digital asset, TCY (which consistently trades well below $1), that they invented, rather than simply returning Plaintiffs' funds.

3. Plaintiffs have demanded that Defendants return their assets, but they have been ignored or rebuffed after each demand. To date, there is no end in sight and Plaintiffs' assets will continue to lose value or potentially be lost forever.

4. Meanwhile, Defendants have each personally benefitted from their wrongful conduct. Plaintiffs' frozen assets have created a liquidity pool for THORChain. That liquidity pool has continued to power transactions on THORChain, which generate different types of fees and rewards.

5. Thorbjornsen is entitled to a portion of such fees and therefore continues to financially benefit by keeping Plaintiffs' assets trapped.

6. Barraford is paid by THORChain's treasury, which, upon information and belief, is dependent on the protocol continuing to generate revenue.

7. Nine Realms has continued to earn revenue through its role as the protocol's core developer and operator, including compensation from the developer fund, as well as node operator rewards as one of the largest node operators on the network, and other financial benefits derived from the protocol's ongoing operations, all while Plaintiffs are prohibited from withdrawing their digital assets.

8. At its core, the facts of this case are simple. In 2018, Thorbjornsen and Barraford launched a purportedly decentralized cryptocurrency platform, non-party THORChain. Nine Realms worked as THORChain's core developer and operator and also was a seed investor in "THORWallet" in 2021. In November 2022, THORChain launched its "Savers" program, and in

August 2023, THORChain launched its "Lending" program (referred to collectively as "THORFi").

9. The Savers program (much like a typical saving account) allowed users to deposit their cryptocurrency assets and earn "yield" (*i.e.,* additional assets) over time.

10. The Lending program (much like a typical loan) allowed users to deposit their cryptocurrency assets and receive a loan from THORChain in the denomination of THORChain's own "stablecoin" called "TOR."

11. Critically, Thorbjornsen, Barraford, and Nine Realms, individually and collectively, made numerous public misrepresentations that THORFi was "decentralized." This means that, rather than having transactions pass through an intermediary (like a bank or brokerage firm), users could engage in peer-to-pool transactions that were approved ("validated") by a network of THORChain's node operators. The decentralized nature of THORChain was a central feature of Defendants' marketing. Defendants advertised front and center on THORChain's website and social media that its protocol (*i.e.*, its rules and operating system) ensured that deposited assets remained under the control of depositors—not any central authority.

12. Defendants expressly represented that THORFi users with Savers accounts could "[w]ithdraw to native assets at any time,"[1] (*i.e.,* the depositor's original assets).

---

[1] https://thorchain.org/yield.




13. THORChain further represented that users maintained complete control over their funds, including the right to withdraw principal and accrued yield at any time. Specifically, THORChain advertised that "Users can deposit native assets like Bitcoin, earn yield in-kind, and withdraw their principal at any time, all while maintaining full control of their keys."[2]

14. In other words, THORChain promised its Savers account holders that they could deposit their assets, grow their assets, and withdraw their assets at any time, without risk that a centralized authority would intervene to prevent any withdrawal of user assets.

15. With respect to THORFi users with Lending accounts, Defendants—through THORChain's official documentation on its website—further promised that users would be able to "repay loans at any time, with any amount in any asset,"[3] and that they would "always ha[ve] the right to have their collateral returned if they repay the loan."[4]

16. Defendants advertised THORChain's Lending program as providing collateralized loans without interest, liquidations, or centralized interference. In other words, THORChain promised its Lending account holders that their collateral would be returned as soon as they repaid

---

[2] https://docs.thorchain.org/thornodes/archived/savers-faq.

[3] https://docs.thorchain.org/thornodes/archived/lending.

[4] *Id.*

their loan.

17. These statements were not merely marketing slogans. These statements described the allegedly core aspects of the Savers and Lending programs and are the fundamental representations on which Plaintiffs entrusted their assets to THORChain and, in turn, Thorbjornsen, Barraford, and Nine Realms.

18. In addition, Thorbjornsen, Barraford, and Nine Realms represented that THORFi was not exposed to THORChain's own native asset, RUNE. This was false.

19. Defendants touted THORFi's decentralization and independence from RUNE to induce investors—such as Plaintiffs—to deposit their digital assets into either Savers or Lending accounts. It worked. Plaintiffs saw and accepted public statements made by Defendants in THORChain's advertisements on its website, by Barraford on cryptocurrency specific podcasts, by Defendants in articles they each authored, and by Defendants on their individual social media platforms and THORChain's X (Twitter) accounts, and—in reliance on those statements—deposited millions of dollars of cryptocurrency into the THORFi Savers and Lending programs.

20. Yet Defendants' statements regarding THORFi's decentralization and independence from RUNE were false.

21. Contrary to their public statements, THORChain (and in turn, THORFi) was not decentralized. In fact, Thorbjornsen, Barraford, and Nine Realms each independently had access to a master key, the "Admin Mimir," that could unilaterally block THORChain users' access to their THORFi accounts.

22. The Admin Mimir key is an "override" mechanism. It allowed insiders, like Thorbjornsen, Barraford, and Nine Realms, to bypass the decentralized governance system and

unilaterally modify, suspend, or override core protocol parameters.[5] Although the existence of the Admin Mimir key was noted deep within THORChain's official documentation, Defendants' repeated representations of THORChain's "decentralization" on social media garnered far more attention among potential users, as Defendants intended.

23. In truth, THORChain and THORFi were anything but "decentralized"; rather, without its users' knowledge, Defendants exercised full control over the assets held within THORChain's custody.

24. Likewise, contrary to Defendants' public statements, THORChain and THORFi were exposed to RUNE. This meant that when the price of RUNE decreased, THORFi users suffered, and the entire protocol was put at risk.

25. Specifically, in late 2024, THORFi began to unravel as its dependence on RUNE exposed fatal weaknesses in its design. Although Defendants represented that users in the Savers program would have no "RUNE price exposure,"[6] both the Savers and Lending programs were in fact underpinned by RUNE as the core source of collateral and liquidity. As RUNE's value fell, the protocol attempted to mint additional RUNE to meet its obligations, triggering inflation that further eroded RUNE's price and left liquidity pools under-collateralized. This feedback loop—declining prices causing more minting, which caused further price declines—created a cascading loss of confidence, accelerating withdrawals and pushing THORFi into a full-blown liquidity crisis. By early January 2025, RUNE had lost nearly half its value, and the protocol faced hundreds of millions of dollars in unmet liabilities.

26. On January 9, 2025, Thorbjornsen invoked Admin Mimir, thereby freezing all user

---

[5] *See* Declaration of James P. Brennan ("Brennan Decl."), dated April 6, 2026 at ¶ 26 n.12.

[6] https://thorchain.org/yield; *see also* https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057.

withdrawals and loan repayments. This conduct contravened the many public statements about use of Admin Mimir. Later that same day, THORChain node operators[7]—who were responsible for, among other things, securing the THORChain network by validating transactions and overseeing the protocol—voted to overturn Thorbjornsen's unilateral freeze, temporarily re-enabling THORFi Savers and Lending access.

27. On January 24, 2025, however, THORChain node operators voted to suspend both programs indefinitely. Although protocol modifications ostensibly required 67% node approval, on information and belief, the validator set (*i.e.*, the group of computers approved to verify and process transactions on the network) was—and remains—controlled by a small group of insiders controlled by or aligned with Defendants. This decision froze over $200 million in user deposits, including digital assets belonging to Plaintiffs. Since then, Plaintiffs (and other users) have been locked out of their accounts with no means of accessing or recovering their funds.

28. Defendants' conduct directly contradicts their representations that THORChain was non-custodial, decentralized, and governed by transparent community mechanisms. Plaintiffs were not only denied access to their assets but also suffered additional losses from the collapse in the value of RUNE and other market impacts tied to the freeze controlled by Defendants.

29. Upon information and belief, at all relevant times, Thorbjornsen, Barraford, and Nine Realms each independently retained the ability to return Plaintiffs' assets through the protocol's emergency function, dubbed "Ragnarok." Ragnarok occurs automatically when the number of active nodes falls below a certain threshold and returns the remaining funds from

[7] A THORChain node operator runs a validator node—a server that verifies transactions, produces new blocks, and helps secure the network—while also managing cross-chain liquidity pools and earning rewards for maintaining the system's integrity. Theoretically, independent node operators distribute network control and validation across many unrelated participants, ensuring no single person or entity can control transactions, funds, or network decisions.

