**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMIE SHILLER, BRIAN KORNRUMPF, HALSEY RICHARTZ, AMNON MELZER, RYAN TREAT, GEOFF FRINK, JEREMY GRAINGER, RANDY CORAN, BRIAN DUBS, GUY ZILBER, CURTIS HALE, DIRK WEILER-THELEMANN, DARRELL SMITH, CHAD MIELKE, and ROBERT CHRISTIANSEN,<br><br>Plaintiffs,<br><br>v.<br><br>CHAD BARRAFORD, JOHN-PAUL THORBJORNSEN, and NINE REALMS, INC.,<br><br>Defendants. | C.A. NO. 1:25-CV-10287-MKV<br><br>**DECLARATION OF JAMES P. BRENNAN** |

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

## I. My Background

1. I am a forensic accountant with over 20 years of experience conducting analyses and providing expert testimony in matters involving accounting fraud, Ponzi schemes, financial crimes, and asset-tracing and recovery. I have specific experience in forensic accounting and investigations regarding both fiat and cryptocurrency.

2. I am a Senior Managing Director and Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held. J.S. Held is a global professional service firm which provides technical, scientific, and financial advisory services.

3. Prior to working at J.S. Held, I held positions at other investigation firms, including FTI Consulting, Alvarez & Marsal, and Kroll. In these positions, I managed teams responsible for

investigations involving money laundering, terrorist financing, Ponzi schemes, asset theft, and other fraudulent activities, as well as asset-tracing and recovery.

4. I hold both a B.S. and a M.S. in accounting from St. John's University. I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5. A copy of my resume is attached as **Exhibit A**.

6. I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions. A significant amount of my practice and experience involves advising on crypto-related matters.

7. I am routinely retained to perform analyses of information related to financial crimes, which include forensic investigations and flow-of-funds analyses related to crypto wallet addresses and fiat bank accounts.

8. I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

9. I also train domestic and international government entities concerning cryptocurrency and financial crimes. These entities include, among others, the U.S. Department of Justice, U.S. Department of Homeland Security, and U.S. bankruptcy courts.

10. I have been retained by McDermott Will & Schulte LLP, who represents Plaintiffs Jamie Shiller, Brian Kornrumpf, Halsey Richartz, Amnon Melzer, Ryan Treat, Geoff Frink, Trey Grainger, Randy Coran, Brian Dubs, Guy Zilber, Curtis Hale, Dirk Weiler-Thelemann, Darrell Smith, Chad Mielke, and Robert Christiansen ("Plaintiffs").

11. I submit this Declaration in support of Plaintiffs' Second Amended Complaint against Defendants Chad Barraford, John-Paul Thorbjornsen, and THORChain ("Defendants").

## II. Background: Decentralized Finance and THORChain, and the Regulatory Environment

12. The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

13. Within the cryptocurrency industry, there are various applications and uses of the technology, including decentralized finance ("DeFi").

14. DeFi is based on the utilization of smart contracts to bring many applications of traditional finance to the cryptocurrency space in a decentralized fashion. This includes decentralized exchanges, lending and borrowing platforms, yield farming and staking, and the tokenization of real-world assets.

15. THORChain was co-founded by Barraford[1] and Thorbjornsen[2] in 2018. It released its first public testnet in 2020 and officially launched in 2022 as its own blockchain with a decentralized exchange built to facilitate the trading of assets across multiple blockchains.[3]

16. Unlike centralized exchanges, where funds are held by a controlled entity and trades are executed on the users' behalf, activity on decentralized exchanges is facilitated by a protocol and funds are not custodied by the platform.

17. Decentralized finance applications are often "permissionless" meaning that there is no central point of control once the protocol is made public, and therefore they do not exist in the

---

[1] https://www.cryptocompare.com/coins/rune/overview.
[2] https://blockworks.co/news/thorchain-executive-decision-restructuring.
[3] https://messari.io/project/thorchain/profile.

same regulatory sphere as centralized exchanges.

