**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JAMIE SHILLER, BRIAN KORNRUMPF, HALSEY RICHARTZ, AMNON MELZER, RYAN TREAT, GEOFF FRINK, JEREMY GRAINGER, RANDY CORAN, BRIAN DUBS, GUY ZILBER, CURTIS HALE, DIRK WEILER-THELEMANN, DARRELL SMITH, CHAD MIELKE, and ROBERT CHRISTIANSEN,<br><br>     Plaintiffs,<br><br>  v.<br><br><br>CHAD BARRAFORD, JOHN-PAUL THORBJORNSEN, and THORCHAIN,<br><br>     Defendants. | Civil Action No. 1:25-cv-10287-MKV |

**DEFENDANT CHAD BARRAFORD'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**MCGOVERN WEEMS LLC**

Alec Chiquoine (*Pro Hac Vice*)
Leif T. Simonson
William F. McGovern
3 Columbus Circle, 15th Floor
New York, NY 10019
Tel.: (312) 550-6895
alec@mcgovernweems.com
leif@mcgovernweems.com
bill@mcgovernweems.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... i

INTRODUCTION ................................................................................................................... 1

SUMMARY OF THE ALLEGATIONS ................................................................................. 2

    A.   THORChain, THORFi, and Defendants ........................................................... 2

    B.   The Collapse of THORFi and the Aftermath ................................................... 4

    C.   Materials Incorporated by Plaintiffs That Fatally Undercut Their Claims ..................... 6

        1.   THORChain's website, thorchain.org .......................................................... 6

        2.   Publicly Available Articles and Media Coverage ......................................... 8

LEGAL STANDARDS ........................................................................................................... 9

ARGUMENT ........................................................................................................................ 10

    I.   Plaintiffs Fail to Plausibly Allege That Any Supposed Misrepresentation Caused Their Injury ................................................................................................... 10

    II.   Plaintiffs Fail to Plausibly Allege That They Reasonably Relied on the Alleged Misrepresentations ................................................................................ 12

        1.   Decentralization and Admin Mimir ............................................................ 14

        2.   RUNE exposure ........................................................................................... 15

    III.   The Statements Plaintiffs Attribute to Barraford Are Improperly Cherry-Picked and Not Actionable ................................................................. 17

    IV.   Plaintiffs Fail to Plead with the Required Particularity Under Rule 9(b) ......................... 20

    V.   Plaintiffs Fail to Plead New York Nexus as Required Under NYGBL ........................... 23

    VI.   Plaintiffs Fail to Allege a Barraford Owed Them a Duty or That They Had a Sufficiently Close Relationship with Barraford ............................................... 24

CONCLUSION ..................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Alfandary v. Nikko Asset Mgmt.*, 2019 U.S. Dist. LEXIS 210772 (S.D.N.Y. Dec. 6, 2019) ....... 10

*Amusement Indus. v. Stern*, 786 F. Supp. 2d 758 (S.D.N.Y. 2011) ............................................ 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ...................................... 11

*AVRA Surgical Robotics, Inc. v. Gombert*, 41 F. Supp. 3d 350 (S.D.N.Y. 2014) ....................... 21

*Banque Franco-Hellenique De Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22
   (2d Cir. 1997) ............................................................................................................................ 16

*Barron v. Helbiz Inc.*, 2023 U.S. Dist. LEXIS 155324 (S.D.N.Y. Aug. 31, 2023) ...................... 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 9

*Berman v. Morgan Keegan & Co., 2011 U.S. Dist. LEXIS 27867 (S.D.N.Y. Mar. 14, 2011)* ...... 21

*Bhagat v. Sharad Shah*, No. 24-CV-1424 (VEC) (RFT), 2025 LX 279581 (S.D.N.Y. July 2,
   2025) ......................................................................................................................................... 24

*Brock Capital Grp. LLC v. Siddiqui*, 2022 U.S. Dist. LEXIS 101738 (S.D.N.Y. June 7, 2022) . 14

*Buss Chemtech AG v. PCS Phosphate Co.*, No. 25-cv-3710 (JGK), 2026 LX 28869
   (S.D.N.Y. Jan. 6, 2026) ............................................................................................................ 20

*Buxbaum v. Webull Fin., LLC*, No. 1:24-cv-09784 (VSB) (SDA), 2025 LX 635453
   (S.D.N.Y. Nov. 13, 2025) ................................................................................................... 12, 20

*Crigger v. Fahnestock & Co.,* 443 F.3d 230 (2d Cir. 2006) .......................................................... 16

*Cruz v. Fxdirectdealer, LLC*, 720 F.3d 115 (2d Cir. 2013) ......................................................... 23

*Demirovic v. Ortega*, No. 15 CV 327 (CLP), 2016 U.S. Dist. LEXIS 200056
   (E.D.N.Y. Sep. 15, 2016) .......................................................................................................... 25

*Dimuro v. Clinique Labs., LLC*, 572 F. App'x 27 (2d Cir. 2014) ................................................ 21

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ................................. 12

*Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999) ................. 13

*Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y. 2018) .................. 17, 18, 19

*In re Aegean Marine Petroleum Network, Inc.*, 529 F. Supp. 3d 111 (S.D.N.Y. 2021).............. 21

*In re Crude Oil Commodity Litig.*, 2007 U.S. Dist. LEXIS 47902 (S.D.N.Y. June 28, 2007)..... 20

*In re Farfetch Ltd. Sec. Litig.*, 802 F. Supp. 3d 652 (S.D.N.Y. 2025)........................................ 10

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)............................ 22

*Kassover v. UBS AG*, 619 F. Supp. 2d 28 (S.D.N.Y. 2008) ......................................................... 21

*Kraft v. Third Coast Midstream*, No. 19-cv-9398 (LJL), 2021 U.S. Dist. LEXIS 43016
    (S.D.N.Y. Mar. 8, 2021)......................................................................................................... 10

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991).......................................................... 10

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)....................................................... 11

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173 (2011) ................................................... 24

*Mingues v. Nelson,* No. 96 CV 5396 (GBD), 2004 U.S. Dist. LEXIS 2492 (S.D.N.Y. Feb. 19,
    2004)...................................................................................................................................... 10

*Moncada v. Nuna Baby Essentials, Inc.*, No. 25-cv-2592 (PKC), 2026 LX 167475
    (S.D.N.Y. Mar. 30, 2026)....................................................................................................... 10

*Olson v. Major League Baseball,* 29 F.4th 59 (2d Cir. 2022) ...................................................... 12

*Olson v. Major League Baseball*, 447 F. Supp. 3d 159 (S.D.N.Y. 2020) .................................... 22

*Orbis Glob. Equity LE Fund v. Vale S.A.*, No. 21-CV-6590 (EK)(VMS), 2026 U.S. Dist.
    LEXIS 49313 (E.D.N.Y. Mar. 10, 2026) ............................................................................... 22

*Pauwels v. Deloitte LLP*, 83 F.4th 171 (2d Cir. 2023) ................................................................. 25

