# EXHIBIT 5

| | |
|---|---|
| **From:** | Cooper, Ben |
| **To:** | jpthor@protonmail.com |
| **Cc:** | Evans, Joseph; Berman, Eli; Obichi, Ndudi |
| **Subject:** | RE: Shiller v. Barraford, et al., No. 1:25-cv-10287-MKV (SDNY) |
| **Date:** | Tuesday, March 10, 2026 9:50:54 AM |
| **Attachments:** | Dkt. 031 - 2026.01.19 - Amended Complaint.pdf |
| | Dkt. 022 - 2025.12.12 - Electronic Summons Issued as to John-Paul Thorbjornsen.pdf |

Mr. Thorbjornsen,

I am following up on my March 4 email to confirm whether you are willing to accept electronic service of the attached Summons and Amended Complaint in *Shiller v. Barraford*, et al., No. 1:25-cv-10287-MKV (SDNY), currently pending in the United States District Court for the Southern District of New York.

Please let us know.


Regards,

**Ben Cooper**
Counsel

**T:** +1 212 547 5752 | **M:** +1 617 833 5917
bcooper@mcdermottlaw.com | LinkedIn

McDermott Will & Schulte LLP | mcdermottlaw.com
One Vanderbilt Avenue | New York, NY 10017 | USA



---

**From:** Cooper, Ben <bcooper@mcdermottlaw.com>
**Sent:** Wednesday, March 4, 2026 3:35 PM
**To:** jpthor@protonmail.com
**Cc:** Evans, Joseph <Jbevans@mcdermottlaw.com>; Berman, Eli <eberman@mcdermottlaw.com>; Obichi, Ndudi <nobichi@mcdermottlaw.com>
**Subject:** Shiller v. Barraford, et al., No. 1:25-cv-10287-MKV (SDNY)

Mr. Thorbjornsen,

Attached is the Summons and Amended Complaint in *Shiller v. Barraford*, et al., No. 1:25-cv-10287-MKV (SDNY), currently pending in the United States District Court for the Southern District of New York.

Please confirm whether you are willing to accept service electronically.  Also, please advise whether you are represented by counsel in this matter, and if so, provide counsel's name and contact

information.


Thank you,

**Ben Cooper**
Counsel

**T:** +1 212 547 5752 | **M:** +1 617 833 5917
bcooper@mcdermottlaw.com | LinkedIn

McDermott Will & Schulte LLP | mcdermottlaw.com
One Vanderbilt Avenue | New York, NY 10017 | USA



**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

JAMIE SHILLER, BRIAN KORNRUMPF, HALSEY RICHARTZ, AMNON MELZER, RYAN TREAT, GEOFF FRINK, JEREMY GRAINGER, RANDY CORAN, BRIAN DUBS, GUY ZILBER, CURTIS HALE, DIRK WEILER-THELEMANN, and DARRELL SMITH,

Plaintiffs,

v.

CHAD BARRAFORD, JOHN-PAUL THORBJORNSEN, and NINE REALMS, INC.,

Defendants.

C.A. NO. 1:25-CV-10287-MKV

**JURY TRIAL DEMANDED**

---

### AMENDED COMPLAINT

Plaintiffs Jamie Shiller, Brian Kornrumpf, Halsey Richartz, Amnon Melzer, Ryan Treat, Geoff Frink, Jeremy Grainger, Randy Coran, Brian Dubs, Guy Zilber, Curtis Hale, Dirk Weiler-Theleman, and Darrell Smith (collectively, "Plaintiffs"), by their undersigned attorneys, hereby allege as follows:

### NATURE OF THE ACTION

1. After promising that the assets pledged to the THORChain Savers and Lending program ("THORFi") were safe and technically could not be converted, Defendants Chad Barraford ("Barraford"), John-Paul Thorbjornsen ("Thorbjornsen"), and Nine Realms, Inc. ("Nine Realms") froze more than $8.4 million in digital assets belonging to Plaintiffs. Barraford and Thorbjornsen co-founded THORChain. Nine Realms is THORChain's core developer; it holds authority over all operations including testing, deploying, and approving software releases, maintaining administrative control over protocol parameters, overseeing updates, and maintaining

THORChain's website, social media, and other public platforms.  Barraford, Thorbjornsen, and Nine Realms developed, operated, and publicly promoted the decentralized-finance systems THORChain and its financial products, such as THORFi.  In truth, THORChain and THORFi were anything but "decentralized"; rather, without its users' knowledge, Defendants exercised full control over the assets held within THORChain's custody.