THORChain's liquidity pools to the users. Allowing Ragnarok to occur would have resulted in THORFi users' access to their native assets being at least partially restored.

30. Since locking out THORFi users—including Plaintiffs—in January 2025, Defendants have refused to return Plaintiffs' assets despite Plaintiffs' demand to do so.

31. Instead, rather than permit Ragnarok to partially restore Plaintiffs' assets, Defendants exacerbated the damages they already caused to Plaintiffs by enacting "Proposal 6." Proposal 6 is a deceptive "restitution" plan which minted a new token, TCY, and purported to denominate users' losses on a one-to-one basis and promised holders 10% of future network fees. In other words, Plaintiffs received one new TCY token for every $1 dollar of liability held. However, at that time, TCY was trading at $0.16 (sixteen cents on the dollar), meaning the TCY token did not even come close to compensating Plaintiffs for their losses.

32. Proposal 6 was a sham. THORChain's revenue had collapsed and, under Proposal 6, repayment in any reasonable time frame is impossible.

33. Plaintiffs entrusted approximately $11.1 million with Defendants in reliance on Defendants' statements that Plaintiffs would always maintain access to their assets and would not be exposed to RUNE. Rather than "become gods with unmatched yields"[8] as Defendants promised, Plaintiffs have suffered and will continue to suffer.

34. Defendants' conduct has caused Plaintiffs to suffer significant financial harm, including the inability to access their digital assets, which remain frozen and inaccessible to Plaintiffs. Plaintiffs seek damages, restitution, and an order compelling Defendants to execute the Ragnarok process, or similar process, to return remaining assets. They also assert claims for conversion, fraud, negligent misrepresentation, unjust enrichment and violations of the New York

---

[8] https://medium.thorfi.io/introducing-thor-nodes-son-of-odin-24dbdfb4f4c7.

Deceptive Practices Act, N.Y. Gen. Bus. Law §§ 349–350.

## PARTIES AND NONPARTIES

### A. Investor Plaintiffs

35. Plaintiffs are individual investors who maintained THORFi accounts and deposited substantial digital, cryptocurrency assets into the Savers and Lending programs.

36. Plaintiff Jamie Shiller is a resident of Puerto Rico who lost approximately $2.8 million worth of Bitcoin ("BTC") and Ethereum ("ETH") in his THORChain Lending account.

37. Plaintiff Geoff Frink is a resident of Texas who lost approximately $2.3 million worth of BTC and ETH in his THORChain Savers account.

38. Plaintiff Brian Kornrumpf is a resident of North Carolina who lost approximately $850,000 worth of BTC in his THORChain Lending account.

39. Plaintiff Jeremy Grainger is a resident of South Carolina who lost approximately $650,000 worth of BTC in his THORChain Lending account.

40. Plaintiff Ryan Treat is a resident of Florida who lost approximately $350,000 worth of BTC and Avalanche ("AVAX") in his THORChain Savers account.

41. Plaintiff Halsey Richartz is a resident of Florida who lost approximately $190,000 worth of BTC in his THORChain Savers account.

42. Plaintiff Amnon Melzer is a resident of South Africa who lost approximately $200,000 worth of BTC and Dogecoin ("DOGE") in his THORChain Savers account.

43. Plaintiff Randy Coran is a resident of California who lost approximately $350,000 worth of BTC, DOGE, Binance Coin ("BNB") and Litecoin ("LTC") in his THORChain Savers account.

44. Plaintiff Brian Dubs is a resident of Oregon who lost approximately $210,000 worth of BTC in his THORChain Savers account.

45. Plaintiff Curtis Hale is a resident of Vermont who lost approximately $370,000 worth of ETH and Tether ("USDT") in his THORChain Savers account.

46. Plaintiff Guy Zilber is a resident of Israel who lost approximately $87,000 worth of ETH and LTC in his THORChain Savers account.

47. Plaintiff Dirk Weiler-Thelemann is a resident of Germany who lost approximately $77,000 worth of BNB in his THORChain Savers account.

48. Plaintiff Darrell Smith is a resident of Texas who lost approximately $80,000 worth of BTC and LTC in his THORChain Savers account.

49. Plaintiff Chad Mielke is a resident of Edmonton, Alberta, Canada who lost approximately $651,000 worth of BTC in his THORChain Lending account.

50. Plaintiff Robert Christiansen is a resident of Utah who lost approximately $2,000,000 worth of USDC in his THORChain Savers account.

**B. Defendants**

51. Defendant Chad Barraford is, on information and belief, an individual residing in the State of New York.

52. Barraford is a co-founder and, at all relevant times, was a lead developer, operator, and public spokesperson for THORChain and THORFi.

53. As part of his role as co-founder, developer, and public promoter of THORChain, Barraford was also responsible for managing and publishing content on THORChain's official website and documentation. To that end, at all relevant times prior to this action, Barraford regularly posted about THORChain and THORFi on his personal social media platforms, such as his X (Twitter) account, @CBarraford.

54. Upon information and belief, Barraford, operating under the pseudonym "Son of Odin," authored significant portions of THORChain's underlying code.

55. Upon information and belief, Barraford met with Thorbjornsen on multiple occasions in New York, including in April 2024, to conduct THORChain-related business, as well as meet with key Nine Realms developers in New York.

56. Defendant John-Paul Thorbjornsen is, on information and belief, an Australian citizen who conducts business in the United States, including in this District, through, at all relevant times, his operation and promotion of THORChain and THORFi and through extensive online activity targeting U.S. and New York investors.

57. Thorbjornsen is a co-founder, and at all relevant times, was a lead developer, operator, and public spokesperson for THORChain and THORFi.

58. As part of his role as co-founder, developer, and public promoter of THORChain, Thorbjornsen was also responsible for managing and publishing content on THORChain's official website and documentation. To that end, at all relevant times prior to this action, Thorbjornsen regularly posted about THORChain and THORFi on his personal social media platforms, such as his X (Twitter) account, @jpthor.

59. Thorbjornsen regularly interacted with New York-based users and developers via THORChain's website, Discord servers, and social media platforms. Upon information and belief, Thorbjornsen traveled to New York on multiple occasions, including in April 2024, to conduct THORChain-related business with Barraford and as well as meet with key Nine Realms developers in New York.

60. Defendant Nine Realms, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Phoenix, Arizona. Upon information and belief, certain key developers reside in New York and operate THORChain within New York.

61. At all relevant times Nine Realms acted as the core developer, operator, and promoter of the THORChain and THORFi protocols. Since 2021, it has been responsible for operational tasks and maintenance of THORChain's infrastructure, planning THORChain version releases, and testing and leading releases of new updates and releases to THORChain's protocol. On or around March 18, 2026, Nine Realms announced that over the next six weeks, it was gradually stepping back from its active role in THORChain.

62. In addition, at all relevant times prior to this action, Nine Realms regularly posted about and promoted THORChain and THORFi on its social media platforms, such as its X (Twitter) account, @ninerealms_cap.

63. Nine Realms served as a node operator for THORChain and earned significant financial benefits through its role. Nine Realms was a seed investor in "THORWallet" in 2021.

**C. Nonparty THORChain**

64. Nonparty THORChain is an unincorporated association consisting of a network of developers, node operators, and promoters ultimately overseen and controlled by Barraford and Thorbjornsen.

65. THORChain maintains a continuous and interactive online presence accessible in the State of New York through its website (thorchain.org), social media accounts, and associated decentralized applications. THORChain conducts business with users in this District by offering, marketing, and facilitating the deposit of digital assets into its "Savers" and "Lending" programs.

66. On information and belief, THORChain's membership includes approximately 100 validator node operators, core developers, and governance participants—many of whom are affiliated with Thorbjornsen, Barraford, and Nine Realms—have actively directed, managed, and controlled THORChain's operations and public communications.

## JURISDICTION AND VENUE

67. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and complete diversity exists among the parties.

68. This Court has personal jurisdiction over Defendant Thorbjornsen because he purposefully directed his conduct toward the United States and this District, disseminating misrepresentations through websites, Discord channels, and social media platforms knowing and intending that investors in New York would rely upon and act on those statements. His conduct caused injury in this District, and the exercise of jurisdiction comports with due process and N.Y. C.P.L.R. § 302(a)(1)–(3).