18. As part of THORChain's continued growth, THORChain expanded its DeFi offerings in November 2022[4] and August 2023 to include the lending and borrowing protocol branded as THORFi.[5]

## III. Nine Realms

19. Nine Realms is a blockchain developer group that has contributed extensively to the development of THORChain and the platform's integration with external blockchains.[6]

20. THORChain's "Frequently Asked Questions" section of the developer website states that Nine Realms, led by Gavin McDermott ("McDermott"), has "publicly taken over" the operational responsibilities for the THORChain system.[7]

21. These facts indicate that Nine Realms participated in and supported the operational decisions made on January 9, 2025, to use the administrative keys and to pause loan redemptions.

## IV. THORFi Collapse Timeline

22. More than a year before the liquidity crisis in THORChain's Lending and Savers program that wiped out roughly $200 million in depositor funds, early signs of instability appeared when THORFi paused new deposits in September 2024.[8]

23. The potential instability of THORFi Lending was also well known to THORChain's own developers. In a 2021 Q&A session, co-founder and system administrator Chad Barraford acknowledged that: "We'll probably know about it like six months in advance or even 12 months in advance. We'll just kind of see the writing on the wall. I don't expect there to

[4] https://blockworks.co/news/native-bitcoin-in-defi-this-dex-wants-to-boost-trust.
[5] https://www.binance.com/en/square/post/2023-08-14-thorchain-launches-thorfi-lending-protocol-960493.
[6] https://ninerealms.com/.
[7] https://docs.THORChain.org/frequently-asked-questions.
[8] https://blockworks.co/news/thorchain-halts-withdrawals-insolvency.

be some sort of like mass exodus of loans just because the only thing that would cause somebody to a mass exodus of loans is if people feel that they might not get their collateral back or their collateral is unavailable."[9]

24. On January 9, 2025, RUNE[10] experienced significant volatility, posing an existential threat to the lending program because RUNE was minted and burned to facilitate loans.

25. That same day, co-founder and system administrator John-Paul Thorbjornsen used the "Admin Mimir" key to pause loan redemptions, locking more than $200 million in user funds to preserve liquidity.[11]

26. Thorbjornsen's use of the "Admin Mimir" key is central to the freezing and conversion of Plaintiffs' assets. Although THORChain marketed its systems as fully decentralized, and therefore not subject to unilateral control, Thorbjornsen's actions demonstrated that a single administrator could override the protocol.[12]

27. This non-consensual pause contradicted statements on THORChain's own website. A January 9, 2025 capture explicitly stated that "THORChain is permissionless to deposit and withdraw."[13] Yet the administrative code included a key, known as the Admin Mimir, that allowed the decentralized governance system to be bypassed and loans to be paused.

---

[9] https://www.youtube.com/watch?v=fUug5MBQBhA
[10] RUNE is the native utility token of the THORChain blockchain, which is used as the base liquidity for the platform.
[11] https://crypto.news/thorchain-in-massive-200m-debt-pauses-network-for-restructuring-votes/.
[12] The "Admin Mimir" key is an administrative function is THORChain that can override or alter the parameters of the protocol.
[13] https://web.archive.org/web/20250124220137/https://thorchain.org/yield




28. Following Thorbjornsen's unilateral decision, months before the collapse, a developer named "Leena" posted in the THORChain Discord[14] claiming that the pause reflected community and node-operator consensus—a statement later shown to be false.




29. In a June 20, 2024 podcast interview, Thorbjornsen admitted that he created the "Leena" persona as to means to remain anonymous and portray the THORChain ecosystem as decentralized.[15]

---

[14] Discord is a communication app where users can communicate in real-time through various channels for specific topics.
[15] https://www.youtube.com/watch?v=K-TwFU10Cd4

30. Shortly after Thorbjornsen paused loan redemptions, node operators overturned the decision and voted to reinstate redemptions. The original pause was not a consensus decision.[16]

31. These rapid reversals on January 9, 2025 eroded investor confidence, triggering a decline in RUNE's price.[17]

32. A THORChain developer, "pluto9r," in the internal Discord chat acknowledged that the resulting decline in RUNE's price and the "bank run" were self-inflicted and caused by Thorbjornsen's actions.[18]




33. On January 10, 2025, an article was published in *Bitcoin Magazine*, titled "Why You May Want to Redeem Your Bitcoin From THORChain's Lending Service," which detailed that the platform likely had insufficient BTC to repay lenders due to the price fluctuations in BTC and lacking liquidity.[19]

34. RUNE continued to see price instability, and on January 23, 2025, Thorbjornsen posted to X (Twitter) stating that if RUNE fell below $2.50 that he would recommend that the nodes vote to pause loan redemptions.