*Rostami v. Open Props, Inc.*, No. 22-CV-3326 (RA), 2023 U.S. Dist. LEXIS 3706
    (S.D.N.Y. Jan. 9, 2023)............................................................................. 14, 15, 17, 19

*Sandoval v. Uphold HQ Inc.*, No. 21-CV-7579 (VSB), 2024 U.S. Dist. LEXIS 55045
    (S.D.N.Y. Mar. 27, 2024)................................................................................. 12, 25

*Sheiner v. Supervalu Inc.*, 2024 U.S. Dist. LEXIS 96348 (S.D.N.Y. May 28, 2024) ............ 12, 13

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167 (S.D.N.Y. 2009) .... 23

*Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony
    Fin. Sec. Litig.)*, 988 F.3d 157 (2d Cir. 2021)....................................................................... 17

*Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014)...................................... 13, 15

*Wright v. Publrs. Clearing House, Inc.*, 439 F. Supp. 3d 102 (E.D.N.Y. 2020) .................... 23, 24

*Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352 (S.D.N.Y. 2022) ........................................... 21

**<u>Statutes</u>**

FRCP 9(b) ............................................................................................................. 2, 20, 21, 22

FRCP 12(b)(6) ..................................................................................................................... passim

Defendant Chad Barraford ("Barraford"), by and through his undersigned counsel, respectfully submits this memorandum of law in support of his motion to dismiss Plaintiffs' Second Amended Complaint ("SAC").

## INTRODUCTION

Having twice amended their complaint, Plaintiffs still fail to plead viable claims. The operative SAC suffers from a myriad of issues warranting dismissal, but at least two of them are so fundamental that they cannot be cured through further corrective pleading: (1) Plaintiffs cannot plausibly allege that their loss or injury was caused by Defendants' alleged misrepresentations concerning THORChain/THORFi, and (2) they cannot plausibly allege that they reasonably relied upon those alleged misrepresentations.

Plaintiffs allege that they were injured on January 24, 2025, when Defendants allegedly "barred" them from accessing digital assets they had deposited between 2022 and 2023, supposedly in reliance on "unequivocal statements that [their digital assets] would always be accessible to Plaintiffs." (SAC ¶ 1.) But as is clear from the SAC, the risk that was allegedly concealed from Plaintiffs—that a "centralized authority" might "intervene to prevent any withdrawal of their assets" or that they might not "always ha[ve] the right to have their collateral returned" (SAC ¶¶ 14–15)—had *already* materialized on *January 9*, 2025, when Defendant John-Paul Thorbjornsen ("Thorbjornsen") allegedly "invoked Admin Mimir, thereby temporarily freezing all user withdrawals and loan repayments," a move that Plaintiffs admit was "overturn[ed]" later that same day (SAC ¶ 26). Certainly by that point (if not before), the risk Plaintiffs allege was previously concealed was plainly revealed. And yet Plaintiffs claim no loss or injury *as of January 10*, as there was none; at that point, and for the next 14 days, Plaintiffs were free to withdraw their assets from THORFi without any hindrance. But critically, they *chose* to maintain their deposits—an intervening cause that destroys Plaintiffs' ability to plead causation.

Furthermore, based on the materials incorporated into the SAC by reference, the "risks" of a potential freeze from Admin Mimir were well known even prior to January 9, rendering Plaintiffs' allegations of reasonable reliance simply implausible.

Plaintiffs' attempt to hold Barraford liable for their losses suffers from numerous other problems, as well. The statements Plaintiffs attribute to Barraford are simply not actionable, as they were clearly either subjective statements of opinion (not fact) or vague statements of optimism upon which no reasonable investor would rely. Plaintiffs otherwise fail to plead their claims with the requisite particularity under Rule 9(b). And their claims under the New York General Business Law ("NYGBL") and for unjust enrichment are likewise deficient.

Given the fundamental flaws in the claims, most of which cannot be cured with further amendment, the Court should dismiss the SAC in its entirety, with prejudice, as to Barraford.

## SUMMARY OF THE ALLEGATIONS

### A.    THORChain, THORFi, and Defendants

THORChain is a "cryptocurrency protocol that enables cross-chain liquidity and yield generation with the capability to facilitate transactions in various forms of cryptocurrency."[1] (SAC ¶ 86.) Plaintiffs also define "THORChain" as "an unincorporated association consisting of a network of developers, node operators, and promoters . . . ." (*Id.* ¶ 64.) Approximately 100 node operators "were responsible for, among other things, securing the THORChain network by validating transactions and overseeing the protocol [*i.e.*, the rules by which THORChain operated] . . . ." (*Id.* ¶¶ 11, 26, 26 fn.7, 66.) Notably, Plaintiffs assert no claims against THORChain, and it is not a party to this action.

---

[1] As required, Barraford accepts Plaintiffs' well-pleaded, factual allegations as true solely for the purpose of arguing his motion to dismiss.

2

Defendants Barraford and Thorbjornsen[2] are each "co-founder[s] and . . . lead developer[s], operator[s] and public spokesperson[s] for THORChain and THORFi." (*See id.* ¶¶ 52-57.) Defendant Nine Realms ("Nine Realms") is "the core developer, operator, and promoter of the THORChain/THORFi protocols." (*Id.* ¶ 61.)

In November 2022, THORChain launched the "Savers" program, which "allowed users to deposit their cryptocurrency assets and earn 'yield' (*i.e.*, additional assets) over time." (*Id.* ¶¶ 8-9.) In August 2023, THORChain launched the "Lending" program, which "allowed users to deposit their cryptocurrency assets and receive a loan from THORChain in the denomination of THORChain's own 'stablecoin' called 'TOR.'" (*Id.* ¶¶ 8, 10.) Savers and Lending are collectively referred to as "THORFi." (*Id.* ¶ 8.) Plaintiffs are individuals who between November 2022 and December 2024 deposited cryptocurrency assets (*e.g.*, Bitcoin ("BTC"), Ethereum ("ETH"), USDC, etc.) in either Savers or Lending. (*Id.* ¶¶ 35-50, 126-140.)

"RUNE" is "THORChain's native cryptocurrency, which functions as an intermediary for cross-chain swaps (*i.e.*, transactions across different blockchain networks) on THORChain's so-called decentralized exchange." (*Id.* ¶ 94.) Plaintiffs allege that "RUNE exposure was not just incidental to participation in the Savers and Lending program. It was *essential* to it." (*Id.* ¶ 143.) In short, the cryptocurrency assets Plaintiffs deposited in THORFi "were immediately converted to RUNE" which "was then 'burned' when swapped for a borrower's desired cryptocurrency, and new RUNE was minted when loans were repaid to repurchase the original collateral [the digital asset the THORFi user originally deposited]." (*Id.* ¶ 144.) Thus, to be clear, Plaintiffs were not investors in RUNE; rather, RUNE was merely an intermediary that allowed for cross-chain swaps.

---

[2] Plaintiffs have yet to serve Thorbjornsen, and he has not made an appearance in this matter.

(*Id.* ¶ 94.) However, Plaintiffs allege that Defendants misled them by claiming that THORFi was not "exposed" to RUNE. (*See, e.g., id.* ¶¶ 18, 24, 33, 207(a), 216(b), 234(b).)