2.      Plaintiffs are individual investors who deposited cryptocurrency assets such as Bitcoin ("BTC") and Ethereum ("ETH") into THORFi—under representations that explicitly characterized such deposits, in the case of Lending, as "loans" to the THORChain protocol. Defendants marketed those products as preserving user custody and offering unrestricted withdrawals for deposited assets and the ability to close out loans at any time, which Defendants emphasized in THORChain's technical documentation and public messaging.

3.      Defendants advertised on THORChain's website and social media that its protocol ensured that deposited assets remained under the control of depositors.  Defendants expressly represented that users could "[w]ithdraw to native assets at any time."[1]

## Savers Vaults

Savers is the simplest way to provide liquidity to THORChain. Users can deposit any major Layer 1 asset and earn without RUNE price exposure. Withdraw to native assets at any time.

Learn More

4.      In THORChain's official documentation on its website, which explained its

---

[1] https://thorchain.org/yield.  A "native asset" is the primary cryptocurrency of a blockchain, created by its protocol and used to pay transaction fees, secure the network, and enable value transfer within that system.  Examples include BTC and ETH.

operations, Defendants further promised that users would be able to "repay loans at any time, with any amount in any asset,"[2] and that they would "always have the right to have their collateral returned if they repay the loan."[3]

5.      These statements were not merely marketing slogans—they were the fundamental representations on which Plaintiffs entrusted their assets to THORChain and, in turn, Barraford, Thorbjornsen, and Nine Realms.

6.      These representations were also false: Barraford and Thorbjornsen, together with Nine Realms, retained centralized control over assets deposited into THORFi through a concealed administrative override known as the "Admin Mimir" key—an internal mechanism that allowed insiders, like Barraford, Thorbjornsen, and Nine Realms, with access to the key to bypass the governance system and modify, suspend, or override core protocol parameters.[4]

7.      Plaintiffs saw and accepted THORChain's advertisements and the representations on its website and deposited millions of dollars of cryptocurrency into the THORFi Savers and Lending programs.

8.      Defendants advertised THORChain's Savers program as a way to earn yield without exposure to THORChain's native token, RUNE.

9.      Defendants advertised THORChain's Lending program as providing collateralized loans without interest, liquidations, or centralized interference.

10.      In late 2024, THORFi began to unravel as its dependence on RUNE exposed fatal weaknesses in its design.  Although Defendants represented that users in the Savers program would

---

[2] https://docs.thorchain.org/thorchain-finance/lending

[3] *Id.*

[4] *See* Dkt. No. 19 (Declaration of James P. Brennan ("Brennan Decl.")) ¶ 26 n.12.

have no "RUNE price exposure,"[5] both the Savers and Lending programs were in fact underpinned by RUNE as the core source of collateral and liquidity. As RUNE's value fell, the protocol attempted to mint additional RUNE to meet its obligations, triggering inflation that further eroded the token's price and left liquidity pools under-collateralized. This feedback loop—declining prices causing more minting, which caused further price declines—created a cascading loss of confidence, accelerating withdrawals and pushing THORFi into a full-blown liquidity crisis. By early January 2025, RUNE had lost nearly half its value, and the protocol faced hundreds of millions of dollars in unmet liabilities.

11. On January 9, 2025, Thorbjornsen departed from the chain protocol by independently freezing all user withdrawals and loan repayments by invoking Admin Mimir. Later that same day, THORChain node operators[6]—who were responsible for, among other things, securing the THORChain network by validating transactions and overseeing the protocol—voted to overturn Thorbjornsen's unilateral freeze, temporarily re-enabling THORFi Savers and Lending access.

12. On January 24, 2025, however, THORChain node operators voted to suspend both programs indefinitely. Although protocol modifications ostensibly required 67% node approval, on information and belief, the validator set was—and remains—controlled by a small group of insiders controlled by or aligned with Defendants. This decision froze over $200 million in user deposits, including over $8.3 million in digital assets belonging to Plaintiffs. Since then, Plaintiffs (and other users) have been locked out of their accounts with no means of accessing or recovering

---

[5] https://thorchain.org/yield; *see also* https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057.

[6] A THORChain node operator runs a validator node—a server that verifies transactions, produces new blocks, and helps secure the network—while also managing cross-chain liquidity pools and earning rewards for maintaining the system's integrity. Theoretically, independent node operators distribute network control and validation across many unrelated participants, ensuring no single person or entity can control transactions, funds, or network decisions.

their funds.