69. This Court has personal jurisdiction over Defendant Barraford because, on information and belief, he resides in New York, New York, conducts business within this District, and committed the acts and omissions described herein within New York.

70. This Court has personal jurisdiction over Defendant Nine Realms pursuant to its express consent to jurisdiction in the State of New York and its waiver of any defenses relating to personal jurisdiction or venue for purposes of this action.

71. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred within the Southern District of New York, where Defendant Barraford resides.

## STATEMENT OF FACTS

### A. Cryptocurrency Terminology

72. "Blockchain" refers to the digital ledger that, among other things, keeps a record of cryptocurrency transactions in the chronological order in which they occur.

73. "Protocol" refers to the set of rules, or the operating system, that defines how a blockchain network functions.

74. A "node" or "node operator" generally refers to the individual computer or device that, among other functions, makes sure the protocol is being followed. Other types of nodes may, for example, validate and approve transactions, suggest new transactions, and store a history of transactions.

75. "Network" refers to the web of interconnected nodes.

76. "System" refers to the collective network and platform.

77. "Platform" refers to the software application that gives users access to the blockchain system.

78. A "native asset" is the primary cryptocurrency of a blockchain that is created by its protocol. Commonly used native assets include BTC and ETH. Native assets can be used to pay transaction fees, secure the network, and enable value transfer within that system.

79. "Synthetic asset," in the context of THORChain and Savers, refers to a depositor's digital, redeemable claim—and IOU—on pool liquidity. After a user deposited 1 native asset—like BTC—it was converted into a synthetic asset comprised of 50% native BTC and 50% RUNE.

80. "RUNE" refers to THORChain's native cryptocurrency.

81. "Stablecoin" refers to cryptocurrencies designed to have a relatively stable price, achieved by tying the value of the stablecoin to another commodity or currency.

82. "Yield," like interest, refers to return or profit the user generates from depositing cryptocurrency assets into a blockchain network.

83. A "centralized" network refers to one in which a single entity holds customer assets and executes transactions on users' behalf. [9]

84. By contrast, a "decentralized" network refers to one in which applications operate

[9] Brennan Decl. ¶ 16.

through autonomous protocols, and user funds are not held in the custody of any intermediary (*e.g.*, a bank or brokerage firm).[10] Because decentralized finance applications are typically "permissionless," with no central authority capable of controlling or halting activity, they fall outside the regulatory frameworks that govern centralized platforms.[11]

**B. Thorbjornsen, Barraford, and Nine Realms Create THORChain in 2018.**

85. Thorbjornsen and Barraford founded THORChain in 2018.[12]

86. THORChain is a cryptocurrency protocol that enables cross-chain liquidity and yield generation with the capability to facilitate transactions in various forms of cryptocurrency, including BTC and ETH.[13]

87. Since 2018, Thorbjornsen and Barraford have acted as THORChain's controlling developers, public spokespersons, and promoters.

88. Since 2018, Nine Realms served as THORChain's core developer and has authority over all critical operations.[14] Nine Realms tested, deployed, and approved software releases, maintained administrative privileges over protocol parameters, including the Admin Mimir key and Ragnarok, and oversaw all updates. Nine Realms publicly represented itself as providing "[c]ore development and infrastructure for THORChain," responsible for "[m]aintaining public infrastructure for THORChain ecosystem." At all relevant times, THORChain's "Frequently Asked Questions" section of the developer website states that Nine Realms, led by Gavin

[10] Brennan Decl. ¶ 16.

[11] Brennan Decl. ¶ 17.

[12] Brennan Decl. ¶ 15.

[13] https://thorchain.com/.

[14] *See* Brennan Decl. ¶ 19.

McDermott ("McDermott"), has "publicly taken over" the operational responsibilities for the THORChain system.[15]

89. As part of its role in maintaining and supporting THORChain's public infrastructure, Nine Realms was responsible for managing and publishing content and documentation on THORChain's official website (THORChain.org). In addition, on information and belief, Nine Realms managed THORChain's official communication channels, including Medium, Discord, and X (Twitter). Plaintiffs regularly relied on representations and updates made on these communication channels.

90. In addition to managing and publishing content for THORChain, Nine Realms independently promoted it. For example, on November 16, 2022, Nine Realms' CEO, Gavin McDermott, was quoted in a *Financial IT* article promoting THORChain as "revolutionizing earning and lending opportunities."

91. Finally, Nine Realms hosts a podcast, "THORChain Weekly Live." Upon information and belief, since Nine Realms began the podcast in October 2023, it has published over 160 episodes, with Barraford regularly appearing to speak.

92. At all relevant times, Thorbjornsen, Barraford, and Nine Realms acted on their own behalf and THORChain and within the scope of its governance structure. They were responsible for, among other things, maintaining the protocol's codebase (*i.e.,* the complete collection of software code that makes up the system), directing node operators, and publishing official statements through THORChain's website and social media channels.

[15] Brennan Decl. ¶ 20.

93. As early as 2021, Defendants promised THORChain users that they would "become gods with unmatched yields" and that the THOR protocol would be "high, stable, passive, and consistent."[16]

## C. THORChain Boasts THORFi Users' Independence from RUNE.

94. RUNE is THORChain's native cryptocurrency, which functions as an intermediary for cross-chain swaps (*i.e.*, transactions across different blockchain networks) on THORChain's so-called decentralized exchange.

95. Defendants also made representations concerning the Savers and Lending programs exposure to RUNE and the attendant risks.

96. Defendants, through THORChain, expressly represented that the Savers program was insulated from volatility in the price of RUNE. THORChain's official website states: "Savers is the simplest way to provide liquidity to THORChain. Users can deposit any major Layer 1 asset and earn ***without RUNE price exposure***."[17]

97. On X, Defendants promised THORChain users that RUNE would be deflationary—consistently "non-zero and constantly increas[ing]."[18]




[16] https://medium.thorfi.io/introducing-thor-nodes-son-of-odin-24dbdfb4f4c7
[17] https://thorchain.org/yield.
[18] https://x.com/THORChain/status/1689595386602897408.

98. Defendants prominently featured a promise of "Low Risk Liquidity" with "no impermanent loss or RUNE exposure" on THORChain's website.[19]




99. On April 7, 2023, in response to a larger X discussion, Barraford tweeted: "Two important things missed 1) borrowers are not price exposed to $RUNE. So a decline in $RUNE price does NOT incentivize or place pressure on borrowers to close. All the borrower cares about is "can i get my collateral back" which is detached from $RUNE's price."

100. On August 8, 2023, THORChain's official X account promised users that RUNE was "deflationary."[20]




[19] https://thorchain.org/yield.
[20] https://x.com/THORChain/status/1688888467298914304.

101. On August 19, 2023, Defendants, through THORChain's X account, assured its users that even if RUNE's value collapsed, THORFi Lending would be "ok."[21] It further assured users that its node operators would be monitoring inflationary risks closely, and that the risks of the service are "transparent."




102. Defendants pitched to THORChain users that they would not have any exposure to RUNE, and that the risks that did exist were being adequately managed and were transparent. This was not true. In reality, Plaintiffs were exposed to RUNE, RUNE was not stable, and the risks were neither being adequately managed nor transparent.

103. Defendants' representations that users were not exposed to RUNE were material. For Savers, the representation induced users to deposit their native assets (like BTC or ETH) into a system whose solvency depended on an asset to which Defendants specifically told them they

---

[21] https://x.com/THORChain/status/1693063836017033374.

were not exposed or dependent on. For Lenders, the undisclosed dependence on RUNE was material because the protocol's ability to return collateral (*i.e.,* users' deposited assets) depended on RUNE's value relative to such collateral. Once RUNE crashed, the liquidity pool could not cover redemptions, causing the protocol to default on approximately $200 million in liabilities.

### D. Thorbjornsen, Barraford, and Nine Realms Launch and Promote THORFi in 2022 While Touting THORChain's "Decentralization."

104. THORChain purports to be a decentralized network governed by independent node operators.

105. In late 2022 and 2023, THORChain launched two programs under the THORFi brand to attract consumer deposits: Savers and Lending. Prior to launching THORFi, Defendants each touted THORChain's decentralization.