---

[16] https://www.binance.com/en/square/post/19389021178434.
[17] https://messari.io/report/thorchain-q1-2025-brief.
[18] Nine Realms is a developer group that has been responsible for leading THORChain's operational needs.
[19] https://bitcoinmagazine.com/takes/why-you-may-want-to-redeem-your-bitcoin-from-THORChains-lending-service.


JP.THOR | ACEL
@jpthor

If $RUNE hits $2.50 I will be recommending to every node I delegate with to Pause Lending via Node Mimir.

1) Pause lending
2) Tokenise positions on App Layer asap (with maybe even $RUJI incentives)
3) 10% System Income into payback fund to accumulate RUNE to fund payouts
4) Re-enable lending.

Simple. We can get it done in 2-3 months. All loans will be honoured with a sensible throttle. If you want out whilst it is paused you can sell your entire position on the app layer.

You know it's the right thing to do.

35. On January 24, the system's operators again paused redemptions—this time even before RUNE reached the $2.50 threshold discussed publicly. At that point, THORChain could still have halted the system and repaid remaining assets using its "Ragnarock" function, but it deliberately chose not to do so.[20]

**LPs: Signalling Priority for Chains**

Additionally, if a connected chain is no longer economically valuable, then all liquidity providers in that chain can leave. If a pool is empty, it will be delisted, and this will cause the network to immediately sever ties with that chain in a process call a "ragnarok".

36. A January 24, 2025, capture of THORChain's API endpoint displaying the Mimir governance settings illustrates the ease at which loans could be paused within this system by its administrators, as a command to do so were readily available in the code.[21]

```
"PAUSELOANS": 1,
```

37. Additionally. Nine Realm falsely portrayed to users that the closing of loan redemptions on January 24 was only temporary:

---

[20] https://docs.THORChain.org/understanding-THORChain/rune
[21] https://web.archive.org/web/20250124205002/https://thornode.ninerealms.com/thorchain/mimir




38. Following the pausing of loan redemptions, community members submitted proposals to resolve the debt situation. Numerous proposals were submitted, but Thorbjornsen encouraged participants specifically to support the "Proposal 6," which advocated for maintaining the platform rather than closing it. Thorbjornsen claimed that this approach would drive up the price of RUNE and allow the team to retain the collateral in lending.[22]




39. The synthetic assets ("synths") served as the units of account representing the collateral in the lending arrangement. Therefore, even after the protocol was paused, there remained a viable opportunity for customer funds to be returned.

40. Proposal 6, authored by the founder of Maya Protocol,[23] was ultimately adopted. It allocates only 10% of THORChain's income to a new token, TCY, which customers may claim.[24]

---

[22] https://gitlab.com/-/snippets/4801556
[23] Maya Protocol is a decentralized cross-chain liquidity protocol built on a separate iteration of THORChain source code that operates independently to provide system redundancy and complementary services to THORChain.
[24] *Id.*

The proposal acknowledged that this structure introduces “a bit more uncertainty for TCY holders.”[25]

41. A February 1, 2025 conversation in THORChain’s developer chat, obtained by Plaintiff Shiller, revealed that liquidity attributable to the THORFi Savers program remained on the protocol but was inaccessible to users.




42. The next day, despite there still being many looming issues with THORFi, Thorbjornsen announced his plans to step away from THORChain.

---

[25] *Id.*



Pinned

JP

@jpthor

TC now gets to start a new chapter as the basic, boring decentralised liquidity protocol. Stewarded by @ninerealms_cap @strangelovelabs and supported by the ecosystem.

Chains, integrations, swaps, fees.

It is clear the protocol has outgrown me. I was there during a time of risk, experimentation, innovation. That spirit helped deliver the protocol in the first place, streaming swaps, decentralised churning and more. Truly - we had no idea what was going to work - we weren't copying anyone else. We tried a bunch, some worked some didn't.

I was wrong on THOFi, others were right. As a first-principles builder - you are sometimes blinded by your own level of conviction - you have to believe strongly in yourself.

I'll help quietly if needed in the background, but will no longer be a public face or advocate of TC. I'll hand that over to other prominent community members.