Plaintiffs also allege that Defendants misled them by representing that THORChain/THORFi was "decentralized" (*see, e.g.*, *id.* ¶¶ 11, 19-23, 207(a), 216(a), 234(a)), which Plaintiffs apparently took to mean "no person or entity [had] unilateral authority to control or restrict user assets" (*id.* ¶¶ 207(d), 216(d)) and that THORFi users "would always maintain access to their assets [*i.e.*, the cryptocurrency assets they deposited in THORFi] . . ." (*id.* ¶¶ 33, 218, 234(c)). Plaintiffs allege that THORChain/THORFi was in fact "centralized," primarily because of a feature called "Admin Mimir," which Defendants could unilaterally invoke to "pause" THORChain/THORFi, preventing THORFi users from withdrawing/redeeming their deposited digital assets during the pause. (*See id.* ¶¶ 21-23, 120, 174, 203(a), 208, 218, 234(c).)

## B.    The Collapse of THORFi and the Aftermath

According to Plaintiffs, in late 2024, THORFi began to "unravel" as the price of RUNE did not increase commensurate with the price increase of other cryptocurrencies. (*See id.* ¶ 25, 144-46.) As Plaintiffs describe it, as the delta between RUNE's value and that of the cryptocurrency assets originally deposited in THORFi grew:

> [T]he protocol attempted to mint additional RUNE to meet its obligations, triggering inflation that further eroded RUNE's price and left liquidity pools under-collateralized. This feedback loop—declining prices causing more minting, which caused further price declines—created a cascading loss of confidence, accelerating withdrawals and pushing THORFi into a full-blown liquidity crisis.

(*Id.*)  Again, as Plaintiffs were not investors in RUNE, they do not and cannot plausibly allege that they were injured by the drop in RUNE price; rather, it ***increased the risk*** of THORFi's collapse (*i.e.*, that THORChain could not "pay back" all THORFi depositors the full value of their deposits).

On January 9, 2025, Thorbjornsen invoked Admin Mimir, "thereby freezing all user withdrawals and loan repayments." (*Id.* ¶¶ 26, 152.) However, Thorbjornsen's invocation of

4

Admin Mimir was overridden that same day by THORChain's node operators (of which there are approximately 100 and who in fact exercise ultimate control over THORChain and THORFi (*id.* ¶¶ 26, 66, 74), and THORFi users' (including Plaintiffs') access was restored (*id.* ¶¶ 26, 159). Notably, Plaintiffs do not allege that Barraford had anything to do with Thorbjornsen's use of Admin Mimir on January 9.

For fourteen days, from January 9-24, 2025, THORFi users could withdraw/redeem their deposited assets and incur minimal, if any, loss. (*Id.* ¶¶ 159-60.) Despite this opportunity, and the public warnings and advice about the continued viability of THORFi, described below, Plaintiffs did not withdraw their digital assets, opting to leave them in THORFi. (*See id.* ¶¶ 27, 34, 237(a)-(b).)

On January 24, 2025, THORChain's nodes elected to suspend THORFi, with at least 67% voting in favor of doing so. (*Id.* ¶¶ 27, 160-61.) They did so because the increasing gulf between the price of RUNE and that of other cryptocurrencies meant THORFi did not have the liquidity necessary to make whole the outstanding Lending accounts (*i.e.*, assuming a user repaid their loan, purchase and return the digital assets THORFi users had deposited as collateral). (*See id.* ¶¶ 144-48.) This suspension remains in effect, and Plaintiffs are unable to withdraw the digital assets they originally deposited in THORFi. (*See id.* ¶¶ 141, 165, 199.)

On February 3, 2025, THORChain's nodes voted to adopt "Proposal 6" as part of an effort to compensate THORFi users who could not recoup their digital assets. (*See id.* ¶¶ 179-81.) THORChain would issue a new token, TCY, with THORFi users "able to claim one TCY per $1 owed to them by the protocol, and promised TCY holders 10% of future network [THORChain] swap fees in order to compensate users." (*Id.* ¶ 180.) Plaintiffs describe the TCY plan as a "sham" because, based on THORChain's current trading and activity levels, it would take many years

5

before TCY holders were reimbursed the total value of the digital assets they lost. (*See id.* ¶¶ 182-85.) However, notably, Plaintiffs do not allege whether any of them elected to receive TCY (and thereby the benefits the tokens convey).[3]

Based on these allegations, Plaintiffs assert five claims against the Defendants: (1) conversion; (2) common law fraud; (3) negligent misrepresentation; (4) unjust enrichment; and (5) violation of New York Gen. Bus. Law ("NYGBL") §§ 349–350. (*Id.* ¶¶ 201-236.)

## C. Materials Incorporated by Plaintiffs That Fatally Undercut Their Claims

The SAC and its accompanying declaration repeatedly reference THORChain's website (thorchain.org) and other documents, including news articles, social media posts, and online videos. (*See, e.g.,* SAC ¶¶ 12-13, 15, 19, 96-101, 110-19, 120 fn. 34, 157 fn. 50.) But several of these materials fatally undercut Plaintiffs' claims.

### 1. THORChain's website, thorchain.org

As noted above, Plaintiffs allege that Defendants' statements that THORChain/THORFi was "decentralized" and that THORFi users would "always maintain access to their assets" were false and misleading due to the existence of Admin Mimir, which Defendants could unilaterally enact. But THORChain's website, thorchain.org, which Plaintiffs cite throughout the SAC, described not only the existence of Admin Mimir but also its functionality. (Decl. of Alexander Chiquoine ("AC Decl."), Ex. A.) A section of the website describing THORChain's governance contained an entire subsection titled "Mimir." (Ex. A at 1.) It specifically stated that "Mimir" was a "feature to allow changes in the constants of the chain [*i.e.*, THORChain's operating protocol] . . . ." (*Id.*) It described "Admin Mimir," differentiating it from "Node Mimir," which makes obvious

---

[3] Upon information and belief, at least several Plaintiffs elected to receive TCY. At least one Plaintiff even choose to purchase additional TCY from another THORFi user(s), undermining the assertion "Plaintiffs" believe TCY is a sham.

6

that "admins," like Defendants, have Mimir abilities. (*Id*.) Another subsection within the "How It Works" section of thorchain.org was titled "Constants and Mimir." (*Id.* at 2.) It reiterated, "Constants can be overridden via Mimir and nodes have the ability to vote on and change Mimir values." (*Id.*) Even a general overview page of thorchain.org contained a section that described Mimir, explained that nodes could use Mimir and define its abilities, but also referenced that "admins" would "take[] priority" if there was no node consensus.[4] (*Id.*)

Plaintiffs also claim that Defendants misrepresented if/how users of THORFi were "exposed to RUNE," including on thorchain.org. (*See, e.g.,* SAC ¶¶ 24, 96, 110.) But again, the role of RUNE was disclosed on THORChain's website. For instance, after the launch of Savers, the homepage of thorchain.org advertised: "Cross-Chain Swaps. Swap between blockchains directly from your wallet. Earn yield on your assets. Powered by RUNE." (AC Decl., Ex. B at 1.) After the launch of Lending, the website homepage updated to state: "Cross-Chain Swaps. Swap, Borrow, and Earn with your native assets. Powered by RUNE." (Ex. B at 1.) In a tab titled "Powered by Rune," thorchain.org explained that "***RUNE plays a vital part in the network***. Node operators must bond RUNE to ensure the network's economic security. ***In the liquidity pools, each asset is paired with RUNE as a settlement asset to maximize liquidity and efficiency, while capturing value for RUNE***." (*Id.* at 2 (emphasis added).) Any reasonable individual who reviewed the website would understand that RUNE was central to THORChain/THORFi's operations.