13.     Defendants' conduct directly contradicts their representations on THORChain's website that THORChain was non-custodial, decentralized, and governed by transparent community mechanisms.  Plaintiffs were not only denied access to their assets but also suffered additional losses from the collapse in the value of RUNE and other market impacts tied to the freeze controlled by Defendants.

14.     Defendants have retained the ability to return Plaintiffs' assets through the protocol's emergency function, dubbed "Ragnarok," which would return the centralized power that Defendants have usurped to the individual users.  However, Defendants have refused to invoke the function.

15.     Instead, Defendants have promoted a deceptive "restitution" plan known as Proposal 6, which minted a new token—TCY—purporting to denominate users' losses on a one-to-one basis and promising holders 10% of future network fees.  The plan was a sham: THORChain's revenue had collapsed and, under the plan, repayment in any reasonable time frame is impossible.

16.     Defendants' conduct has caused Plaintiffs to suffer significant financial harm, including the inability to access their digital assets, which remain frozen and inaccessible to Plaintiffs.  Plaintiffs seek damages, restitution, and an order compelling Defendants to execute the Ragnarok process to return remaining assets.  They also assert claims for conversion, fraud, and violations of the New York Deceptive Practices Act, N.Y. Gen. Bus. Law §§ 349–350.

## PARTIES AND NONPARTIES

17.     Plaintiffs are individual investors who maintained THORFi accounts and deposited substantial digital assets into the Savers and Lending programs.

18.     Plaintiff Jamie Shiller is a resident of Puerto Rico who lost approximately $2.8

million worth of BTC and ETH in his THORChain Lending account.

19. Plaintiff Geoff Frink is a resident of Texas who lost approximately $2.3 million worth of BTC and ETH in his THORChain Savers account.

20. Plaintiff Brian Kornrumpf is a resident of North Carolina who lost approximately $850,000 worth of BTC in his THORChain Lending account.

21. Plaintiff Jeremy Grainger is a resident of South Carolina who lost approximately $650,000 worth of BTC in his THORChain Lending account.

22. Plaintiff Ryan Treat is a resident of Florida who lost approximately $350,000 worth of BTC and AVAX in his THORChain Savers account.

23. Plaintiff Halsey Richartz is a resident of Florida who lost approximately $190,000 worth of BTC in his THORChain Savers account.

24. Plaintiff Amnon Melzer is a resident of South Africa who lost approximately $200,000 worth of BTC and DOGE in his THORChain Savers account.

25. Plaintiff Randy Coran is a resident of California who lost approximately $350,000 worth of BNB, BTC, DOGE, and LTC in his THORChain Savers account.

26. Plaintiff Brian Dubs is a resident of Oregon who lost approximately $210,000 worth of BTC in his THORChain Savers account.

27. Plaintiff Curtis Hale is a resident of Vermont who lost approximately $370,000 worth of ETH and USDT in his THORChain Savers account.

28. Plaintiff Guy Zilber is a resident of Israel who lost approximately $87,000 worth of ETH and LTC in his THORChain Savers account.

29. Plaintiff Dirk Weiler-Thelemann is a resident of Germany who lost approximately $77,000 worth of BNB in his THORChain Savers account.

30.     Plaintiff Darrell Smith is a resident of Texas who lost approximately $80,000 worth of BTC and LTC in this THORChain Savers account.

31.     Defendant Chad Barraford is, on information and belief, an individual residing in the State of New York.  He is a co-founder and, at all relevant times, was a lead developer, operator, and public spokesperson for THORChain and THORFi.

32.     Defendant John-Paul Thorbjornsen is, on information and belief, an Australian citizen who conducts business in the United States, including in this District, through, at all relevant times, his operation and promotion of THORChain and THORFi and through extensive online activity targeting U.S. and New York investors.  He is a co-founder and, at all relevant times, was a lead developer, operator, and public spokesperson for THORChain and THORFi.  He regularly interacted with New York-based users and developers via THORChain's website, Discord servers, and social media platforms.

33.     Defendant Nine Realms, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Phoenix, Arizona.  At all relevant times Nine Realms acted as the core developer, operator, and promoter of the THORChain and THORFi protocols.  Since 2021, it has been responsible for operational tasks and maintenance of THORChain's infrastructure, planning THORChain version releases, and testing and leading releases of new updates and releases to THORChain's protocol.