106. For example, on May 17, 2022, Barraford posted on X: "@THORChain can succeed with an algo stable where $UST (and so many others) failed" because "$TOR will always be redeemable for any layer 1 stablecoin on the network (USDT, USDC, BUSD, DAI, etc.)."[22]




107. In other words, Barraford was publicly touting that THORChain's stablecoin—TOR—would not fail where other stablecoins had because TOR was backed by real assets to which users could cash out. This statement positioned THORFi products as a safer option for users, while failing to disclose that the Admin Mimir key could lock out users from withdrawing their assets.

[22] https://x.com/CBarraford/status/1526597142466416640.

108. He further stated there was "little reason for a bank run to occur."[23]

109. The Savers program launched on or around November 12, 2022, and allowed users to earn yield by depositing "layer 1 assets" (*i.e.*, native assets such as BTC and ETH), into the network in exchange for synthetic assets, which could then be deposited into a Savings Vault.

110. Defendants publicly advertised Savers as being a "permissionless, open-source, decentralized, self-custody solution that enable[d] users to earn in-kind yield on native assets without any price exposure to RUNE."[24] This claim was featured prominently on THORChain's website, where any interested user signing up for THORChain's services could see it.




111. Defendants emphasized user control, writing on THORChain's website that users would be able to "***withdraw their principal any time***" because users "maintain full control of their keys" and that it was a "decentralized self-custody solution."[25]

[23] *Id.*

[24] https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057

[25] https://docs.thorchain.org/thornodes/archived/savers-faq.

FREQUENTLY ASKED QUESTIONS

# Savers

## What is a Savers Vault?

Savers Vaults are way to supply single-asset liquidity on THORChain. Any user can simply deposit native Bitcoin, earn in-kind yield, and withdraw their principal any time since they maintain full control of their keys.

- Orginal Launch Article ↗

112. On November 15, 2022—shortly after the day of Savers' launch—*Medium* published an article authored by Nine Realms claiming that "[t]here is no person, group, or entity that can unilaterally control user funds on THORChain."[26]

113. Shortly after the launch, on or around November 29, 2022, Nine Realms posted on X: "Our industry needs decentralized, native asset rails for swapping, risk management, and settlement. This is exactly what @THORChain is designed for. It works, and we are scaling it."

114. Following the launch of Savers, Barraford appeared on a YouTube Q&A on December 1, 2022, during which he assured users that THORFi's risks were "relatively small" and that the protocol was designed so that users' collateral would "always remain available."[27]

115. With respect to THORChain's risk and whether "Lending is not working," Barraford stated: "We'll probably know about it like six months in advance or even 12 months in advance. We'll just kind of see the writing on the wall. I don't expect there to be some sort of like mass exodus of loans just because the only thing that would cause somebody to a mass exodus of loans is if people feel that they might not get their collateral back or their collateral is unavailable

[26] https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057.

[27] https://youtu.be/fUug5MBQBhA?si=2D9O2yX3UkHbXzHW.

and there's no reason to believe that."[28]

116. Barraford would later post on X on or around December 18, 2022, that: "Savers is huge. Pure BTC yield on your BTC. Simple as that, all decentralized, transparent etc."

117. The Lending program was introduced on August 20, 2023, and permitted users to lend native assets (such as BTC and ETH) and borrow thor.tor, a THORChain-issued stablecoin. The program promised users "no interest, no liquidation, and no expiration."[29]

118. Defendants published the following representations on THORChain's official website that Plaintiffs accepted when depositing their cryptocurrency:

- "Users can deposit native assets like Bitcoin, earn yield in-kind, and withdraw their principal at any time, all while maintaining full control of their keys."[30]
- "Savers is the simplest way to provide liquidity to THORChain. Users can deposit any major Layer 1 asset and earn without RUNE price exposure."[31]
- "Users can repay loans at any time, with any amount in any asset."[32]
- "The user will always ha[ve] the right to have their returned collateral if they repay the loan."[33]

119. Barraford posted on X on or around April 3, 2024, that the "golden rule of the protocol is never to put collateral at risk, i.e., block users from closing loans."

---

[28] https://youtu.be/fUug5MBQBhA?si=2D9O2yX3UkHbXzHW; Brennan Decl. ¶ 23.

[29] https://medium.com/thorchain/lending-on-thorchain-646bbf2e6e1b.

[30] https://docs.thorchain.org/thornodes/archived/savers-faq.

[31] https://thorchain.org/yield.

[32] https://docs.thorchain.org/thornodes/archived/lending.

[33] *Id.*




120. These representations were false. In reality, Thorbjornsen, Barraford, and Nine Realms retained centralized control over THORChain through access to a developer override mechanism, Admin Mimir, that could disable THORFi users' access to their Savers and Lending accounts and prevented them from withdrawing assets, without their consent.[34]

121. On the flip side, Thorbjornsen, Barraford, and Nine Realms had the ability to permit Ragnarok to occur, the function which would counteract the Admin Mimir freeze and partially restore THORFi users' access to their native assets.

122. THORChain's misrepresentations about its decentralization and its users' independence from RUNE are prominently featured on the website. By contrast, users can find THORChain's acknowledgement of the existence of the Admin Mimir key and Ragnarok only by clicking through hyperlinks found at the bottom of THORChain's homepage and by scrolling and expanding multiple sub-sections of THORChain's technical and operational documentation.

**E. Plaintiffs Open THORFi Accounts in Reliance on Defendants' Representations.**

123. Each Plaintiff saw and accepted Defendants' representations before they opened THORFi accounts and deposited approximately $11.1 million worth of digital assets.

[34] https://medium.com/chainargos/hammering-thorchain-its-totally-centralized-with-hard-coded-admin-keys-15a8876e149a

124. Through each Defendants' access to the Admin Mimir key, each Defendant exercised dominion over Plaintiffs' digital assets.

125. By depositing their digital assets into THORChain, and by extension, placing their digital assets under Thorbjornsen, Barraford, and Nine Realms' control, Plaintiffs have a close relationship with each Defendant.

126. **Plaintiff Jamie Shiller** had direct communication with Barraford over Telegram—an instant messaging application—in or around March 2024. Barraford assured Plaintiff Shiller that the Lending program was safe and stated that THORFi had "mechanisms to protect again[st] things like price manipulation and bank runs." Plaintiff Shiller attended two web meetings featuring Barraford. The first was a group Zoom meeting on March 12, 2024, during which Barraford was a featured speaker and was actively promoting THORFi. During that call, Barraford explained the Savers and Lending programs. The second was a one-on-one private meeting on March 20, 2024, during which Barraford explained the protocol's safety mechanisms. Plaintiff Shiller also reviewed THORChain's documentation on its website and other social media posts that assured users that the Lending program was decentralized, self-custodial, and no liquidation. Plaintiff Shiller also watched publicly available videos and podcasts which aired between December 1, 2022, and March 15, 2024, and which featured Barraford discussing THORChain and THORFi. In reliance on Defendants' representations, Plaintiff Shiller deposited a total of approximately 582.536 ETH and 8.457 BTC into THORFi Lending, on or around March 18, 2024, to April 1, 2024, through multiple transactions.

127. **Plaintiff Halsey Richartz** reviewed THORChain's promotional materials on its website and amplified across social media and understood, based on those materials, that the Savers program would allow him to earn passive yield on his BTC—without exposure to RUNE

and without relinquishing control of his assets. Plaintiff Richartz never intended to sell his BTC and, based on Defendants' representations about THORFi, viewed THORFi as a low-risk method of generating returns on his holdings. In reliance on Defendants' representations, Plaintiff Richartz deposited 1.78 BTC into the Savers program from on or around February 25, 2023, to May 18, 2024.

128. **Plaintiff Brian Kornrumpf** was introduced to THORFi Savers through THORChain's documentation on its website, social media posts from Thorbjornsen, Barraford and THORChain (@THORChain and @thorchain-admin), and other community forums (including the THORChain Community Telegram, and THORChain University and ThorSwap Discord channels). Plaintiff Kornrumpf also reviewed Medium articles published by Nine Realms and researched Thorbjornsen to understand his credibility in the cryptocurrency industry. He understood, based on those representations, that he would be able to earn yield on his assets and could withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Kornrumpf deposited 13.1 BTC into the Lending program starting from on or around March 8, 2024. Kornrumpf also redeemed some loans during that period, with ultimately approximately 8.1 BTC lost in the Lending program.