I am no longer required in any part of TC's operations, and haven't been for a while. The last of the keys are being purged.

I will shift my attention to helping $RUJI and $VULT - to which I owe it to the teams and investors of those projects to deliver.

Lastly - the vast quantity of my assets are tied up in the protocol itself - as Bond, DLP, Saver, Borrower. I've been in crypto since 2013 - my 2021 liquidity exit was funded by my other holdings - all my $RUNE is in the protocol itself and I will ride it to the end.

I am here to build valuable things that are useful. Sometimes they work, sometimes they don't. You have to take risks. DEFI is extremely early, and the primitives are still being baked out.

Thanks for all those that supported me over the years, I believe I've got a few more years of strong buildout. I'm aware that my style and persona will need a re-modelling - the max CHAOS style is not long-term productive. I will shift to more consistent persona - pursuing transparency and reliability.

Onwards.

12:05 PM · Feb 2, 2025 · 56.8K Views

43. On February 10, 2025, THORChain shared to the public via X that the "admin mimir" function has been removed and that now node operators have control over the network. By publicly stating that after the removal of the "admin mimir" function the nodes gained full control, THORChain acknowledged that the protocol was never fully decentralized.


THORChain
@THORChain

Admin Mimir has been removed from the network with today's update

Nodes have full control over all network parameters

[mimir] remove admin mimir #check-lint-warning
Code
Merged akrokr requested to merge akh/remove_admin into develop 1 month ago

11:38 AM · Feb 10, 2025 · 28.3K Views

24 85 531 7

44. On February 28, 2025, Thorbjornsen publicly admitted that THORChain had the ability to halt the system and return customers a portion of their funds, referring to Ragnarock.


JP
@jpthor

This is not what happened.
TC had 3 options in January.

1) Do nothing and let a small amount of users take all the funds, with the majority getting zero. (This was about to happen).

2) Shut the protocol down, and get everyone 20c on their dollar back, with equity holders getting zero

3) Keep the protocol running with the optimistic view to repay everyone in full after some time.

TC is an actively governed system. Every user has opted in to letting TC nodes be the guardians of their capital before they use the protocol. TC nodes were initially ok with (1), then switched to (3) with Prop6.

At any point - a new set of nodes may choose another option, but for now it's (3). Users can campaign nodes at any time. To assert there was no process is being mis-informed. There was a week of debates and community proposals with nodes switching votes many times.

Lex - this is decentralised governance and it works.

—

On to the swaps - once again - decentralised governance. Nodes voted many times on halting the protocol - in fact it was halted multiple times in the last 2 days as nodes fought it out.

At any point nodes can change their votes. Currently devs are building tools to get nodes more control on what transactions they observe.

Hopefully this clarifies what you didn't understand.

## V. THORFi Economic Analysis: RUNE, TCY, and TerraLuna Comparison

### a. Lending System Mechanics

45. When lenders provided assets such as BTC or ETH to THORFi, the funds were converted into RUNE.

46. RUNE would be burned once it was swapped for the borrower's desired cryptocurrency.

47. Then, once the loan was paid back, additional RUNE was minted to repurchase the original collateral.

48. Therefore, the protocol was designed to depend on RUNE outperforming major assets like ETH and BTC; if RUNE failed to appreciate at a higher rate, the system would become structurally unstable. In such circumstances, the protocol would be forced to mint increasing amounts of new RUNE to meet its obligations—diluting the token's value, weakening collateral reserves, and triggering a downward spiral that made repayment of user deposits increasingly impossible.

49. As outlined in a document published by THORChain,[26] the mechanics for the THORFi system were based on an assumption that RUNE would grow at twice the rate of BTC (BTC increases 5x, whereas RUNE increases 10x in this assumption).




[26] https://thorchain-community.medium.com/under-the-hood-lending-101-f934e1c22792.

50. The instability and impracticality of such a model can be further understood when comparing the price appreciations of BTC and RUNE from August 20, 2023, when the Lending platform was launched, to January 23, 2025, when it was indefinitely halted.

51. On August 23, 2023, BTC's closing price was $26,128.04, as compared to its closing price on January 23, 2025, which was $104,064.98. This is an appreciation of 298.2%.