---

[4] Plaintiffs admit that thorchain.org contained "acknowledgement of the existence of the Admin Mimir key" but try to undermine the significance of this fact by claiming these disclosures were concealed, accessible only by "clicking through hyperlinks" and "scrolling and expanding multiple sub-sections," unlike the website's purported misrepresentations, which were "prominently featured[.]" (SAC ¶ 122). But simply comparing the Uniform Resource Locator ("URL") internet addresses cited by Plaintiffs with those in Barraford's Ex. A shows the supposed misrepresentations and the disclosures were equally available and apparent on the website. (*E.g., compare* SAC ¶¶ 96 fn. 17, 111 fn. 25 *with* Ex. A.) In any case, Plaintiffs were each allegedly investing several hundreds of thousands into THORChain. They should be expected to review at least its website thoroughly.

### 2.    Publicly Available Articles and Media Coverage

Plaintiffs also reference (without quoting) publicly available articles that address key issues and events. These articles are likewise deeply problematic for their claims.

#### i.    *"Hammering THORChain: It's Totally Centralized With Hard-Coded Admin Keys"*

To support their claim that Defendants misled them about Admin Mimir, its ability to limit Plaintiffs' access to their digital assets in THORFi, and whether THORChain/THORFi was decentralized or centralized, Plaintiffs cite a publicly available article from medium.com. (SAC ¶ 120 fn. 34; AC Decl., Ex. C.) It was published in September 2024—months **before** the pause of THORFi on January 9, 2025, and freeze on January 24, 2025—and is entitled, "*Hammering THORChain: It's Totally Centralized With Hard-Coded Admin Keys*." (Ex. C.)

The title alone raises serious doubts about if/how any THORFi user could be confused or misled about whether THORFi was **completely** "decentralized" at least in part because of "hard-coded admin keys [*i.e.*, Admin Mimir]." But the first lines of the article remove any doubt:

> THORChain is a wonderful example of a blockchain (and we use that term loosely) that calls itself decentralized but is in fact anything but. It is more or less trivial to prove THORChain is anything but decentralized if anyone were to look for a few moments.

(*Id.* at 2.)

The article goes on to criticize THORChain as an "obviously-defective-to-anyone-competent-that-looks blockchain," and bluntly revealed the "truth" behind many of Defendants' alleged misrepresentations. (*See id.* at 3-20.) For instance, it details how Mimir is "the admin interface" allowing admins "near-total access," including to "pause" THORChain, **and how "admins" had previously paused THORChain "several times**." (*Id.* at 11-12.) No reasonable individual who read this publicly available article, or any like it, would believe that THORChain

8

was "decentralized" in the extreme way Plaintiffs now claim to have understood the term, or fail to appreciate the existence and import of Admin Mimir.

ii.    ***"Why You May Want to Redeem Your Bitcoin From THORChain's Lending Services"***

The SAC incorporates another article through the accompanying declaration. (*See* SAC ¶ 157 fn. 50; Brennan Decl. ¶ 33 (ECF 49-1)). This one, published in Bitcoin Magazine on January 10, 2025 (one day after Thorbjornsen used Admin Mimir to temporarily pause THORFi and before THORFi's collapse), is entitled, "*Why You May Want to Redeem Your Bitcoin From THORChain's Lending Services.*" (AC Decl., Ex. D). After thoroughly explaining how Lending worked, using screenshots from THORChain's website, and why Lending was in a precarious position, the author concluded, "With all this said, if you're still feeling skittish about having lent THORChain your bitcoin as collateral for a loan, you might want to redeem it. If I were using the service, I would." (*Id.* at 5.) And yet Plaintiffs admit that despite having fourteen days between the temporary pause on January 9 and the indefinite node-instituted freeze on January 24 to remove/redeem their digital assets, they did not. No reasonable individual who read this article, or others like it, would fail to appreciate THORFi's precarious financial position, or that while they could, for the time, withdraw/redeem their digital assets, they might soon lose that ability.

## LEGAL STANDARDS

To survive a motion to dismiss, a complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff must allege facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). Courts are "not bound to accept as true a conclusory allegation where the pleadings are devoid of

9

any specific facts or circumstances supporting such an assertion. Nor must the court ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Mingues v. Nelson,* No. 96 CV 5396 (GBD), 2004 U.S. Dist. LEXIS 2492, at *10 (S.D.N.Y. Feb. 19, 2004) (quotations and citations omitted).

A court may consider "documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). When a complaint quotes documents in parts and omits critical portions, the court may consider the full documents. *See In re Farfetch Ltd. Sec. Litig.*, 802 F. Supp. 3d 652, 673 (S.D.N.Y. 2025) ("[C]ourts may consider any. . . statements or documents incorporated into the complaint by reference. . . ."); *Kraft v. Third Coast Midstream*, No. 19-cv-9398 (LJL), 2021 U.S. Dist. LEXIS 43016, at *38 (S.D.N.Y. Mar. 8, 2021) (courts may consider full text of quoted documents in complaint on a motion to dismiss).

## ARGUMENT[5]

**I.   Plaintiffs Fail to Plausibly Allege That Any Supposed Misrepresentation Caused Their Injury**

To plead fraud, a plaintiff must allege that "defendant's misrepresentations directly caused their losses." *Alfandary v. Nikko Asset Mgmt.*, 2019 U.S. Dist. LEXIS 210772, at *4 (S.D.N.Y. Dec. 6, 2019) (cleaned up). Causation is also required for a claim of negligent misrepresentation. *Amusement Indus. v. Stern*, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011). Similarly, to sustain a claim under NYGBL sections 349 and 350, the plaintiff must allege the defendant's material deceptive act/statement caused the injury. *Moncada v. Nuna Baby Essentials, Inc.*, No. 25-cv-2592 (PKC), 2026 LX 167475, at *19 (S.D.N.Y. Mar. 30, 2026).

---

[5] Most of the arguments made by Defendant Nine Realms in its motion to dismiss apply with equal force to Barraford and are incorporated here by reference.

"[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). "Thus to establish loss causation, a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* (cleaned up). Put another way, "the plaintiff's complaint must plead that the loss was foreseeable and **caused by the materialization of the risk concealed by the fraudulent statement**." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007) (emphasis added).