34.     Nonparty THORChain is an unincorporated association consisting of a network of developers, node operators, and promoters ultimately overseen and controlled by Barraford and Thorbjornsen.  THORChain maintains a continuous and interactive online presence accessible in the State of New York through its website (thorchain.org), social media accounts, and associated decentralized applications.  THORChain conducts business with users in this District by offering,

marketing, and facilitating the deposit of digital assets into its "Savers" and "Lending" programs.

35. On information and belief, THORChain's membership includes approximately 100 validator node operators, core developers, and governance participants—many of whom are affiliated with Defendants Thorbjornsen and Barraford—have actively directed, managed, and controlled THORChain's operations and public communications.

## JURISDICTION AND VENUE

36. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and complete diversity exists among the parties.

37. This Court has personal jurisdiction over Defendant Barraford because, on information and belief, he resides in New York, New York, conducts business within this District, and committed the acts and omissions described herein within New York.

38. This Court has personal jurisdiction over Defendant Thorbjornsen because he purposefully directed his conduct toward the United States and this District, disseminating misrepresentations through websites, Discord channels, and social media platforms knowing and intending that investors in New York would rely upon and act on those statements. His conduct caused injury in this District, and the exercise of jurisdiction comports with due process and N.Y. C.P.L.R. § 302(a)(1)–(3).

39. This Court has personal jurisdiction over Defendant Nine Realms pursuant to its express consent to jurisdiction in the State of New York and its waiver of any defenses relating to personal jurisdiction or venue for purposes of this action.

40. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred within the Southern District of New York, where Defendant Barraford resides.

**STATEMENT OF FACTS**

**A.    Thorbjornsen, Barraford, and Nine Realms' Control over THORChain**

41.    THORChain was founded in 2018 by Thorbjornsen and Barraford[7] who, along with Nine Realms, have acted as its controlling developers and promoters.

42.    Nine Realms is THORChain's core developer and has authority over all critical operations.[8]    Nine Realms tested, deployed, and approved software releases, maintained administrative privileges over protocol parameters, including the Admin Mimir key and Ragnarok, and oversaw all updates.

43.    Nine Realms publicly represented itself as providing "[c]ore development and infrastructure for THORChain," responsible for "[m]aintaining public infrastructure for THORChain ecosystem," and, on information and belief, managed its official communication channels, including THORChain.org, Medium, Discord, and X (Twitter).

44.    THORChain's "Frequently Asked Questions" section of the developer website states that Nine Realms, led by Gavin McDermott ("McDermott"), has "publicly taken over" the operational responsibilities for the THORChain system.[9]

45.    THORChain is a cryptocurrency protocol that enables cross-chain liquidity and yield generation with the capability to facilitate transactions in various forms of cryptocurrency, including BTC and ETH.[10]    It purports to be a decentralized network governed by independent node operators.

46.    Unlike centralized applications—where a single entity holds customer assets and

---

[7] Brennan Decl. ¶ 15.

[8] *See* Brennan Decl. ¶ 19.

[9] Brennan Decl. ¶ 20.

[10] https://thorchain.com/.

executes transactions on users' behalf—decentralized applications operate through autonomous protocols, and user funds are not held in the custody of any intermediary.[11] Because decentralized finance applications are typically "permissionless," with no central authority capable of controlling or halting activity, they fall outside the regulatory frameworks that govern centralized platforms.[12]

47. In reality, Thorbjornsen, Barraford, and Nine Realms exercised centralized control over THORChain through access to the Admin Mimir key, a developer override that allowed core personnel to bypass protocol governance.[13]

48. At all relevant times, Thorbjornsen, Barraford, and Nine Realms acted on their own behalf and THORChain and within the scope of its governance structure. They were responsible for, among other things, maintaining the protocol's codebase, directing node operators, and publishing official statements through THORChain's website and social media channels.

**B.      The THORFi Savers and Lending Programs**

49. As early as 2021, Defendants promised THORChain users that they would "become gods with unmatched yields" and that the THOR protocol would be "high, stable, passive, and consistent."[14]

50. In late 2022 and 2023, THORChain launched two products under the THORFi brand—Savers and Lending—to attract consumer deposits.

51. The Savers program, launched on November 15, 2022, allowed users to earn yield by depositing layer 1 assets, such as BTC, into the network in exchange for synthetic assets, which could be deposited into a Savings Vault. Defendants publicly advertised THORChain' Savers

---

[11] Brennan Decl. ¶ 16.

[12] Brennan Decl. ¶ 17.