129. **Plaintiff Amnon Melzer** learned of THORFi Savers through posts on X. Based on representations made on THORChain's website, Medium, and through social media, Plaintiff Melzer understood that THORFi Savers was decentralized and that he could use it to earn yield on his digital assets without any price exposure to RUNE and that he would be able to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Melzer deposited 1.845 BTC and 12,153.65 DOGE into the Savers program on or around November 30, 2023, through May 20, 2024.

130. **Plaintiff Ryan Treat** learned of the THORFi Savers program through Defendants' promotion on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Treat understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Treat deposited approximately 2.997 BTC and 1,006.38 AVAX into the Savers program on or around March 20, 2023, to November 8, 2024.

131. **Plaintiff Geoff Frink** learned of the THORFi Savers program through his Edge wallet, which displayed information derived from THORChain's publicly distributed materials.[35] Defendants intended and expected that third-party wallets such as Edge would convey their representations to users, including assurances that deposited assets would remain under user control and could not be frozen. Relying on those representations, Plaintiff Frink understood that his assets would remain accessible at all times. Plaintiff Frink also understood the only risk of staking[36] to be a short un-staking delay of 8–10 days and was not warned of any other risks. In reliance on Defendants' representations, Plaintiff Frink deposited approximately 16.682 BTC and 153.804 ETH into the Savers program on or around November 13, 2024.

132. **Plaintiff Jeremy Grainger** learned of THORFi Lending's representations through Defendants' promotion on social media, including by watching their weekly meetings posted to YouTube, that it was decentralized, self-custodial, and offered loans with no interest, no liquidation, and no expiration. Plaintiff Grainger also reviewed Defendants' representations on the THORChain website and in its documentation that he could close out his loans at any time and have his collateral returned. In reliance on Defendants' representations, Plaintiff Grainger

---

[35] https://edge.app/blog/company-news/edge-rolls-out-thorchain-savers-and-dex-aggregator.

[36] Crypto staking is the process that some blockchain networks use to validate transactions and maintain security on the blockchain in exchange for earning additional crypto rewards.

deposited approximately 11.527 BTC into the Lending program and received approximately 4.877 BTC and 48,968 USDC in loans.

133. **Plaintiff Randy Coran** learned of THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Coran understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Coran deposited approximately 354.73 BNB, 0.9283 BTC, 14,761.8 DOGE, and 8.43 LTC into the Savers program starting on or around May 23, 2024.

134. **Plaintiff Brian Dubs** learned of THORFi Savers through Defendants' promotion of the program on social media (including via @THORChain and @thorchain-admin), the THORChain website, Medium articles, and other online forums. Based on these representations, Plaintiff Dubs understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Dubs deposited approximately 2 BTC into the Savers program on or around December 2, 2023.

135. **Plaintiff Guy Zilber** learned of THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Zilber understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Zilber deposited approximately 23.96 ETH and 64.05 LTC into the Savers program on or around January 2, 2024, to September 2, 2024.

136. **Plaintiff Curtis Hale** learned of THORFi Savers through Defendants' promotion of the program on social media (including via @jpthor and @THORChain), the THORChain website, and other online forums (including listening to webcasts and group calls on X). Based

on these representations, Plaintiff Hale understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Hale deposited approximately 64.57 ETH and 155,532 USDT into the Savers program on or around December 9, 2024, to December 11, 2024.

137. **Plaintiff Dirk Weiler-Thelemann** learned of THORFi Savers through the THORChain website and other online resources. Plaintiff Weiler-Thelemann participated in discussions and asked questions on THORChain Telegram and Discord. Based on these representations, Plaintiff Weiler-Thelemann understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Weiler-Thelemann deposited approximately 112.5 BNB into the Savers program on or around February 23, 2023, to February 27, 2023.

138. **Plaintiff Darrell Smith** learned about THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Smith understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Smith deposited approximately 0.747 BTC and 15.31 LTC into the Savers program on or around November 12, 2023, to January 10, 2024.

139. **Plaintiff Chad Mielke** learned about THORFi Lending through Defendants' promotion of the program on social media (including via @CBarraford and @THORChain), the THORChain website, and other online forums (including a podcast featuring Barraford on or around March 15, 2024). In reliance on Defendants' representations, Plaintiff Mielke deposited approximately 6.26 BTC into the Lending program on or around March 26, 2024.

140. **Plaintiff Robert Christiansen** learned of THORFi Savers through its promotion

across social media and through THORChain's website. Plaintiff Christiansen understood that THORFi Savers was decentralized and that he could use it to earn yield on his digital assets without any price exposure to RUNE and that he would be able to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Christiansen deposited $2,005,133.32 USDC into the Savers program on or around December 23, 2025, and December 24, 2025.

141. Each Plaintiff has been unable to access or recover their assets since January 2025 due to Defendants' arbitrary and centralized exercise of the Admin Mimir key, unlawfully preventing Plaintiffs from accessing their deposits, in direct contravention of Defendants' representations Plaintiffs relied on before making their deposits.

## F. RUNE's Inherent Flaws Lead to Its Collapses.

142. THORFi's collapse was a direct result of its reliance on RUNE.

143. THORFi's failure stemmed from three structural flaws that Defendants built into the protocol's economic design—flaws that guaranteed collapse once RUNE failed to outperform the assets users deposited. RUNE exposure was not just incidental to participation in the Savers and Lending program. It was *essential* to it.

144. *First*, as RUNE's price declined, THORFi was forced to mint additional RUNE to satisfy loan and synthetic-asset obligations, diluting token value and fueling inflation. THORChain's economic model depended on the continuous minting and burning of RUNE to maintain liquidity and collateral across the network. When users provided assets such as BTC or ETH to THORFi, those deposits were immediately converted into RUNE.[37] The RUNE was then "burned" when swapped for a borrower's desired cryptocurrency, and new RUNE was minted

[37] Brennan Decl. ¶ 45.

when loans were repaid to repurchase the original collateral.[38] The system was thus designed to function as a self-reinforcing engine supporting RUNE's price performance relative to major assets like BTC and ETH.[39]

145. *Second*, the decline in RUNE's value relative to native assets such as BTC and ETH left liquidity pools incapable of honoring redemptions. To meet withdrawal requests, the protocol was forced to liquidate additional RUNE, which in turn drove RUNE's price lower. THORFi's instability was rooted in this fundamental reliance on RUNE, contrary to Defendants' representations to the contrary. According to THORChain's own published materials, the Lending platform's assumptions depended on RUNE appreciating at twice the rate of BTC—for example, if BTC's price increased fivefold, RUNE was expected to increase tenfold.[40] This model meant that THORFi could only remain solvent if RUNE consistently outperformed the very assets deposited by users. When that did not occur, the protocol's stability evaporated: falling RUNE prices forced additional minting to cover redemptions, increasing supply and accelerating devaluation.

146. *Third*, each decline in RUNE's price triggered additional minting, compounding inflation and further weakening collateral. This feedback loop eroded user confidence, prompted mass withdrawals, and produced the "bank run" that crippled the protocol. THORFi's architecture rested on the critical assumption that RUNE's market value would remain stable or appreciate over time. But RUNE lost approximately 38% of its value in the two years preceding the freeze, exposing the design's inherent fragility and precipitating instability across the THORChain ecosystem.

---

[38] *Id.* ¶¶ 46-47.

[39] *Id.* ¶ 48.

[40] *Id.* ¶ 49; *see* https://thorchain-community.medium.com/under-the-hood-lending-101-f934e1c22792.

147. Empirical performance data confirmed the model's instability. On August 23, 2023 (three days after THORFi's Lending program launched), BTC traded at approximately $26,128.04 while RUNE traded at $1.13.[41] By January 23, 2025, just before the platform was indefinitely halted, BTC had risen to $104,064.98—an appreciation of nearly 300%—whereas RUNE had increased only to $1.50, or about 33%.[42] Because the protocol's collateral reserves were denominated in RUNE, this divergence meant that THORFi no longer held enough value to repurchase the cryptocurrency originally deposited by users.[43] As lenders and savers sought to redeem their positions, THORFi lacked the liquidity to make them whole.[44]

148. The structural imbalance caused a liquidity crisis. As borrowers attempted to repay loans and lenders sought to withdraw collateral, the shortfall between RUNE's weak appreciation and BTC's surge rendered the protocol insolvent. Depositors' assets—having been converted into RUNE—were effectively wiped out. The zero-interest, no-expiration loans that Defendants marketed as "risk-free" had in fact been predicated on the false assumption that users would not redeem their deposits before RUNE's price caught up to or exceeded BTC's. When that assumption proved untrue, THORFi collapsed.