52. Conversely, RUNE's closing price for August 23, 2023, was $1.13, and on January 23, 2025, it closed at $1.5043, which equals a price appreciation of merely 33.1%.

53. Therefore, when the "bank run" on THORFi occurred between January 9 and 23, 2025, which was triggered by the unwarranted pausing of loan redemptions as well as lenders redeeming their loans, the value of RUNE had not appreciated enough since the loans were made for THORFi to repurchase the BTC collateral as the price difference was too vast.

54. Users of the Lending program were effectively wiped out because their deposits were converted into RUNE, leaving the platform with insufficient liquidity to make them whole—a risk amplified by the structure of the zero-interest, no-expiry loans, which depended on depositors not redeeming their collateral in the near term and on RUNE appreciating in line with the assets it replaced.

**b. TCY Repayment Modeling**

55. Furthermore, (also described above in paras. 38 and 40), Thorbjornsen's proposed resolution to the debt problem involved issuing a new token, TCY, which customers could claim at a rate of one TCY per dollar owed—approximately $210 million in total.[27]

56. Moreover, 10% of THORChain's revenue is to be allocated to the stakers of TCY.

57. According to industry data, THORChain processes approximately $77.6 million

[27] https://dev.thorchain.org/concepts/tcy.html.

worth of trade on a daily basis, however this can fluctuate depending on market conditions.[28]

58. Decentralized exchanges such as THORChain typically earn 0.1% in fees on the trading volume, 10% of which would go towards TCY.[29]

59. By multiplying the estimated daily earnings annually to quantify THORChain's projected annual earnings ($28,304,000) and then multiplying that value by 10% to determine how much will be allocated to TCY, we arrive at $2,830,400 per year. Then, divided by $210 million, this final estimated value allocated per token is $0.01348 each year.

| **THORChain Daily Volume** | **Projected Daily Earnings (using industry standard fee of 0.1%)** | **Projected Annual Income** | **Projected Annual Allocation to TCY** | **Projected Annual Allocation per Individual TCY Token** |
|---|---|---|---|---|
| $77.6 million | $77,600 | $28,304,000 | $2,830,400 | $0.01348 |

60. Assuming THORChain maintains a daily volume of $77.6 million, for each TCY token to reach a value of $1 and match the amount owed to customers, it will take approximately 74 years ($1 divided by $0.01348 equals 74.18 years).

## VI. Vultisig: Thorbjorsen's Latest Business

61. Along with THORChain, Thorbjorsen is also the founder of Vultisig,[30] a decentralized cryptocurrency wallet that was launched in September of 2024.

62. When Thorbjorsen announced on February 2, 2025 that he would be stepping away from THORChain, he also stated his intention to focus on the Vultisig project.

63. Industry experts have cited that Vultisig was utilized by hackers from the Democratic Republic of North Korea in the exploit of cryptocurrency exchange Bybit, which

[28] https://www.coingecko.com/en/exchanges/thorchain.
[29] https://dev.thorchain.org/concepts/tcy.html#:~:text=Token%20Technical%20Overview-,Introduction,a%20share%20of%20THORChain's%20revenue.
[30] https://www.crunchbase.com/organization/vultisig.

Thorbjorsen defended as "legitimate."[31]

64. Blockchain forensics of Vultisig Treasury address thor10qh5272ktq4wes8ex343ky9rsuehcypddjh08k on THORChain shows a swap of 2 million RUNE for 2.2 million USDC in April 2025. Furthermore, in September 2025 0.3 million RUNE was swapped for 0.4 million USDC.

65. In both instances, the USDC was sent to the same Ethereum address 0x0B354326E140bDFb605b90AFF0Fe2CB07D48F7a3 ("~F7a3").

66. In addition to UDSC received from the Vultsig Treasury address, the ~F7a3 address received 2.7 million USDC from address ~F7a3 on THORChain by swapping 2.4 million of its RUNE holdings.

67. Based on my experience, these transfers indicate that the projects are closely related to Thorbjornsen and that funds originating from THORFi may have been used to support his new business ventures.

## VII. Conclusion

68. The freezing of Plaintiffs' assets occurred through a series of actions that, from an accounting and operational standpoint, enabled administrators to halt redemptions and restrict access to deposits without going through the decentralized governance process. These included THORFi's misrepresentation as a decentralized platform, the administrators' undisclosed ability to block customer access to funds, insiders' advance knowledge of impending redemption pauses, their ability to withdraw funds ahead of users, and statements about the TCY token's ability to make investors whole that are inconsistent with the economic reality.