Plaintiffs' own pleadings show that Defendants' alleged misrepresentations about THORFi did not cause their injury. Plaintiffs' alleged injury is their inability to access their funds after the THORChain node operators voted to suspend THORFi indefinitely on January 24, 2025 (*see, e.g.*, SAC ¶ 27). But by then, the risk that Plaintiffs allege was concealed—*i.e.*, that Plaintiffs could be deprived of access to their assets—had **already materialized on January 9, 2025**. On that day, Thorbjornsen "unilaterally disabled Plaintiffs' ability to withdraw assets from THORFi Savers and close loans in THORFi Lending by activating the Admin Mimir key." (SAC ¶ 152.) Thus, by January 9, 2025, the "truth" that users' access to their THORFi deposits could be suspended was plainly revealed.[6]

Yet Plaintiffs admit that despite having fourteen days, from January 9-24, in which they could have withdrawn/redeemed their assets from THORFi, they did not. (SAC ¶¶ 26-27, 159-160.) Consequently, any injury from the January 24 freeze was caused by Plaintiffs' intervening decision to remain in THORFi, despite the fact it was clear by then that their ability to access their deposits could be revoked at any time and THORFi was in significant structural trouble. *See*

---

[6] In fact, THORChain was paused "several times" before January 9, 2025. (Ex. C at 12.)

*Lentell*, 396 F.3d at 177 ("But where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures . . . , a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud -- rather than other salient factors -- that proximately caused plaintiff's loss[.]"); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) ("[W]hen factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.").

## II.    Plaintiffs Fail to Plausibly Allege That They Reasonably Relied on the Alleged Misrepresentations

In addition to failing to plead causation, Plaintiffs fail to plausibly allege they reasonably relied on the alleged misstatements. To state a claim for common law fraud, a plaintiff must plausibly allege that they reasonably relied upon a material misrepresentation or omission. *Buxbaum v. Webull Fin., LLC*, No. 1:24-cv-09784 (VSB) (SDA), 2025 LX 635453, at *15 (S.D.N.Y. Nov. 13, 2025). Reasonable reliance is also required for negligent misrepresentation. *Olson v. Major League Baseball,* 29 F.4th 59, 72 (2d Cir. 2022). And although a plaintiff alleging claims under the NYGBL need not plead that their injury was the result of their reasonable reliance on "erroneous statements," they must plead that the "deceptive practice [was] likely to mislead a reasonable consumer acting reasonably under the circumstances." *Sandoval v. Uphold HQ Inc.*, No. 21-CV-7579 (VSB), 2024 U.S. Dist. LEXIS 55045, at *14 (S.D.N.Y. Mar. 27, 2024).

"Although reasonableness of reliance is generally a question for the jury, courts may resolve this issue as a question of law where no reasonable person could believe the type of misstatement alleged." *Olson*, 29 F.4th at 77 (affirming district court's grant of defendant's motion to dismiss plaintiff's fraud and negligent misrepresentation claims); *see Sheiner v. Supervalu Inc.*, 2024 U.S. Dist. LEXIS 96348, at *8 (S.D.N.Y. May 28, 2024) (granting a motion to dismiss

12

NYGBL claims in part, "[a]lthough the question of whether a business practice or advertisement is misleading to a reasonable consumer is generally a question of fact, it is well settled that a court may determine as a matter of law that an allegedly deceptive practice would not have misled a reasonable consumer" (quotations omitted)).

"Under New York law, the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999) (quotations omitted); *see Sheiner*, 2024 U.S. Dist. LEXIS 96348 at *8 ("To survive a motion to dismiss, a plaintiff [who asserts NYGBL claims] must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers."). "A party entering into a transaction has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business transactions." *Granite Partners*, 58 F. Supp. 2d at 259 (holding that plaintiff had not pleaded reasonable reliance). This includes a duty to "exercise ordinary intelligence" and "show some minimal diligence or care[.]" *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 166 (S.D.N.Y. 2014) (cleaned up).

Here, Plaintiffs fail to plausibly allege reasonable reliance, or that a reasonable consumer acting reasonably under the circumstances would have been misled. Most notably, according to Plaintiffs, by no later than January 9, 2025, every alleged misrepresentation and omission made by the Defendants was revealed. A THORChain administrator could unilaterally pause THORFi via Admin Mimir, which would restrict Plaintiffs' access to their digital assets, and THORFi was in a precarious position because the gap between the price of RUNE and that of other cryptocurrencies was widening. Just the title of a publicly available article published on January 10, 2025, should have put the Plaintiffs on high alert, "*Why You May Want to Redeem Your Bitcoin*

13

*From THORChain's Lending Services*." (Ex. D.) Yet for fourteen days, despite these "revelations" and warnings, and despite being able to withdraw/redeem their assets, Plaintiffs did not and instead continued to rely on Defendants' supposed misrepresentations and omissions. This was patently unreasonable.[7] *See Brock Capital Grp. LLC v. Siddiqui*, 2022 U.S. Dist. LEXIS 101738, at \*9 (S.D.N.Y. June 7, 2022) ("While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused.").

### 1.       Decentralization and Admin Mimir

Even before January 9, 2025, had Plaintiffs performed any reasonable due diligence before investing hundreds of thousands, even millions of dollars, of cryptocurrency assets in THORFi, they easily could have "discovered" Admin Mimir and the "truth" about the extent to which THORChain was "decentralized." For example, the SAC cites an article titled "*Hammering THORChain: It's Totally Centralized With Hard-Coded Admin Keys*," published on September 4, 2024. (Ex. C at 1.) The subheading goes on, "Blockchains herald the promise of decentralization. But THORChain is not the blockchain you're looking for if you care about such ideals, with hard-coded administrative keys that demonstrate the blockchain is run by a handful of individuals." (*Id.*) The article plainly explains, "Mimir is the admin interface," and includes screenshots of THORChain's code as evidence.[8] (*Id.* at 11.)

Continuing its criticism that THORChain is not decentralized,[9] the article explains, "So it would appear the mimir interface can 'pause' the blockchain." (*Id.*) Finally, the article states,

---

[7] Where a plaintiff fails to allege any actionable, fraudulent conduct by the defendant, the plaintiff's unjust enrichment claim will fail too as nothing "unjust" occurred. *See Rostami v. Open Props, Inc.*, No. 22-CV-3326 (RA), 2023 U.S. Dist. LEXIS 3706, at \*16 (S.D.N.Y. Jan. 9, 2023) ("Furthermore, there is little in equity and good conscience that weighs in favor of the return of Plaintiff's investment simply because the inherent risks of that investment were realized." (quotations omitted)).

[8] THORChain's protocol code is publicly available and always has been. Plaintiffs even cite to the code. (SAC ¶ 162.)

[9] Barraford maintains that THORChain/THORFi was "decentralized." Plaintiffs apparently understood, without reason or investigation, "decentralized" to mean the complete lack of any centralized authority. (*See, e.g.,* SAC ¶¶ 11,

"Mind you, it wasn't that the admins could pause the blockchain *in theory*, they actually did so several times." (*Id.* at 12.) "Several times" contains a hyperlink to another article, this one from March 28, 2023, which describing how on that day, THORChain "paused its network" and "halted all trading," as it had before in 2022 and 2021. (AC Decl., Ex. E at 1(article entitled "*THORChain mainnet halted amid new vulnerability reports*").)