[13] https://medium.com/chainargos/hammering-thorchain-its-totally-centralized-with-hard-coded-admin-keys-15a8876e149a

[14] https://medium.thorfi.io/introducing-thor-nodes-son-of-odin-24dbdfb4f4c7

program as being a "permissionless, open-source, decentralized, self-custody solution that enable[d] users to earn in-kind yield on native assets without any price exposure to RUNE."[15] This claim was featured prominently on THORChain's website, where any interested user signing up for THORChain's services could see it.

52.      Defendants publicly advertised the Savers program as being a "permissionless, open-source, decentralized, self-custody solution that enable[d] users to earn in-kind yield on native assets without any price exposure to RUNE."  This claim was featured prominently on THORChain's website, where any interested user signing up for THORChain's services could see it.



53.      Defendants emphasized user control, writing on THORChain's website that users would be able to "***withdraw their principal any time***" because users "maintain full control of their keys" and that it was a "decentralized self-custody solution."[16]

---

[15] https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057
[16] https://docs.thorchain.org/frequently-asked-questions/savers.

**FREQUENTLY ASKED QUESTIONS**

## Savers

### What is a Savers Vault?

Savers Vaults are way to supply single-asset liquidity on THORChain. Any user can simply deposit native Bitcoin, earn in-kind yield, and withdraw their principal any time since they maintain full control of their keys.

- Orginal Launch Article ↗

54.     The Lending Program, introduced on August 20, 2023, permitted users to lend digital assets (such as BTC and ETH) and borrow thor.tor, a THORChain-issued stablecoin.  The program promised users "no interest, no liquidation, and no expiration."[17]

55.     THORChain's official website contained the following representations that Plaintiffs accepted when depositing their cryptocurrency:

- "Users can deposit native assets like Bitcoin, earn yield in-kind, and withdraw their principal at any time, all while maintaining full control of their keys."[18]

- "Savers is the simplest way to provide liquidity to THORChain. Users can deposit any major Layer 1 asset and earn without RUNE price exposure."[19]

- "Users can repay loans at any time, with any amount in any asset."[20]

- "The user will always have the right to have their returned collateral if they repay the loan."[21]

56.     Defendants also made numerous public statements reinforcing these false

---

[17] https://medium.com/thorchain/lending-on-thorchain-646bbf2e6e1b.

[18] https://docs.thorchain.org/thornodes/archived/savers-faq.

[19] https://thorchain.org/yield.

[20] https://docs.thorchain.org/thornodes/archived/lending.

[21] *Id.*

representations through their own social media channels.

57. In a 2021 Q&A session, Barraford stated the following regarding the platform's risk: "We'll probably know about it like six months in advance or even 12 months in advance. We'll just kind of see the writing on the wall. I don't expect there to be some sort of like mass exodus of loans just because the only thing that would cause somebody to a mass exodus of loans is if people feel that they might not get their collateral back or their collateral is unavailable."[22]

58. On May 17, 2022, Barraford posted on X: "@THORChain can succeed with an algo stable where $UST (and so many others) failed" because "$TOR will always be redeemable for any layer 1 stablecoin on the network (USDT, USDC, BUSD, DAI, etc.)."[23]



59. He further stated there was "little reason for a bank run to occur."[24]

60. In a November 15, 2022 Medium article published by THORChain, Defendants claimed that "[t]here is no person, group, or entity that can unilaterally control user funds on THORChain."[25]

61. In a December 1, 2022 YouTube Q&A, Barraford assured users that THORFi's risks were "relatively small" and that the protocol was designed so that users' collateral would

---

[22] https://youtu.be/fUug5MBQBhA?si=2D9O2yX3UkHbXzHW; Brennan Decl. ¶ 23.

[23] https://x.com/CBarraford/status/1526597142466416640.

[24] *Id.*

[25] https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057.

"always remain available."[26]

62. He also stated on X that the "golden rule of the protocol is never to put collateral at risk, i.e., block users from closing loans."



63. These representations were false. Thorbjornsen, Barraford, and Nine Realms retained centralized control through the Admin Mimir override mechanism and could disable withdrawals without user consent.

**C. Plaintiffs' Relationship with THORFi**

64. Each Plaintiff saw and accepted Defendants' and THORFi's representations before they deposited digital assets into THORFi.

65. Plaintiff Jamie Shiller had direct communication with Barraford over Telegram— an instant messaging application—in or around March 2024. Barraford assured Plaintiff Shiller that the Lending program was safe and stated that THORFi had "mechanisms to protect again[st] things like price manipulation and bank runs." Plaintiff Shiller also reviewed THORChain's documentation on its website and other social media posts that assured users that the Lending program was decentralized, self-custodial, and no liquidation. In reliance on Defendants' representations, Plaintiff Shiller deposited a total of approximately 582.536 ETH and 8.457 BTC

---

[26] https://youtu.be/fUug5MBQBhA?si=2D9O2yX3UkHbXzHW.

into THORFi Lending, on or around March 18, 2024 through April 1, 2024.