149. THORFi's instability was therefore inherent to its design. Its core financial mechanisms—the Lending platform, synthetic asset system, and Savers vaults—were interdependent in a way that amplified, rather than mitigated, risk. As one component faltered, it compounded stress on the others, triggering a cascade of failures throughout the network.

150. By early January 2025, these defects converged into a full-blown crisis. RUNE's

---

[41] *Id.* ¶¶ 50-52.

[42] *Id.*

[43] *Id.* ¶ 53.

[44] *Id.* ¶ 54.

value had fallen approximately 40% in a single week, and THORChain faced more than $200 million in outstanding user liabilities it could not meet. Liquidity pools were exhausted, node operators began exiting the network, and the entire protocol teetered on collapse.

151. THORChain's own design set the stage for its downfall. The protocol's dependence on RUNE—used to support its Lending system, synthetic assets, and Savers vaults—made it uniquely vulnerable to market fluctuations. As RUNE's price fell, the protocol had to mint even more RUNE and liquidate reserves to satisfy obligations, which further depressed RUNE's value. Each attempt to stabilize the system only worsened the decline, creating a self-reinforcing downward spiral that culminated in the January 2025 freeze and the permanent loss of user assets.

### G. Thorbjornsen Executes Admin Mimir to Freeze THORFi User's Assets and Prevent a Bank Run.

152. On January 9, 2025, due to high volatility in RUNE's price,[45] Thorbjornsen unilaterally disabled Plaintiffs' ability to withdraw assets from THORFi Savers and close loans in THORFi Lending by activating the Admin Mimir key.

153. Unbeknownst to Plaintiffs, the Admin Mimir key is an administrative function that allowed modification of the protocol without a node operator vote, circumventing the protocol's decentralized governance system. On information and belief, insider-developers such as Barraford and Nine Realms also had access to the Admin Mimir.

154. Despite Defendants' representations to the contrary, the commands to freeze THORFi functions *were built into THORChain's code* and readily accessible by Admin Mimir.[46]

155. This action, made possible by Defendants' centralized control over the protocol's infrastructure, froze Plaintiffs' access to their deposited assets and halted all activity on the

---

[45] Brennan Decl. ¶ 24.

[46] Brennan Decl. ¶ 36.

platform. As a result, Plaintiffs were: (1) prevented from opening new loans, (2) prevented from repaying existing loans, and, critically, (3) prevented from withdrawing cryptocurrency from their wallets.

156. THORChain's own protocol developers admitted in the Discord developer chat[47] that this decline in RUNE price and "bank run" on the platform was self-inflicted by Thorbjornsen's actions.[48] As seen in the screenshot below, "pluto9r," a core THORChain developer working at Nine Realms, agreed that Thorbjornsen was at fault.[49]




157. Some news outlets reported that the freeze occurred because THORChain had insufficient BTC to repay lenders due to price fluctuations in BTC and a lack of liquidity.[50]

158. Thorbjornsen's actions contradicted his own, Barraford's, and Nine Realms' representations through THORChain that users could "withdraw their principal at any time," [51] and that THORChain was a purportedly "decentralized self-custody solution."[52]

159. Thorbjornsen's unilateral freeze was so controversial that, later that same day, node operators voted to overturn Thorbjornsen's freeze, temporarily re-enabling THORFi Savers and

---

[47] Discord is a communication app where users can communicate in real-time through various channels for specific topics. The "Discord developer chat" was a message board specifically dedicated for THORChain developers to discuss development needs of the protocol.

[48] Brennan Decl. ¶ 32.

[49] *Id.*

[50] Brennan Decl. ¶ 33.

[51] https://docs.thorchain.org/thornodes/archived/savers-faq.

[52] https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057.

Lending access.

160. The brief re-enablement of loan redemptions lasted only until January 24, 2025. As RUNE's price continued to deteriorate, Thorbjornsen posted on X on January 23, 2025, that, if RUNE fell below $2.50, he would urge node operators to "pause loan redemptions" again—publicly signaling his intent to trigger another freeze.[53]




161. Yet even before RUNE reached that threshold, THORChain's node operators voted to freeze THORFi once again. This premature vote underscored that the outcome was effectively predetermined and guided by Thorbjornsen's insider influence rather than any neutral or decentralized governance process.[54]

162. A January 24, 2025, capture of THORChain's Mimir governance Application Programming Interface ("API")[55] confirmed how easily the pause could be executed: the

[53] Brennan Decl. ¶ 34.

[54] Brennan Decl. ¶ 35.

[55] THORChain's Mimir governance API is the on-chain interface through which node operators vote on and set network configuration parameters.

administrative command to halt loan redemptions was embedded directly in the protocol's code and could be activated at will by system administrators such as Thorbjornsen and Nine Realms.[56]

```
"PAUSELOANS": 1,
```

163. This shutdown persists to this day, despite THORChain's claim that the Lending and Savers services were only "currently paused." THORChain further claimed that "[t]his interruption is expected to last approximately 90 days."




164. Nine Realms claimed that THORFi was only "temporarily paused."[57]




165. On information and belief, there is no plan to return user assets.

166. Defendants' suspension of loan redemptions, in direct violation of the public

---

[56] Brennan Decl. ¶ 36.

[57] Brennan Decl. ¶ 37.

statements they made to the contrary, triggered a bank run. Users of THORChain lost faith in RUNE and the stability of THORChain and rushed to withdraw assets while the value of RUNE plunged.

167. Following Thorbjornsen's unilateral decision to pause loan redemptions, an account with the username named "Leena" posted in the THORChain Discord server informing users of the pause and stating that community members, developers and node operators were involved in the decision. This was false.




168. In fact, there was no "Leena." This was a fictitious persona invented by Thorbjornsen to falsely assuage concerns about THORChain users' lost cryptocurrency.[58]

169. In a podcast interview on June 20, 2024, Thorbjornsen acknowledged that he created the "Leena" persona as a means to remain anonymous and portray the THORChain ecosystem as decentralized when, in fact, it was not.[59]

170. By January 29, 2025, RUNE was in "free fall" and "lost about 40% of its value" in a single week.[60]

---

[58] *See* Brennan Decl. ¶ 29.

[59] https://www.youtube.com/watch?v=K-TwFU10Cd4.

[60] https://thecryptogateway.it/en/rune-thorchain-crash/.

171. At the time of the pause, THORChain had accrued approximately $200 million in outstanding liabilities.[61]

172. The implosion of THORChain was exacerbated by a subsequent exodus of node operators—who were responsible for securing the network by validating transactions and bonding RUNE as collateral—from the system following the initial devaluation of RUNE. On February 1, 2025, twenty node operators requested to leave the THORChain network with one Discord user responding to this news with "If that's the case we're done."




173. The remaining node operators began to sell RUNE, thereby exacerbating the devaluation of RUNE and collapse of THORFi by further withering the confidence of investors; damaging the security and efficiency of the network by reducing its decentralization; and flooding the crypto market with a new supply of RUNE by releasing RUNE previously held in the network as leverage over nodes in the form of bonds. With the node operators selling RUNE into the

[61] https://medium.com/thorchain/thorfi-unwind-96b46dff72c0.

market, the liquidity pool depth shrank and reduced the protocol's capacity to honor Lending users' redemptions (had users been able to redeem).

174. Thorbjornsen's invocation of Admin Mimir demonstrated that insiders, like Barraford and Nine Realms—in addition to Thorbjornsen himself—retained centralized control over the network. Contrary to Defendants' marketing claims, users had no self-custody over their assets and no recourse once the Admin Mimir function was initiated.

175. On February 10, 2025, THORChain shared to the public via X that the "admin mimir" function has been removed and that now node operators have control over the network.[62] This was another public admission by Defendants that THORChain was never fully decentralized.[63]




## H. Defendants' Refusal to Permit Ragnarok and the TCY "Restitution" Scheme.

176. After the freeze, Defendants retained the ability to permit Ragnarok, THORChain's emergency shutdown and asset-return mechanism that unwinds the network and returns all remaining user funds from its liquidity pools, and lending positions back to depositors.