[31] https://protos.com/vultisig-founder-says-dprk-linked-bybit-transactions-are-legitimate/.

Dated: April 6, 2026
Jupiter, Florida

/s/ *James P. Brennan*
James P. Brennan

Senior Managing Director
J.S. Held, LLC

JS HELD

# JP Brennan

Senior Managing Director, Global Investigations, Crypto, Fintech, and Payments Advisory and Investigations

## Key Expertise



- Forensic Accounting
- Anti-money Laundering (“AML”)
- Compliance
- Investigations
- Damages
- Financial Crime
- Fraud
- Asset Tracing (Crypto + Traditional)
- Money Services Business (“MSBs”)
- Operational Due Diligence
- Cryptocurrency Security Standard (“CCSS”)
- KYC / Onboarding
- Managed / Outsourced Services

## Education

Master of Science (MS), St. John’s University, 2002

Bachelor of Science (BS), St. John’s University, 2001

## Project Geographical Experience

U.S., UK, Singapore, Bermuda, Canada, Bahamas, Gibraltar, Cyprus, Switzerland

## Languages

English

## Summary of Experience

JP Brennan is the Global Head of Fintech, Payments, Crypto Compliance and Investigations at J.S. Held. He brings over 20 years of experience in forensic accounting, damage calculation, auditing, litigation consulting, anti-money laundering (“AML”) compliance, cryptocurrency regulatory compliance, OFAC/sanctions review, complex enhanced and operational due diligence, and bankruptcy. He has an in-depth understanding of the complexities that many FinTech’s are faced with concerning their regulatory framework as well as those issues from a financial crime compliance perspective.

Mr. Brennan has substantial experience in providing complex forensic accounting and financial fraud investigative services, cryptocurrency asset / wallet tracing, development and implementation of AML programs, outsourced Chief Compliance Officer services, as well as providing managed services for large scale remediation and compliance projects. His clients include major law firms, cryptocurrency exchanges (centralized / decentralized), digital asset issuers, custodians, multinational banks, funds, payment processors, financial institutions, and investors.

His expert experience includes such high-profile matters such as Bernard L. Madoff Investment Securities (investigation), Lehman Brothers (bankruptcy investigation), Caesars Entertainment Operating Corp. (examiner report), Bank of New York-Mellon (compliance monitorship), Quadriga CX (crypto asset tracing), and LUNA Foundation Guard (crypto asset tracing).

## Speaking Engagements

Mr. Brennan has presented various forums as well as moderated multiple cryptocurrency-related panels that included topics such as investigations, risk and regulatory, asset recovery, crypto in bankruptcy as well as complex forensic tracing.

## Professional Affiliations/Memberships/Licenses/Training

Association of Certified Fraud Examiners

Certified Bitcoin Professional

## Role at J.S. Held

JP is involved with matters in consulting as well testifying expert capacity. These matters include fiat and digital asset forensic and tracing investigations, recovery of assets, the development, implementation and assessment of regulatory programs, monitorships, training for law enforcement agencies, government licensing, investigations on behalf of examiners, receivers, forensic accounting, and trustees.

## Contact

48 Wall Street, New York, NY 100436 | +1 212-952-5000 (O) |
+1 917-244-8931 (M) | jp.brennan@jsheld.com

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other. public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