THORChain's website also repeatedly referenced "Mimir," explained the function's power, and indicated that two types of Mimir existed, "admin" and "node." (*See supra* Part C.1.) In short, Admin Mimir was not concealed; if Plaintiffs had conducted even a rudimentary investigation of THORChain's website prior to making huge investments in THORFi, they would have seen these references and explanations. *See Ward*, 3 F. Supp. 3d at 166 ("[o]nly when matters are held to be peculiarly within defendant's knowledge is it said that plaintiff may rely without prosecuting an investigation" (internal quotations marks and citations omitted)).

### 2.    RUNE exposure

Plaintiffs' reliance on Defendants' supposed misstatements about THORFi's lack of RUNE exposure were also unreasonable. The fact that THORChain/THORFi was "powered by RUNE" was front-and-center on THORChain's website. (*See supra* Part C.1.) THORFi could not be "powered by RUNE" without any exposure to RUNE. To the extent these disclosures conflicted with Plaintiffs' understanding of what Defendants meant when they stated that THORFi was not "exposed" to RUNE, Plaintiffs should have investigated further and understood exactly what role

---

14, 84.) But "decentralized," especially in the context of crypto platforms, is so vague as to be unactionable. *See Rostami*, 2023 U.S. Dist. LEXIS 3706, at *12-13 (explaining that in the context of a crypto platform, "the word 'decentralized,' especially in this context, is also vague enough that it could be considered 'immeasurable and subjective' and thus non-actionable," but ultimately dismissing the plaintiff's claims for lack of reasonable reliance (citations omitted)).

RUNE played before investing millions of dollars' worth of cryptocurrency in THORFi.[10] *See Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir. 2006) ("Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts.") (cleaned up). This was especially true after January 9, 2025, when the volatility of RUNE's value compared to that of other cryptocurrencies caused a temporary pause in THORFi and generated publicly available articles that not only warned Plaintiffs to get their assets out of THORFi, but clearly explained that RUNE (and its price) was directly responsible for/involved with THORFi's precarious position. (*See* Ex. D.)

Although Plaintiffs were not required to "go to the ends of the earth" to understand THORFi, they were required to exercise some "minimal diligence" once presented with "hints of falsity." *Banque Franco-Hellenique De Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 26-27 (2d Cir. 1997) (overturning a district court's bench trial finding of reasonable reliance where the party "relied on representations he had good reason to doubt."). They did not and thus their fraud and negligent misrepresentation claims must fall. Similarly, no reasonable consumer acting reasonably (*i.e.*, conducting some minimal degree of diligence before investing huge sums in a notoriously risky endeavor like THORFi[11]) would have acted as Plaintiffs did, so Plaintiffs' NYGBL claim must also fall.

---

[10] Notably, while Plaintiffs allege that the misrepresentation was that THORFi users did not have "any exposure to RUNE," (*see, e.g.*, SAC ¶¶ 24, 33, 95, 102), the actual statements they cite all discuss the lack of "RUNE price exposure" (*see, e.g., id.* ¶¶ 25, 96, 98, 99, 118). This difference matters. Because THORFi users did not hold RUNE they were not price exposed to it. However, not being price exposed to RUNE is different than having no exposure to RUNE (*i.e.*, that RUNE, and its price, played and no part in THORFi).

[11] *See* AC Decl., Ex. F at 3 (article, published in November 2022 (the same month Savers launched) cautioning, "As with most crypto investments that come with huge upside potential, yield farming [THORFi was a type of yield farming] is a very risky game and is not for the faint of heart. It requires serious research, knowledge, and risk appetite, especially in turbulent markets like these.")

### III.    The Statements Plaintiffs Attribute to Barraford Are Improperly Cherry-Picked and Not Actionable

In the few statements Plaintiffs directly attribute to Barraford, they cherry-pick in an improper attempt to make them seem misleading or definite and factual. The full statements are not misleading and/or make clear Barraford is presenting his opinion, forward-looking statements of optimism, and/or puffery, none of which are actionable as fraud or misrepresentations.

Plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021). Promissory statements related to future conduct/events and puffery made in promotions are not actionable as fraud. *See Rostami v. Open Props, Inc.*, No. 22-CV-3326 (RA), 2023 U.S. Dist. LEXIS 3706, at *9 (S.D.N.Y. Jan. 9, 2023).

Statements of opinion may be actionable as fraud only "if either the speaker did not hold the belief she professed . . .  the supporting facts she supplied were untrue . . . [or] the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp. 3d 372, 396 (S.D.N.Y. 2018) (quotations omitted). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, or not borne out by subsequent events." *Id.* (quotation omitted)

> To adequately allege that a statement of opinion was misleading through the omission of material information, the investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Id.* (cleaned up).

Here, there is no allegation Barraford was insincere in his opinions about or assessments of THORChain/THORFi. Nor do Plaintiffs allege particular, material ***facts*** that Barraford

17

misstated or left out of the statements they attribute to him. Instead, Plaintiffs cherry-pick portions

of Barraford's statements and present them to seem more definitive and factual than they were.

For example, Plaintiffs claim that during a YouTube Q&A on December 1, 2022, Barraford

"assured users that THORFi's risks were 'relatively small' and that the protocol was designed so

that users' collateral would 'always remain available.'" (SAC ¶ 114). However, the full statement

makes clear Barraford was expressing his optimistic opinion, couched in an acknowledgement of

risk, not "assured" fact:

> Everything has risks, right, like you can't build a protocol at all and anywhere doing anything that doesn't have some sort of potential downside. So, you always have to know what the risks are and know what the benefits are and just ask yourself, "Does the benefits outweigh the risk?" ***I think,*** in this particular case though, ***I think*** the risks are relatively small. ***At least in my head that's true. There's always protocol risk*** . . .[12]

(Ex. G at 1 (emphasis added)). Even if Barraford's opinion about the risks to THORFi being

"relatively small" turned out to be incorrect, this does not make that statement actionable as fraud

or misrepresentation. *See Gregory*, 297 F. Supp. 3d at 396.

Plaintiffs also fault Barraford for his prediction, in the same YouTube Q&A, that there

would not be a "mass exodus" of loans, and even if there were, THORChain would see it coming

six to twelve months in advance. (SAC ¶ 115.) An examination of the full statement underscores

that Barraford was expressing his opinion and predictions about future events (Lending was still

months away from launching at the time of this statement), not statements of fact. (Ex. G at 2 ("I

don't consider…," "probably . . ." (multiple times), "I don't expect . . .").) Again, even if

Barraford's opinion was "unreasonable, irrational, excessively optimistic, or not borne out by

---

[12] Having reviewed the YouTube video Plaintiffs cite, it does not appear Barraford stated that the protocol was designed so that users' collateral would "always remain available," as Plaintiffs allege. (*See* SAC ¶ 114 fn 27.) Of course, Barraford cannot be liable for something he did not say or do.

subsequent events," this does not make it actionable as fraud or misrepresentation. *See Gregory*, 297 F. Supp. 3d at 396; *Rostami*, 2023 U.S. Dist. LEXIS 3706, at \*9.