66.     Plaintiff Halsey Richartz reviewed THORChain's promotional materials on its website and amplified across social media and understood, based on those materials, that the Savers program would allow him to earn passive yield on his BTC—without exposure to RUNE and without relinquishing control of his assets.  Plaintiff Richartz never intended to sell his BTC and, based on Defendants' representations about THORFi, viewed THORFi as a low-risk method of generating returns on his holdings.  In reliance on Defendants' representations, Plaintiff Richartz deposited 1.78 BTC into the Savers program from on or around February 25, 2023 to May 18, 2024.

67.     Plaintiff Brian Kornrumpf was introduced to THORFi Savers through THORChain's documentation on its website, social media posts from Thorbjornsen and Barraford, and other community forums.  He understood, based on those representations, that he would be able to earn yield on his assets and could withdraw his principal at any time.  In reliance on Defendants' representations, Plaintiff Kornrumpf deposited 13.1 BTC into the Lending program starting from on or around March 8, 2024. Kornrumpf also redeemed some loans during that period, with ultimately approximately 8.1 BTC lost in the Lending program.

68.     Plaintiff Amnon Melzer learned of THORFi Savers through posts on X.  Based on representations made on THORChain's website, Medium, and through social media, Plaintiff Melzer understood that THORFi Savers was decentralized and that he could use it to earn yield on his digital assets without any price exposure to RUNE and that he would be able to withdraw his principal at any time.  In reliance on Defendants' representations, Plaintiff Melzer deposited 1.845 BTC and 12,153.65 DOGE into the Savers program on or around November 30, 2023 through May 20, 2024.

69.     Plaintiff Ryan Treat learned of the THORFi Savers program through Defendants' promotion on social media, the THORChain website, and other online forums.  Based on these representations, Plaintiff Treat understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time.  In reliance on Defendants' representations, Plaintiff Treat deposited approximately 2.997 BTC and 1,006.38 AVAX into the Savers program on or around March 20, 2023 through November 8, 2024.

70.     Plaintiff Geoff Frink learned of the THORFi Savers program through his Edge wallet, which displayed information derived from THORChain's publicly distributed materials.[27] Defendants intended and expected that third-party wallets such as Edge would convey their representations to users, including assurances that deposited assets would remain under user control and could not be frozen.  Relying on those representations, Plaintiff Frink understood that his assets would remain accessible at all times.  Plaintiff Frink also understood the only risk of staking[28] to be a short un-staking delay of 8–10 days and was not warned of any other risks.  In reliance on Defendants' representations, Plaintiff Frink deposited approximately 16.682 BTC and 153.804 ETH into the Savers program on or around November 13, 2024.

71.     Plaintiff Jeremy Grainger learned of THORFi Lending's representations through Defendants' promotion on social media that it was decentralized, self-custodial, and offered loans with no interest, no liquidation, and no expiration.  Plaintiff Grainger also reviewed Defendants' representations on the THORChain website and in its documentation that he could close out his loans at any time and have his collateral returned.  In reliance on Defendants' representations, Plaintiff Grainger deposited approximately 11.527 BTC into the Lending program and received

---

[27] https://edge.app/blog/company-news/edge-rolls-out-thorchain-savers-and-dex-aggregator.

[28] Crypto staking is the process blockchain networks like BTC and ETH and other cryptocurrencies use to validate transactions and maintain security on the blockchain in exchange for earning additional crypto rewards.

approximately 4.877 BTC and 48,968 USDC in loans.

72. Plaintiff Randy Coran learned of THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Coran understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Coran deposited approximately 354.73 BNB, 0.9283 BTC, 14,761.8 DOGE, and 8.43 LTC into the Savers program starting on or around May 23, 2024.

73. Plaintiff Brian Dubs learned of THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Dubs understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Dubs deposited approximately 2 BTC into the Savers program on or around December 2, 2023.

74. Plaintiff Guy Zilber learned of THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Zilber understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants' representations, Plaintiff Zilber deposited approximately 23.96 ETH and 64.05 LTC into the Savers program on or around January 2, 2024 to September 2, 2024.

75. Plaintiff Curtis Hale learned of THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Hale understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time. In reliance on Defendants'