[62] https://x.com/THORChain/status/1888991030424297652.

[63] Brennan Decl. ¶ 43.

Specifically, THORChain's documentation states that "[a]ll funds are automatically returned to users" when Ragnarok is triggered.[64]

177. On February 28, 2025, Thorbjornsen acknowledged on X that THORChain had the ability to shut down the protocol and return a portion of users' funds, but opted not to.[65]

178. A conversation in the THORChain developer chat on February 1, 2025, revealed that there was still a form of liquidity in the system, belonging to "Savers," that was still available, but not accessible to users.




179. Following the pause of loan redemptions, community members submitted proposals to resolve the debt situation. Though eight proposals were submitted, Thorbjornsen encouraged participants to support "Proposal 6," which maintained THORFi rather than closing it.[66]

180. On February 3, 2025, THORChain's governance body[67] adopted "Proposal 6," as part of its response to the platform's debt crisis. Under Proposal 6, THORChain established a new token called "TCY." Proposal 6 minted 210 million TCY tokens, with users able to claim one TCY per $1 owed to them by the protocol, and promised TCY holders 10% of future network swap

---

[64] https://docs.thorchain.org/technical-documentation/technical-deep-dive/governance.

[65] Brennan Decl. ¶ 44.

[66] Brennan Decl. ¶ 38.

[67] The THORChain governance body refers to the network's community of node operators who collectively manage protocol upgrades, parameter changes, and ecosystem decisions.

fees in order to compensate users. The plan also eliminated THORFi products, including Lending and Savers.

181. Thorbjornsen publicly endorsed Proposal 6, describing it as a "community proposal" that would allow THORChain to "keep the synth liquidity." Keeping the liquidity of the pool of synthetic assets benefitted Thorbjornsen because the pool continued to generate fees that otherwise would not be available had users been able to withdraw their assets or redeem their loans.




182. The TCY token provided no real restitution. It was an IOU dependent on future THORChain revenues, not backed by any assets or reserves. It conveyed no ownership rights and could not be redeemed by THORChain users for deposited assets.

183. THORChain processes approximately $77.6 million worth of trade on a daily basis, however this can fluctuate depending on market conditions.[68] The market price for TCY is consistently well under one dollar. According to some calculations based on THORChain's

[68] https://www.coingecko.com/en/exchanges/thorchain.

estimated fees, it will take approximately 74 years for each TCY token to reach a value of $1 and match the amount owed to debtors.[69]

184. Community members immediately recognized the futility of the plan. One user summarized: "$200M in deposits won't be repaid. TCY + 10% RUNE won't restore value. Seems more like a way to get rid of creditors & dodge legal risks."




185. The TCY "restitution" plan was a sham, designed by Defendants to stall accountability and maintain the protocol's control over THORChain assets. It served no purpose other than to give the illusion of remediation while depriving users of recovery.

**I. Defendants Ignore Plaintiffs' Post-Freeze Outreach.**

186. Defendants unilaterally froze Plaintiffs' accounts without warning and then ignored their communications demanding answers and the return of their funds.

187. On or around January 10, 2025, Plaintiff Shiller sent direct messages to Thorbjornsen via X and to Barraford via Telegram inquiring about the freeze. Neither Defendant responded. Plaintiff Shiller also actively engaged on the THORChain Developer Discord to ask questions and attempt to find solutions to return THORFi users' assets. His Discord account was

[69] Brennan Decl. ¶¶ 55-60.

subsequently banned for, upon information and belief, stating the Thorbjornsen should be held responsible.

188. Plaintiff Hale sent multiple direct messages to Thorbjornsen, all of which went unanswered. On or around January 25, 2025, Plaintiff Hale expressed his dislike of the community proposals and on or around February 9, 2025, referring to Proposal 6, Plaintiff Hale told Thorbjornsen that he hoped that he would buy his TCY at $1.00 each. Finally, on February 15, 2025, Plaintiff Hale sent Thorbjornsen and Barraford similar messages demanding that his Savers account be made whole.

189. On or around February 17, 2025, Plaintiff Richartz also sent direct messages to Thorbjornsen, THORChain, and Nine Realms on their respective X accounts requesting his digital assets be returned. No Defendant responded.

190. On June 17, 2025, and July 12, 2025, Plaintiff Weiler-Thelemann sent emails to support@thorswap.finance requesting reimbursement of his funds. No one replied.

191. On June 10, 2025, Plaintiffs' counsel sent a letter to Thorbjornsen, Barraford, and Nine Realms demanding that Defendants return Plaintiffs' assets.

192. As of the filing of this Complaint, Defendants have not executed the Ragnarok recovery (or any similar process to return user assets), distributed restitution, or restored user access. Plaintiffs' assets remain frozen.

**J. Pattern of Misconduct**

193. In 2024, Thorbjornsen launched Vultisig, a decentralized cryptocurrency wallet platform.[70] After Thorbjornsen stepped away from THORChain, claiming that the project had outgrown his-early stage, high-risk leadership approach, Vultisig became his main focus.

[70] Brennan Decl. ¶¶ 61.

Blockchain analysis shows that millions of RUNE were swapped for USDC through wallets linked to the Vultisig treasury, suggesting that funds derived from THORFi may have been diverted to support his new enterprise.[71]

194. Taken together, these facts demonstrate a recurring pattern of self-dealing and misuse of investor assets by Thorbjornsen and his associates—first through the exploitation of RUNE markets and later through the diversion of value into affiliated projects. Their manipulation of THORChain's liquidity and concealment of conflicts of interest not only accelerated THORFi's collapse but also reveal Thorbjornsen's intent to enrich himself at the expense of users who relied on their assurances of decentralization and transparency.

**K. Defendants Benefit While Plaintiffs Assets Remain Frozen.**

195. Since the January 2025 freeze, each Defendant has benefited at the expense of Plaintiffs.

196. Although the Savers and Lending programs have both been shut down, THORChain continues to operate. Thorbjornsen and Barraford each continue to promote THORChain on their personal social media platforms and through other online platforms. On information and belief, Thorbjornsen and Barraford continue to benefit because Plaintiffs frozen assets maintain a liquidity pool for THORChain, which powers transactions on the protocol and generates fees and revenues, portions of which are paid to Thorbjornsen and Barraford.

197. Since the January 2025 freeze, Nine Realms has benefited by continuing to earn node operator rewards and payments into THORChain's Developer Fund, from which Nine Realms receives a portion.

**L. Resulting Harm to Plaintiffs.**

[71] Brennan Decl. ¶¶ 62-67.

198. Defendants' conduct directly caused Plaintiffs' losses.

199. Each Plaintiff has been permanently deprived of access to their cryptocurrency, valued collectively at over approximately $11.1 million.

200. Plaintiffs also suffered lost yield, diminished asset value, and consequential losses. Defendants' refusal to permit Ragnarok and return each Plaintiff's funds ensured their damages were permanent.

## COUNT I – CONVERSION

201. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

202. Plaintiffs owned and had the right to possess the cryptocurrency they deposited into the THORFi Savers and Lending programs.

203. Defendants exercised wrongful dominion and control over Plaintiffs' cryptocurrency assets by:

a. Developing and maintaining the Admin Mimir key that enabled circumvention of the protocol's decentralized governance system;

b. Invoking the Admin Mimir on January 9, 2025, thereby freezing all withdrawals;

c. Refusing to permit Ragnarok or any comparable recovery mechanism to restore users' assets; and

d. Retaining protocol fees and developer rewards derived from users' trapped deposits.

204. Such conduct was intentional, unauthorized, and inconsistent with Plaintiffs' ownership rights.

205. As a direct result, Plaintiffs have been permanently deprived of their property and have suffered losses exceeding approximately $11.1 million, plus consequential and punitive damages.

## COUNT II – COMMON LAW FRAUD

206. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

207. Defendants knowingly made false and misleading representations of material fact to Plaintiffs and the public, including but not limited to the following:

a. That THORFi's Savers and Lending programs were "decentralized," "self-custodial," and "permissionless," and that users "maintain full control of their keys" and "may withdraw their principal at any time";

b. That users were "insulated from RUNE price exposure" and faced "low-risk liquidity with no impermanent loss";

c. That RUNE was "deflationary" and "constantly increasing in value"; and

d. That there existed no person or entity with unilateral authority to control or restrict user assets.