## Work Experience

J.S. Held, LLC, Senior Managing Director, 2022 – Present

Kroll, LLC (f/k/a Duff & Phelps), Associate Managing Director, 2017 – 2022

Alvarez & Marsal Holdings, LLC, Director, 2012 – 2017

FTI Consulting, Inc., Director, 2004 – 2012

Deloitte & Touche LLP, Audit Staff, 2002 – 2004

## Select Litigation and Project Experience

### Cryptocurrency and Blockchain Related:

- Retained as the cryptocurrency expert in the Chapter 11 Bankruptcy Proceedings for Prime Trust due to insolvency. Provides litigation consulting and expert witness services related to the investigation of the company as well as performance of other analysis including but not limited fraudulent conveyances and preference payments.
- Retained by a U.S. cryptocurrency exchange as an expert to defend against customer allegations involving the exchanges breach of fiduciary duty and lack of an appropriate AML program.
- Retained in the Voyager Digital Bankruptcy to investigate and recover fraudulent ACH customer payments.
- Retained by a Web3 company that provides infrastructure and applications to be built using its platform. Perform expert and litigation services to defend against allegations of market manipulations, inappropriate disclosure for sources and uses of funds, unjust enrichment, and breach of fiduciary duty.
- Luna Foundation Guard / Terraform Labs / Do Kwon – retained to produce an audit report and cryptocurrency tracing of the assets used to defend the peg of the UST algorithmic stablecoin. Additional work related to market manipulation, wash trading, improper public disclosures, and manipulation of transactions on the Terra network.
- Retained by the Brazilian gov't to conduct the cryptocurrency asset tracing and recovery in the INDEAL pyramid scheme.
- Retained as the expert in a cryptocurrency employment dispute related to the payment of assets at genesis and calculation of the associated staking rewards and airdrops on the Cosmos Network.
- Retained as the expert by the Cred Inc. Liquidation Trust to trace and investigate the theft and fraudulent transfer of assets by Company executives.
- Retained by Bo Shen in the recovery of over $40 million stolen from his personal wallet.
- QuadrigaCX – retained by the receiver (E&Y) to conduct the tracing of cryptocurrency assets.
- Retained as the financial adviser in the EminiFX bankruptcy and investigation.
- Retained by the Canadian courts in the Index Finance hack as the custodian for the cryptocurrency assets stolen.
- Retained as the expert in a well-known international gambling site dispute.
- Retained in the USA v. Ian Freeman (formerly Ian Bernard) and Aria DiMezzo (formerly James Baker) to assist with various litigation support services.
- Conducted and performed operational due diligence for financial and crypto related platforms including but not limited to trade execution, custody, and third-party providers.
- Often retained by bitcoin atm operators, crypto lenders, crypto funds, crypto exchanges, payment processors, and funds to conduct independent AML reviews.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other. public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

- Developed and implemented tracing and monitoring processes and technologies for a crypto money servicer business (“MSBs”).
- Retained by the receiver in a Canadian cryptocurrency exchange investigation and recovery of assets.
- Retained by a large Seychelles-based cryptocurrency exchange to provide a report on proper OTC related procedures.
- Successfully performed an investigation into the fraudulent theft of cryptocurrency related assets of a crypto lender.
- Member of an international FATF committee working on the Travel Rule for Virtual Asset Providers (“VASPs”).
- Performed the outsourcing of cryptocurrency asset reviews for a major US Cryptocurrency Exchange.
- Provide Managed Services for enhanced due diligence procedures for a major US Cryptocurrency Exchange.
- Retained by a U.S. Cryptocurrency Exchange to address regulatory concerns regarding their geo-fencing of IP addresses.
- Retained by a U.S. crypto lender in connection with their 2017 initial coin offering (“ICO”) to provide recission payments to investors.
- Conducted cryptocurrency security standard (“CCSS”) implementations and assessments.
- Conduct annual FBI Training – “How to Conduct Cryptocurrency Investigations.”
- Provided and oversaw a team of 350+ compliance professionals to help meet a New York State Department of Financial Services remediation for a large US-based cryptocurrency exchange.