Barraford's statements on his X account—which Plaintiffs cite as alleged misrepresentations (*see, e.g.,* SAC ¶¶ 99, 106, 108, 116, 119)—especially when read in full, are also obvious opinions, predictive statement, or puffery, none of which are actionable as misrepresentations. (AC Decl., Ex. H (Barraford's X statements cited at SAC ¶ 99, made prior to the launch of Lending), Ex. I (Barraford's X statements cited at SAC ¶¶ 106, 108, made prior to the launch of THORFi), Ex. J (Barraford's X statements cited at SAC ¶ 116).) This is especially true since Barraford's X "biography" plainly states, "Opinions are my own and not financial advice." (Ex. I at 4.)

In another glaring example of cherry-picking, Plaintiff Shiller alleges he communicated directly with Barraford over an instant messaging app (Telegram) "in or around March 2024." (SAC ¶ 126.) Shiller claims Barraford "assured [him] that the Lending program was safe and stated that THORFi had 'mechanisms to protect again[st] things like price manipulation and bank runs.'" (*Id.*) By quoting the conversation, Shiller evidences that he has a copy, but he did not produce it with the SAC. (*See id.*) Barraford also has the conversation and produces it here. (AC Decl., Ex. K.) When read in full, it is clear why Shiller did not produce the entire conversation.

Shiller contacted Barraford on March 30, 2024, concerned because a friend cautioned him against participating in THORFi's Lending program. (Ex. K.) Shiller laid out his friend's criticisms of Lending and asked Barraford, "Can you please tell me how my friend is wrong?" (*Id.*) Barraford's first reply is telling: "Well, it is a new lending design that needs time in the real world to be validated. ***So, it's fair to be cautious.***" (*Id.* (emphasis added).) Barraford then asserts, vaguely, that "[t]here are mechanisms to protect against things like price manipulation and bank

19

runs." (*Id.*) Notably, Plaintiffs do not allege this particular representation was false or misleading. The remaining conversation is unremarkable. (*See id.*) In short, despite including a small snippet of this conversation in the SAC (implying Shiller relied on it), Plaintiff Shiller does not allege Barraford's statement was false, nor does he include Barraford's clear warning that Lending "needs time in the real world to be validate" and acknowledgment that "it's fair to be cautious."

## IV.    Plaintiffs Fail to Plead with the Required Particularity Under Rule 9(b)

Plaintiffs attempt to overcome their lack of actionable statements attributable to Barraford by engaging in impermissible group pleading and failing to plead with the required particularity.

When asserting claims of fraud or misrepresentation (mistake), pleadings must meet heightened requirements to survive a motion to dismiss. *See Buxbaum*, *LLC*, 2025 LX 635453, at *15. Rule 9(b)'s particularity standard "require[s] the complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.*

A plaintiff may not simply describe the alleged misrepresentations in broad terms. *See Buss Chemtech AG v. PCS Phosphate Co.*, No. 25-cv-3710 (JGK), 2026 LX 28869, at *15-16 (S.D.N.Y. Jan. 6, 2026) (granting motion to dismiss where "[plaintiff's] fraud-based allegations do not identify the specific speakers or specify the time and place of the alleged misrepresentations."). Accordingly, courts have consistently declined to attribute alleged misrepresentations of one speaker to a broader group of defendants since "lumping" defendants together fails Rule 9(b). *See In re Crude Oil Commodity Litig.*, 2007 U.S. Dist. LEXIS 47902, at *19 (S.D.N.Y. June 28, 2007) ("In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant.").

Rule 9(b) also applies to "all averments of fraud" such that any claim rooted in deceptive or fraudulent practices must satisfy the particularity pleading requirement. *Kassover v. UBS AG*,

20

619 F. Supp. 2d 28, 31 (S.D.N.Y. 2008). Courts consistently hold that Rule 9(b) applies to claims for negligent misrepresentation, conversion, and unjust enrichment that sound in fraud. *See, e.g., Dimuro v. Clinique Labs., LLC*, 572 F. App'x 27, 32 (2d Cir. 2014) (unjust enrichment); *AVRA Surgical Robotics, Inc. v. Gombert*, 41 F. Supp. 3d 350, 360 (S.D.N.Y. 2014) (negligent misrepresentation); *Berman v. Morgan Keegan & Co., 2011 U.S. Dist. LEXIS 27867, at *38 (S.D.N.Y. Mar. 14, 2011)* (conversion).

Besides a few of Barraford's social media posts, Plaintiffs attribute the remaining alleged misstatements to other Defendants individually, collectively to "Defendants," or to THORChain via its website and social media channels. (*See, e.g.,* SAC ¶¶ 28, 111, 118, 122.) Plaintiffs' attribution of many alleged misstatements to "the Defendants" collectively does not satisfy Rule 9(b). *See In re Aegean Marine Petroleum Network, Inc.*, 529 F. Supp. 3d 111, 147 (S.D.N.Y. 2021) ("Importantly, when fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant. A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b).").

Plaintiffs' attempt to attribute statements from THORChain to Barraford similarly fails. Although Plaintiffs baldly allege that Barraford was "responsible for managing and publishing content on THORChain's official website" (SAC ¶ 53), they do not allege any particularized facts to establish that Barraford had authority over any statement on thorchain.org. *See Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 365 (S.D.N.Y. 2022) ("a securities fraud plaintiff must allege facts showing, either directly or circumstantially, that the individual defendants named in the complaint possessed ultimate authority over the statements at issue"). Plaintiffs make identical, unsupported claims that Thorbjornsen and Nine Realms were also "responsible for managing and publishing content" on thorchain.org. (SAC ¶¶ 58, 89.) Plus, Plaintiffs allege that THORChain

21

consists of approximately "100 validating node operators, core developers, and governance participants. . .[that] actively directed, managed, and controlled THORChain's operations and public communications." (*Id.* ¶ 66.) These cursory and contradictory allegations about who spoke for THORChain, and the absence of any allegation as to who specifically was responsible for any statement on THORChain's website and social media, do not satisfy Rule 9(b)'s particularity requirement. *See Orbis Glob. Equity LE Fund v. Vale S.A.*, No. 21-CV-6590 (EK)(VMS), 2026 U.S. Dist. LEXIS 49313, at \*15-16 (E.D.N.Y. Mar. 10, 2026) (explaining how *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) eliminated the ability to plead that insiders held "ultimate authority" over the statements of a company/entity by virtue of the insiders' participation, as a group, in creating, preparing, or publishing a statement on behalf of the company/entity).