208. At the time these statements were made, Defendants knew them to be false or made them with reckless disregard for their truth. In reality, Defendants retained centralized control of user assets through the Admin Mimir override and knew that THORFi was structurally dependent on the volatile value of RUNE.

209. Defendants made these misrepresentations with the intent to induce Plaintiffs and other users to deposit digital assets into THORFi's Savers and Lending programs and to generate fees and value for Defendants.

210. Plaintiffs reasonably relied on Defendants' representations in choosing to deposit their assets.

211. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiffs suffered damages exceeding approximately $11.1 million, together with lost yield, loss of market value, and consequential harm.

212. Defendants' conduct was willful, malicious, and undertaken in bad faith,

warranting an award of punitive damages.

**COUNT III – NEGLIGENT MISREPRESENTATION**

213. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

214. Defendants were core developers, promoters, and spokespersons of THORChain and provided information about THORChain to Plaintiffs. Specifically, Defendants publicly disseminated representations about THORChain for the purpose of inducing prospective users, including Plaintiffs, to deposit digital assets into THORFi's Savers and Lending program and to generate fees and value for Defendants.

215. As Plaintiffs' provider of information regarding THORChain, Defendants owed Plaintiffs a duty to impart complete and correct information.

216. Defendants made false and misleading representations about THORChain to Plaintiffs, including but not limited to the following:

a. That THORFi's Savers and Lending programs were "decentralized," "self-custodial," and "permissionless," and that users "maintain full control of their keys" and "may withdraw their principal at any time";

b. That users were "insulated from RUNE price exposure" and faced "low-risk liquidity with no impermanent loss";

c. That RUNE was "deflationary" and "constantly increasing in value"; and

d. That there existed no person or entity with unilateral authority to control or restrict user assets.

217. Defendants made these representations in advertisements, social media posts, and on the THORChain website for the purpose of inducing prospective users, including Plaintiffs, to deposit digital assets into THORFi's Savers and Lending program and to generate fees and value for Defendants.

218. The Defendants' representation that THORChain was decentralized and that there was no person or entity with unilateral authority to control or restrict user assets was materially false and misleading because Defendants retained centralized control of user assets through the Admin Mimir override. Defendants' representation that THORChain users were insulated from RUNE price exposure and that RUNE was deflationary was materially false and misleading because THORFi was structurally dependent on the volatile value of RUNE.

219. Defendants knew or should have known Plaintiffs would rely on the misrepresentations because Defendants publicly represented themselves as core developers and spokespersons of THORChain and specifically directed their advertising and promotional statements to prospective THORChain users, including Plaintiffs.

220. Plaintiffs relied on Defendant's misrepresentation by viewing their advertisements and promotional statements through THORChain's documentation on its website, social media posts, and other online forums and depositing assets into THORFi's Savers and Lending program in reliance on those misrepresentations.

221. Plaintiffs' reliance on Defendants' misrepresentation was both reasonable and justifiable because these statements were made directly by the developers, promoters, and spokespersons of THORChain and were presented as accurate information intended to induce reliance.

222. Plaintiffs had no reason to doubt the accuracy of Defendants' representations regarding THORChain because the representations were made by THORChain's founders and core developers, disseminated through official promotional channels, and appeared consistent with THORChain's stated functionality.

223. As a direct and proximate result of relying on Defendants' misrepresentations, Plaintiffs suffered damages exceeding approximately $11.1 million, together with lost yield, loss of market value, and consequential harm.

224. Defendants' negligent misrepresentation, inducing Plaintiffs' reliance thereon, was a direct and proximate cause of Plaintiffs' loss, which Plaintiffs would not have sustained but for Defendants' misrepresentations.

225. As a result of Defendants' negligent misrepresentation, Plaintiffs are entitled to an award of damages in an amount to be proved at trial, but no less than approximately $11.1 million.

**COUNT IV – UNJUST ENRICHMENT**

226. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

227. Defendants have been unjustly enriched at Plaintiffs' expense as a result of their wrongful conduct in marketing, operating, and controlling the THORFi Savers and Lending programs.

228. Defendants induced Plaintiffs to deposit their cryptocurrency into THORFi's programs and Plaintiffs relied on Defendants' representations in doing so.

229. Plaintiffs conferred a specific and direct benefit upon Defendants by depositing such cryptocurrency, valued at more than approximately $11.1 million, into THORFi's programs. Those deposits increased the liquidity on the THORChain network, generated transactions fees and node rewards for Defendants, and enhanced the value of RUNE and other assets Defendants held or controlled.

230. Defendants knowingly accepted and retained those benefits despite their unequivocal statements that Plaintiffs would always have access to their assets and even after freezing Plaintiffs' accounts, refusing to return their property, and continuing to receive economic

benefits from Plaintiffs' trapped deposits.

231. Defendants' retention of these benefits is inequitable and against good conscience because they misrepresented the nature of THORFi's operation, concealed their centralized control, and used Plaintiffs' funds to sustain and enrich themselves at Plaintiffs' expense.

232. Plaintiffs are entitled to restitution and disgorgement of all benefits conferred upon Defendants, together with interest and all equitable relief necessary to restore them to the position they occupied prior to Defendants' wrongful acts.

**COUNT V – VIOLATION OF N.Y. GEN. BUS. LAW §§ 349–350**

233. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

234. Defendants, in the regular course of THORChain's business, engaged in unfair and deceptive acts by:

a. Falsely advertising THORFi as decentralized, self-custodial, and low-risk;

b. Falsely advertising that THORFi savers had no exposure to the price of RUNE;

c. Concealing its ability to freeze user funds through Admin Mimir; and

d. Continuing to market THORFi as safe during its collapse.

235. Defendants' willful and knowing conduct was consumer-oriented and likely to mislead reasonable consumers.

236. Plaintiffs were injured as a result and seek actual, statutory, and treble damages, plus attorneys' fees under §§ 349(h) and 350-e.

**PRAYER FOR RELIEF**

237. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and award the following relief:

a. Awarding Plaintiffs compensatory damages for the full fair-market value of Plaintiffs' converted and detained cryptocurrency assets, including all consequential, incidental, and expectancy losses arising from Defendants' misconduct;

b. Awarding Plaintiffs restitution and disgorgement requiring Defendants to return any funds, tokens, or assets wrongfully obtained or retained through their operation of the THORFi programs, including protocol rewards, transaction fees, or developer payments derived from user deposits;

c. Awarding Plaintiffs compensatory damages arising from Defendants' fraud;

d. Awarding Plaintiffs punitive damages to punish and deter Defendants' willful, malicious, and fraudulent conduct, including their deliberate concealment of the Admin Mimir control function, and their refusal to execute the Ragnarok recovery process;

e. Awarding Plaintiffs restitution and disgorgement of all benefits unjustly obtained;

f. Awarding Plaintiffs statutory and treble damages under N.Y. Gen. Bus. Law §§ 349–350;

g. Injunctive and equitable relief, including but not limited to an order compelling Defendants to:

   (1) Immediately execute or cooperate in the execution of the Ragnarok recovery process, or similar process, to return all remaining digital assets to Plaintiffs and similarly situated users;

   (2) Disclose, preserve, and account for all on-chain and off-chain assets under their control related to THORFi Savers and Lending programs; and

   (3) Refrain from further transfer, concealment, or dissipation of any funds traceable to Plaintiffs' deposits;

h. Awarding Plaintiffs pre- and post-judgment interest at the maximum legal rate, from the date of the freeze through the date of payment;

i. Awarding Plaintiffs costs and expenses including all reasonable fees and expenses incurred in prosecuting this action, as permitted by law and equity; and

j. Awarding Plaintiffs such further and other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

238. Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: April 6, 2026
New York, New York.

**McDermott Will & Schulte LLP**

*/s/ Joseph B. Evans*

Joseph B. Evans
M. Elias Berman
Benjamin F. Cooper
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
jbevans@mcdermottlaw.com
eberman@mcdermottlaw.com
bcooper@mcdermottlaw.com

*Attorneys for Plaintiffs Jamie Shiller, Brian Kornrumpf, Halsey Richartz, Amnon Melzer, Ryan Treat, Geoff Frink, Jeremy Grainger, Randy Coran, Brian Dubs, Guy Zilber, Curtis Hale, Dirk Weiler-Thelemann, Darrell Smith, Chad Mielke, Robert Christiansen*