**Non-Cryptocurrency and Blockchain Related:**

- Provided investigative services and litigation support to the court-appointed trustee for the liquidation of Bernard L. Madoff Investment Securities and his counsel. Engagement assistance to date has included the day-to-day direction and supervision of teams in areas including forensic investigation, data analysis and litigation consulting.
- Retained by the US Federal Reserve Bank to review AML Programs for their 12 branches.
- Served on the team selected by the U.S. Attorney offices in the Eastern and Southern Districts of New York and Western Pennsylvania to support the monitoring of the non-prosecution agreements of both The Bank of New York and Mellon Financial Corporation, to monitor and report on the state of the banks’ suspicious activity reporting practices and AML procedures.
- Served on the monitorship team for the Standard Chartered Bank.
- Provided litigation consulting and expert witness services, including expert report preparation and deposition and trial preparation for a multi-billion-dollar accounting malpractice case filed in a class action against one of the major accounting firms. The case involved review and analysis of several years of audit work papers as well as research and analysis.
- Provided litigation consulting, including expert report preparation and deposition and trial preparation for an oil and gas company to determine whether a series of corporate transactions constituted a fraudulent conveyance and as a result rendered the company insolvent.
- Retained by multiple hedge funds to dispute the SEC allegations of collusion related to trade and market manipulation.
- Created onboarding policies and procedures for banks, hedge funds, as well as crypto funds and exchanges.
- Served on the investigations team, retained by Caesars Entertainment Operating Company, Inc. (“CEOC”), Richard J. Davis, to investigate and determine whether fifteen transactions between CEOC and the leveraged buyout sponsors (“LBO”) arose to constituted constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty.
- Expert support work on the determination of payments to creditors in the Nortel Networks bankruptcy.
- Expert support work on the calculation of damages / lost profits for a pharmaceutical dispute.
- Expert support in the investigation into various matters within the Lehman bankruptcy.
- Expert support in the investigation of Allen Stanford.
- Hired as the outsourced CCO multiple payment processors that are going through the money transmission licensing process.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other.
public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

## Speaking Engagements and Articles

- Law360 article, Using Data To Arm Against Future Crypto Market Turbulence", December 16, 2022.
- Luna Foundation Guard release, "Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022", November 16, 2022.
- Brave NewCoin article, "The Cryptocurrency Regulatory Framework: How Countries are Approaching the Virtual Currency", March 2022.
- Wolters Kluwer Banking and Financial Services Policy Report – April 30, 2019, "The Curious Case of Crypto."
- Kroll article, "Cryptocurrencies: Protecting Your Downside in the Face of Uncertainty", May 2018.
- Medium Article Contributor: https://medium.com/@james.p.brennan1.
- Official Monetary and Financial Institutions Forum ("OMFIF") Digital Monetary Institute Symposium 2021, "Cryptocurrency's Regulatory Impact", September 2021.
- MIT: Center for Real Estate," Real Disruption - How Technology is Changing and Challenging Real Estate", 2017.
- Kroll, "Examining the Anti-Money Laundering (AML) Risks and Red Flags of Crypto Exchanges", October 2021.
- BPP Continuing Education, "What you need to know when your clients are considering crypto", 2021.
- Association of Certified Fraud Examiners, "The Future of AML and Blockchain", May 2021.
- JS Held Thought Leadership Related Articles.

## Testimony

- *Michael Sofaer v. BKCM, LLC, Supreme Court of the State of New York, County of New York.*
- *Paul Merkley v. Gemini Trust Company, LLC*, JAMS Arbitration.
- *Jonathan Shomroni v. Fei Labs Inc. et al, Superior Court of the State of California, County of San Francisco.*
- *Prime Core Technologies Inc. et al, United States Bankruptcy Court, District of Delaware.*
- *MB Technology LTD v. Orbis Blockchain Technologies et al, High Court of New Zealand, Auckland Registry.*
- *Mobile Med Work Health Solutions, Inc.; JLL Ventures, Inc. and M-M WHS LLC v. Joshua Moore, Cory Rodruguez,*

  *NFN8 Group, Inc.; NFNF8 Holdings, LLC, NFN8 Capital, LLC; NFN8 Media, LLC, NFN8 Foundation, and Cryptotech Holdings LLC, United States District Court, Western District of Texas.*
- *Tiffany Enger v. Patrick Enger, In The Fourth Judicial District Court Utah County, State of Utah.*
- *The Office of the Minnesota Attorney General Keith Ellison, In the Matter of the Money Transmission License of Coinme Inc., d/b/a Coinme.*
- *Eide Bailly LLP vs. Seven Peaks Ventures Fund II, LP; and SPV – Prime Core, LLC / Seven Peaks Ventures Fund II, LP; and SPV – Prime Core, LLC v. Eide Bailly LLP, District Court, Clark County Nevada.*
- *Block Mining, Inc., f/k/a Blockware Mining, Inc. v. Hosting Source, LLC, District Court, Western District of Washington at Seattle.*
- *Bitmain Georgia Technologies Limited v. Meta Centergy LLC, AAA Arbitration.*
- *Bitmain Georgia Technologies Limited v. Hashland, Inc., and Andrew Zhu, AAA Arbitration.*

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other. public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.