The SAC is also largely devoid of specificity as to which alleged misstatements each Plaintiff saw and relied upon. The SAC references dozens of alleged misrepresentations, only some of which it avers a particular Plaintiff(s) saw/heard and relied on. (*See, e.g.*, SAC ¶ 126.) For most of the Plaintiffs, the SAC generic alleges some version of "Plaintiff X learned of THORChain/THORFi through Defendants' promotion on social media, the THORChain website, and other sites/community forums and relied on the same." (*See, e.g., id.* ¶¶ 127-30, 133-38, 140.) This does not satisfy Rule 9(b)'s requirement. *See Olson v. Major League Baseball*, 447 F. Supp. 3d 159, 167 (S.D.N.Y. 2020) ("[W]hat is known to the plaintiff, his own reliance, must be alleged with particularity. . . But here, the complaint does not even allege that the plaintiffs saw, read, or otherwise noticed any of the few actionable misrepresentations."). The Court should dismiss Plaintiffs' fraud and negligent misrepresentation claims because they fail to plead with specificity.

22

## V.      Plaintiffs Fail to Plead New York Nexus as Required Under NYGBL

Plaintiffs hope to benefit from the NYGBL's treble damages and attorneys' fees provisions. (SAC ¶¶ 236, 237(h)). But Plaintiffs—all of whom reside outside of New York (*see id.* ¶¶ 35-50)—have not alleged a transactional nexus between their claims and New York. They lack standing and their claim must be dismissed.

To establish standing to raise a claim under NYGBL §§ 349 and 350, a plaintiff must allege that "some part of the underlying transaction occurred in New York State." *Wright v. Publrs. Clearing House, Inc.*, 439 F. Supp. 3d 102, 110 (E.D.N.Y. 2020) (quoting *Cruz v. Fxdirectdealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013)). That a defendant's primary place of business is New York is insufficient. *Id.* Similarly insufficient are allegations that "the Defendants hatched the deceptive scheme in New York; sent the relevant advertising materials from New York; and received payment and processed orders in New York." *Id.* at 110-11; *see SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 203 n.19 (S.D.N.Y. 2009) ("The reach of [the NYGBL] is explicitly limited to the deception of consumers occurring in New York. It is not sufficient that a marketing plan originates in New York if the consumer deception occurs elsewhere.").

Plaintiffs (after the benefit of multiple amendments) allege that Barraford is a resident of New York who periodically met with the other Defendants "in New York . . . to conduct THORChain-related business." (SAC ¶¶ 51, 55.) They claim that Thorbjornsen, who has not been served and thus not appeared in this matter, "conducts business" in New York "through . . . his operation and promotion of THORChain and THORFi and through extensive online activity targeting U.S. and New York investors." (*Id.* ¶¶ 56, 59.) As to Nine Realms, Plaintiffs allege that "[u]pon information and belief, certain key developers reside in New York and operate THORChain within New York." (*Id.* ¶ 60.) Meanwhile, "THORChain maintains a continuous and interactive online presence accessible in the State of New York" including through its website,

23

social media accounts, and "conduct[ing] business with users [in New York]" via THORFi. (*Id.* ¶ 65.) But these allegations are insufficient to confer standing for Plaintiffs to raise a NYGBL claim.

In essence, Plaintiffs allegations boil down to Barraford residing in New York and non-party THORChain conducting some portion of its business in New York. But the law is clear that none of their allegations suffice to establish that the transaction(s) by/through which Plaintiffs were supposedly deceived occurred in New York:

> In sum, the new allegations assert that the Defendants hatched the deceptive scheme in New York; sent the relevant advertising materials from New York; and received payment and processed orders in New York. These facts neither individually nor cumulatively establish that some part of the underlying transaction occurred in New York State. Rather, they are merely clever re-articulations of the allegation that the Defendants operate their principal place of business in New York, because they only establish the location of some clerical aspects of the Defendants' business.

*Wright*, 439 F. Supp. 3d at 110. Plaintiffs lack standing to raise the NYGBL and their claim should be dismissed with prejudice.

## VI.     Plaintiffs Fail to Allege a Barraford Owed Them a Duty or That They Had a Sufficiently Close Relationship with Barraford

To sustain a claim for unjust enrichment, a plaintiff must allege a sufficiently close relationship with the defendant. *See Barron v. Helbiz Inc.*, 2023 U.S. Dist. LEXIS 155324, at *49-50 (S.D.N.Y. Aug. 31, 2023) (holding that to allege unjust enrichment, at a minimum, the defendant must be aware of the plaintiff's existence); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 176 (2011) (there must be an indication of a relationship between parties that caused inducement).

Similarly, under New York law, a claim for negligent misrepresentation requires a plaintiff allege the parties have a "special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff." *Bhagat v. Sharad Shah*, No. 24-CV-1424 (VEC) (RFT), 2025 LX 279581, at *26 (S.D.N.Y. July 2, 2025). Generally, when there is no direct contact

24

between the parties, no relationship or duty exists. *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 115 (2d Cir. 2012) (affirming dismissal of negligent misrepresentation claim where plaintiff failed to allege any direct contact between itself and the defendants).

Plaintiffs fail to allege any close or special relationship with Barraford. The SAC contains almost no allegations of any direct contact between Barraford and the Plaintiffs, or that Barraford even knew the Plaintiffs existed. *See Barron*, 2023 U.S. Dist. LEXIS 155324 at *49-50. The one exception is Plaintiff Shiller, who had a brief, direct instant message conversation with Barraford. (SAC ¶ 126; Ex. K.) However, this kind of limited contact is not sufficient to establish the necessary relationship.[13] *See Pauwels v. Deloitte LLP*, 83 F.4th 171, 189 (2d Cir. 2023) (allegations of only minimal contact between parties, "including a handful of phone calls," inadequate to sustain unjust enrichment claim). Without alleging the necessary relationship between themselves and Barraford, Plaintiffs' negligent misrepresentation and unjust enrichment claims must fall.

## **CONCLUSION**

For the reasons stated above, Defendant Barraford respectfully requests that this Court dismiss Plaintiffs' Second Amended Complaint in its entirety with prejudice.

*[Signature page to follow]*

---

[13] Because Plaintiffs' claims for fraud and negligent misrepresentation fail, their claims for conversion and unjust enrichment, which are premised on the same alleged misconduct, should also be dismissed as duplicative. *See Sandoval*, 2024 U.S. Dist. LEXIS 55045, at *26 (dismissing unjust enrichment claim where it duplicated plaintiff's NYGBL claim, which was also dismissed); *Demirovic v. Ortega*, No. 15 CV 327 (CLP), 2016 U.S. Dist. LEXIS 200056, at *12 (E.D.N.Y. Sep. 15, 2016) (dismissing unjust enrichment claim as duplicative of conversion claim, which was allowed).

DATED: April 20, 2026                    Respectfully submitted,

                                         **MCGOVERN WEEMS, LLC**

                                         /s/ *Alec Chiquoine*
                                         Alec Chiquoine (*Pro Hac Vice*)
                                         Leif T. Simonson
                                         William F. McGovern
                                         3 Columbus Circle, 15th Floor
                                         New York, NY 10019
                                         Tel.: (612) 550-6895
                                         bill@mcgovernweems.com
                                         leif@mcgovernweems.com
                                         alec@mcgovernweems.com

                                         *Attorneys for Defendant Chad Barraford*

26