representations, Plaintiff Hale deposited approximately 64.57 ETH and 155,532 USDT into the Savers program on or around December 9, 2024 to December 11, 2024.

76.     Plaintiff Dirk Weiler-Thelemann learned of THORFi Savers through the THORChain website and other online resources.  Based on these representations, Plaintiff Weiler-Thelemann understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time.  In reliance on Defendants' representations, Plaintiff Weiler-Thelemann deposited approximately 112.5 BNB into the Savers program on or around February  23, 2023 to February 27, 2023.

77.     Plaintiff Darrell Smith learned about THORFi Savers through Defendants' promotion of the program on social media, the THORChain website, and other online forums. Based on these representations, Plaintiff Smith understood that he could earn yield on his digital assets while retaining the ability to withdraw his principal at any time.  In reliance on Defendants' representations, Plaintiff Smith deposited approximately 0.747 BTC and 15.31 LTC into the Savers program on or around November 12, 2023 to January 10, 2024.

78.     Each Plaintiff has been unable to access or recover their assets since January 2025 due to Defendants' arbitrary and centralized exercise of the Admin Mimir key, unlawfully preventing Plaintiffs from accessing their deposits, in direct contravention of Defendants' representations Plaintiffs relied on before making their deposits.

**D.     THORFi's Collapse**

79.     THORFi's collapse was a direct result of its reliance on RUNE.  RUNE is THORChain's native cryptocurrency, which functions as an intermediary for cross-chain swaps on THORChain's so-called decentralized exchange.

80.     Nine Realms, as part of its role in maintaining and supporting THORChain's public infrastructure, was responsible for managing and publishing content on THORChain's official

website and documentation.

Barraford and Thorbjorsen, in their roles as co-founders, developers, and public promoters of THORChain, were also responsible for managing and publishing content on THORChain's official website and documentation.

81.     According to THORChain's official documentation, which was publicly posted on THORChain's website, users maintained complete control over their funds, including the right to withdraw principal and accrued yield at any time.  Specifically, the documentation represented: "Users can deposit native assets like Bitcoin, earn yield in-kind, and withdraw their principal at any time, all while maintaining full control of their keys."[29]

82.     Defendants also made representations concerning the Savers and Lending programs exposure to RUNE and the attendant risks.

83.     Defendants, through THORChain, expressly represented that the Savers program was insulated from volatility in the price of RUNE.  THORChain's official website states: "Savers is the simplest way to provide liquidity to THORChain.  Users can deposit any major Layer 1 asset and earn *without RUNE price exposure*."[30]

84.     Defendants promised THORChain users that RUNE would be deflationary—consistently "non-zero and constantly increas[ing]."[31]

---

[29] https://docs.thorchain.org/thorchain-finance/savings.
[30] https://thorchain.org/yield.
[31] https://x.com/THORChain/status/168959538602897408.



85.     THORChain's website prominently featured a promise of "Low Risk Liquidity" with "no impermanent loss or RUNE exposure."[32]



86.     On August 8, 2024, THORChain's official X account promised users that RUNE was "deflationary."[33]

---

[32] https://thorchain.org/yield.

[33] https://x.com/THORChain/status/168888467298914304.



87.     On August 19, 2023, the THORChain X account assured its users that even if RUNE's value collapsed, THORFi Lending would be "ok."[34]  It further assured users that its node operators would be monitoring inflationary risks closely, and that the risks of the service are "transparent."



88.     Defendants pitched to THORChain users that they would not have any exposure to RUNE, and that the risks that did exist were being adequately managed and were transparent.  This

---

[34] https://x.com/THORChain/status/1693063836017033374.

was not true.  In reality, Plaintiffs were exposed to RUNE, RUNE was not stable, and the risks were neither being adequately managed nor transparent.

89.     THORFi's failure stemmed from three structural flaws that Defendants built into the protocol's economic design—flaws that guaranteed collapse once RUNE failed to outperform the assets users deposited.  RUNE exposure was not just incidental to participation in the Savers and Lending program.  It was *essential* to it.

90.     *First*, as RUNE's price declined, THORFi was forced to mint additional RUNE to satisfy loan and synthetic-asset obligations, diluting token value and fueling inflation. THORChain's economic model depended on the continuous minting and burning of RUNE to maintain liquidity and collateral across the network.  When users provided assets such as BTC or ETH to THORFi, those deposits were immediately converted into RUNE.[35]  The RUNE was then "burned" when swapped for a borrower's desired cryptocurrency, and new RUNE was minted when loans were repaid to repurchase the original collateral.[36]  The system was thus designed to function as a self-reinforcing engine supporting RUNE's price performance relative to major assets like BTC and ETH.[37]

91.     *Second*, the decline in RUNE's value relative to native assets such as BTC and ETH left liquidity pools incapable of honoring redemptions.  To meet withdrawal requests, the protocol was forced to liquidate additional RUNE, which in turn drove RUNE's price lower.  THORFi's instability was rooted in this fundamental reliance on RUNE, contrary to Defendants' representations to the contrary.  According to THORChain's own published materials, the Lending platform's assumptions depended on RUNE appreciating at twice the rate of BTC—for example,

---

[35] Brennan Decl. ¶ 45.

[36] *Id.* ¶¶ 46-47.

[37] *Id.* ¶ 48.

if BTC's price increased fivefold, RUNE was expected to increase tenfold.[38]  This model meant that THORFi could only remain solvent if RUNE consistently outperformed the very assets deposited by users.  When that did not occur, the protocol's stability evaporated: falling RUNE prices forced additional minting to cover redemptions, increasing supply and accelerating devaluation.

92.    *Third*, each decline in RUNE's price triggered additional minting, compounding inflation and further weakening collateral.  This feedback loop eroded user confidence, prompted mass withdrawals, and produced the "bank run" that crippled the protocol.  THORFi's architecture rested on the critical assumption that RUNE's market value would remain stable or appreciate over time.  But RUNE lost approximately 38% of its value in the two years preceding the freeze, exposing the design's inherent fragility and precipitating instability across the THORChain ecosystem.

93.    Empirical performance data confirmed the model's instability.  When THORFi's Savers and Lending programs launched on August 23, 2023, BTC traded at approximately $26,128.04 while RUNE traded at $1.13.[39]  By January 23, 2025, just before the platform was indefinitely halted, BTC had risen to $104,064.98—an appreciation of nearly 300%—whereas RUNE had increased only to $1.50, or about 33%.[40]  Because the protocol's collateral reserves were denominated in RUNE, this divergence meant that THORFi no longer held enough value to repurchase the cryptocurrency originally deposited by users.[41]  As lenders and savers sought to redeem their positions, THORFi lacked the liquidity to make them whole.[42]

---

[38] *Id.* ¶ 49; *see* https://thorchain-community.medium.com/under-the-hood-lending-101-f934e1c22792.

[39] *Id.* ¶¶ 50-52.

[40] *Id.*

[41] *Id.* ¶ 53.

[42] *Id.* ¶ 54.

94.     The structural imbalance caused a liquidity crisis.  As borrowers attempted to repay loans and lenders sought to withdraw collateral, the shortfall between RUNE's weak appreciation and BTC's surge rendered the protocol insolvent.  Depositors' assets—having been converted into RUNE—were effectively wiped out.  The zero-interest, no-expiration loans that Defendants marketed as "risk-free" had in fact been predicated on the false assumption that users would not redeem their deposits before RUNE's price caught up to or exceeded BTC's.  When that assumption proved untrue, THORFi collapsed.

95.     THORFi's instability was therefore inherent to its design.  Its core financial mechanisms—the Lending platform, synthetic asset system, and Savers vaults—were interdependent in a way that amplified, rather than mitigated, risk.  As one component faltered, it compounded stress on the others, triggering a cascade of failures throughout the network.

96.     By early January 2025, these defects converged into a full-blown crisis.  RUNE's value had fallen approximately 40% in a single week, and THORChain faced more than $200 million in outstanding user liabilities it could not meet.  Liquidity pools were exhausted, node operators began exiting the network, and the entire protocol teetered on collapse.

97.     THORChain's own design set the stage for its downfall.  The protocol's dependence on RUNE—used to support its Lending system, synthetic assets, and Savers vaults— made it uniquely vulnerable to market fluctuations.  As RUNE's price fell, the protocol had to mint even more RUNE and liquidate reserves to satisfy obligations, which further depressed RUNE's value.  Each attempt to stabilize the system only worsened the decline, creating a self-reinforcing downward spiral that culminated in the January 2025 freeze and the permanent loss of user assets.

### E.    The January 2025 Freeze

98.    On January 9, 2025, due to high volatility in RUNE's price,[43] Thorbjornsen unilaterally disabled Plaintiffs' ability to withdraw assets from THORFi Savers and close loans in THORFi Lending by activating the Admin Mimir key.  Unbeknownst to Plaintiffs, the Admin Mimir key is an administrative function that allowed modification of the protocol without a node operator vote, circumventing the protocol's decentralized governance system.  On information and belief, insider-developers such as Barraford and Nine Realms also had access to the Admin Mimir. Despite Defendants' representations to the contrary, the commands to freeze THORFi functions *were built into THORChain's code* and readily accessible by Admin Mimir.[44]

99.    This action, made possible by Defendants' centralized control over the protocol's infrastructure, froze Plaintiffs' access to their deposited assets and halted all activity on the platform.  As a result, Plaintiffs were (1) prevented from opening new loans, (2) prevented from repaying existing loans, and, critically, (3) unable to withdraw cryptocurrency from their wallets.

100.    THORChain's own protocol developers admitted in the Discord developer chat[45] that this decline in RUNE price and "bank run" on the platform was self-inflicted by Thorbjornsen's actions.[46]  As seen in the screenshot below, "pluto9r," an CORE THORChain developer working at Nine Realms, agreed that Thorbjornsen was at fault.[47]

---

[43] Brennan Decl. ¶ 24.

[44] Brennan Decl. ¶ 36.

[45] Discord is a communication app where users can communicate in real-time through various channels for specific topics.  The "Discord developer chat" was a message board specifically dedicated for THORChain developers to discuss development needs of the protocol.

[46] Brennan Decl. ¶ 32.

[47] *Id.*



101.    Some news outlets reported that the freeze occurred because THORChain had insufficient BTC to repay lenders due to price fluctuations in BTC and a lack of liquidity.[48]

102.    Thorbjornsen's actions contradicted his own, Barraford's, and Nine Realms' representations through THORChain that users could "withdraw their principal at any time," [49] and that THORChain was a purportedly "decentralized self-custody solution."[50]

103.    Thorbjornsen's unilateral freeze was so controversial that, later that same day, node operators voted to overturn Thorbjornsen's freeze, temporarily re-enabling THORFi Savers and Lending access.

104.    The brief re-enablement of loan redemptions lasted only until January 24, 2025. As RUNE's price continued to deteriorate, Thorbjornsen posted on X on January 23, 2025 that, if RUNE fell below $2.50, he would urge node operators to "pause loan redemptions" again—publicly signaling his intent to trigger another freeze.[51]

---

[48] Brennan Decl. ¶ 33.

[49] https://docs.thorchain.org/frequently-asked-questions/savers.

[50] https://medium.com/thorchain/thorchain-savers-vaults-fc3f086b4057.

[51] Brennan Decl. ¶ 34.



105.    Yet even before RUNE reached that threshold, THORChain's node operators voted to freeze THORFi once again. This premature vote underscored that the outcome was effectively predetermined and guided by Thorbjornsen's insider influence rather than any neutral or decentralized governance process.[52]

106.    A January 24, 2025 capture of THORChain's Mimir governance API[53] confirmed how easily the pause could be executed: the administrative command to halt loan redemptions was embedded directly in the protocol's code and could be activated at will by system administrators such as Thorbjornsen and Nine Realms.[54]

$$\boxed{\text{"PAUSELOANS": 1,}}$$

107.    This shutdown persists to this day, despite THORChain's claim that the Lending and Savers services were only "currently paused." THORChain further claimed that "[t]his

---

[52] Brennan Decl. ¶ 35.

[53] THORChain's Mimir governance API is the on-chain interface through which node operators vote on and set network configuration parameters.

[54] Brennan Decl. ¶ 36.

interruption is expected to last approximately 90 days."



108.   Nine Realms claimed that THORFi was only "temporarily paused."[55]



109.   On information and belief, there is no plan to return user assets.

110.   Defendants' suspension of loan redemptions, in direct violation of the public statements they made to the contrary, triggered a bank run.  Users of THORChain lost faith in RUNE and the stability of THORChain and rushed to withdraw assets while the value of RUNE plunged.

111.   Following Thorbjornsen's unilateral decision to pause loan redemptions, an account with the username named "Leena" posted in the THORChain Discord server informing users of the pause and stating that community members, developers and node operators were

---

[55] Brennan Decl. ¶ 37.

involved in the decision.  This was false.



112.    In fact, there was no "Leena."   This was a fictitious persona invented by Thorbjornsen to falsely assuage concerns about THORChain users' lost cryptocurrency.[56]

113.    In a podcast interview, Thorbjornsen acknowledged that he created the "Leena" persona as a means to remain anonymous and portray the THORChain ecosystem as decentralized when, in fact, it was not.[57]

114.    By January 29, 2025, RUNE was in "free fall" and "lost about 40% of its value" in a single week.[58]

115.    At the time of the pause, THORChain had accrued approximately $200 million in outstanding liabilities.[59]

116.    The implosion of THORChain was exacerbated by a subsequent exodus of node operators—who were responsible for securing the network by validating transactions and bonding RUNE as collateral—from the system following the initial devaluation of RUNE.   On

---

[56] *See* Brennan Decl. ¶ 29.

[57] https://www.youtube.com/watch?v=K-TwFU10Cd4.

[58] https://thecryptogateway.it/en/rune-thorchain-crash/.

[59] https://medium.com/thorchain/thorfi-unwind-96b46dff72c0.

February 1, 2025, twenty node operators requested to leave the THORChain network with one Discord user responding to this news with "If that's the case we're done."



117. The remaining node operators began to sell RUNE, thereby exacerbating the devaluation of RUNE and collapse of THORFi by further withering the confidence of investors; damaging the security and efficiency of the network by reducing its decentralization; and flooding the crypto market with a new supply of RUNE by releasing RUNE previously held in the network as leverage over nodes in the form of bonds.

118. Thorbjornsen's invocation of Admin Mimir demonstrated that insiders, like Barraford and Nine Realms—in addition to Thorbjornsen himself—retained centralized control over the network. Contrary to Defendants' marketing claims, users had no self-custody over their assets and no recourse once the Admin Mimir function was initiated.

119.    On February 10, 2025, THORChain shared to the public via X that the "admin mimir" function has been removed and that now node operators have control over the network.[60] This was another public admission by Defendants that THORChain was never fully decentralized.[61]



## F.    Defendants' Refusal to Execute Ragnarok and the TCY "Restitution" Scheme

120.    After the freeze, Defendants retained the ability to invoke Ragnarok, THORChain's emergency shutdown and asset-return mechanism that unwinds the network and returns all remaining user funds from its liquidity pools, and lending positions back to depositors. Specifically, THORChain's documentation states that "[a]ll funds are automatically returned to users" when Ragnarok is triggered.[62]

121.    On February 28, 2025, Thorbjornsen acknowledged that THORChain had the ability to shut down the protocol and return a portion of users' funds, but opted not to.[63]

---

[60] https://x.com/THORChain/status/1888991030424297652.

[61] Brennan Decl. ¶ 43.

[62] https://docs.thorchain.org/technical-documentation/technical-deep-dive/governance

[63] Brennan Decl. ¶ 44.

122. A conversation in the THORChain developer chat on February 1, 2025 revealed that there was still a form of liquidity in the system, belonging to "Savers," that was still available, but not accessible to users.



123. Following the pause of loan redemptions, community members submitted proposals to resolve the debt situation. Though 8 proposals were submitted, Thorbjornsen encouraged participants to support "Proposal 6," which maintained THORFi rather than closing it.[64]

124. On February 3, 2025, THORChain's governance body[65] adopted "Proposal 6," as part of its response to the platform's debt crisis. Under the plan, THORChain established a new instrument called "TCY." The plan minted 210 million TCY tokens, with users able to claim one TCY per $1 owed to them by the protocol, and promised TCY holders 10% of future network swap fees in order to compensate users. The plan also eliminated THORFi products, including Lending and Savers.

125. Thorbjornsen publicly endorsed the proposal, describing it as a "community proposal" that would allow THORChain to "keep the synth liquidity."

---

[64] Brennan Decl. ¶ 38.

[65] The THORChain governance body refers to the network's community of node operators who collectively manage protocol upgrades, parameter changes, and ecosystem decisions.



126. The TCY token provided no real restitution. It was an IOU dependent on future THORChain revenues, not backed by any assets or reserves. It conveyed no ownership rights and could not be redeemed by THORChain users for deposited assets.

127. THORChain processes approximately $77.6 million worth of trade on a daily basis, however this can fluctuate depending on market conditions.[66] According to some calculations based on THORChain's estimated fees, it will take approximately 74 years for each token to reach a value of $1 and match the amount owed to debtors.[67]

128. Community members immediately recognized the futility of the plan. One user summarized: "$200M in deposits won't be repaid. TCY + 10% RUNE won't restore value. Seems more like a way to get rid of creditors & dodge legal risks."

---

[66] https://www.coingecko.com/en/exchanges/thorchain.

[67] Brennan Decl. ¶¶ 55-60.



129.    The TCY "restitution" plan was a sham, designed by Defendants to stall accountability and maintain the protocol's control over THORChain assets.  It served no purpose other than to give the illusion of remediation while depriving users of recovery.

130.    As of the filing of this Complaint, Defendants have not executed the Ragnarok recovery, distributed restitution, or restored user access.  Plaintiffs' assets remain frozen.

## G.    Pattern of Misconduct

131.    In 2024, Thorbjornsen launched Vultisig, a decentralized cryptocurrency wallet platform.[68]  After Thorbjornsen stepped away from THORChain, claiming that the project had outgrown his-early stage, high-risk leadership approach, Vultisig became his main focus. Blockchain analysis shows that millions of RUNE were swapped for USDC through wallets linked to the Vultisig treasury, suggesting that funds derived from THORFi may have been diverted to support his new enterprise.[69]

132.    Taken together, these facts demonstrate a recurring pattern of self-dealing and misuse of investor assets by Thorbjornsen and his associates—first through the exploitation of RUNE markets and later through the diversion of value into affiliated projects.  Their manipulation

---

[68] Brennan Decl. ¶¶ 61.

[69] Brennan Decl. ¶¶ 62-67.

of THORChain's liquidity and concealment of conflicts of interest not only accelerated THORFi's collapse but also reveal Thorbjornsen's intent to enrich himself at the expense of users who relied on their assurances of decentralization and transparency.

**H.     Resulting Harm to Plaintiffs**

133.    Defendants' conduct directly caused Plaintiffs' losses.

134.    Each Plaintiff has been permanently deprived of access to their cryptocurrency, valued collectively at over $8.4 million.

135.    Plaintiffs also suffered lost yield, diminished asset value, and consequential losses. Defendants' refusal to execute Ragnarok and return each Plaintiff's funds ensured their damages were permanent.

<u>**COUNT I – CONVERSION**</u>

136.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

137.    Plaintiffs owned and had the right to possess the cryptocurrency they deposited into the THORFi Savers and Lending programs.

138.    Defendants exercised wrongful dominion and control over Plaintiffs' cryptocurrency assets by:

      a.    Developing and maintaining the Admin Mimir key that enabled circumvention of the protocol's decentralized governance system;

      b.    Invoking the Admin Mimir on January 9, 2025, thereby freezing all withdrawals;

      c.    Refusing to invoke Ragnarok or any comparable recovery mechanism to restore users' assets; and

      d.    Retaining protocol fees and developer rewards derived from users' trapped deposits.

139.    Such conduct was intentional, unauthorized, and inconsistent with Plaintiffs'

ownership rights.

140. As a direct result, Plaintiffs have been permanently deprived of their property and have suffered losses exceeding $8.4 million, plus consequential and punitive damages.

## COUNT II – COMMON LAW FRAUD

141. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

142. Defendants knowingly made false and misleading representations of material fact to Plaintiffs and the public, including but not limited to the following:

    a. That THORFi's Savers and Lending programs were "decentralized," "self-custodial," and "permissionless," and that users "maintain full control of their keys" and "may withdraw their principal at any time";

    b. That users were "insulated from RUNE price exposure" and faced "low-risk liquidity with no impermanent loss";

    c. That RUNE was "deflationary" and "constantly increasing in value"; and

    d. That there existed no person or entity with unilateral authority to control or restrict user assets.

143. At the time these statements were made, Defendants knew them to be false or made them with reckless disregard for their truth. In reality, Defendants retained centralized control of user assets through the Admin Mimir override and knew that THORFi was structurally dependent on the volatile value of RUNE.

144. Defendants made these misrepresentations with the intent to induce Plaintiffs and other users to deposit digital assets into THORFi's Savers and Lending programs and to generate fees and value for Defendants.

145. Plaintiffs reasonably relied on Defendants' representations in choosing to deposit their assets.

146. As a direct and proximate result of Defendants' fraudulent misrepresentations and

omissions, Plaintiffs suffered damages exceeding $8.4 million, together with lost yield, loss of market value, and consequential harm.

147.   Defendants' conduct was willful, malicious, and undertaken in bad faith, warranting an award of punitive damages.

## COUNT III – UNJUST ENRICHMENT

148.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

149.   Defendants have been unjustly enriched at Plaintiffs' expense as a result of their wrongful conduct in marketing, operating, and controlling the THORFi Savers and Lending programs.

150.   Plaintiffs conferred a specific and direct benefit upon Defendants by depositing their cryptocurrency, valued at more than $8.4 million, into THORFi's programs.  Those deposits increased the liquidity on the THORChain network, generated transactions fees and node rewards for Defendants, and enhanced the value of RUNE and other assets Defendants held or controlled.

151.   Defendants knowingly accepted and retained those benefits even after freezing Plaintiffs' accounts, refusing to return their property, and continuing to receive economic benefits from Plaintiffs' trapped deposits.

152.   Defendants' retention of these benefits is inequitable and against good conscience because they misrepresented the nature of THORFi's operation, concealed their centralized control, and used Plaintiffs' funds to sustain and enrich themselves at Plaintiffs' expense.

153.   Plaintiffs are entitled to restitution and disgorgement of all benefits conferred upon Defendants, together with interest and all equitable relief necessary to restore them to the position they occupied prior to Defendants' wrongful acts.

## COUNT IV – VIOLATION OF N.Y. GEN. BUS. LAW §§ 349–350

154. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

155. Defendants, in the regular course of THORChain's business, engaged in unfair and deceptive acts by:

    a.    Falsely advertising THORFi as decentralized, self-custodial, and low-risk;

    b.    Falsely advertising that THORFi savers had no exposure to the price of RUNE;

    c.    Concealing its ability to freeze user funds through Admin Mimir; and

    d.    Continuing to market THORFi as safe during its collapse.

156. Defendants' willful and knowing conduct was consumer-oriented and likely to mislead reasonable consumers.

157. Plaintiffs were injured as a result and seek actual, statutory, and treble damages, plus attorneys' fees under §§ 349(h) and 350-e.

## PRAYER FOR RELIEF

158. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and award the following relief:

    a.    Awarding Plaintiffs compensatory damages for the full fair-market value of Plaintiffs' converted and detained cryptocurrency assets, including all consequential, incidental, and expectancy losses arising from Defendants' misconduct;

    b.    Awarding Plaintiffs restitution and disgorgement requiring Defendants to return any funds, tokens, or assets wrongfully obtained or retained through their operation of the THORFi programs, including protocol rewards, transaction fees, or developer payments derived from user deposits;

    c.    Awarding Plaintiffs compensatory damages arising from Defendants' fraud;

    d.    Awarding Plaintiffs punitive damages to punish and deter Defendants' willful, malicious, and fraudulent conduct, including their deliberate

concealment of the Admin Mimir control function, and its refusal to execute the Ragnarok recovery process;

e.  Awarding Plaintiffs restitution and disgorgement of all benefits unjustly obtained;

f.  Awarding Plaintiffs statutory and treble damages under N.Y. Gen. Bus. Law §§ 349–350;

g.  Injunctive and equitable relief, including but not limited to an order compelling Defendants to:

   (1)  Immediately execute or cooperate in the execution of the Ragnarok recovery process to return all remaining digital assets to Plaintiffs and similarly situated users;

   (2)  Disclose, preserve, and account for all on-chain and off-chain assets under their control related to THORFi Savers and Lending programs; and

   (3)  Refrain from further transfer, concealment, or dissipation of any funds traceable to Plaintiffs' deposits;

h.  Awarding Plaintiffs pre- and post-judgment interest at the maximum legal rate, from the date of the freeze through the date of payment;

i.  Awarding Plaintiffs costs and expenses including all reasonable fees and expenses incurred in prosecuting this action, as permitted by law and equity; and

j.  Awarding Plaintiffs such further and other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

159.  Plaintiffs hereby demand a jury trial on all issues so triable.

Dated:   January 19, 2026
          New York, New York.

**M**c**D**ERMOTT **W**ILL **& S**CHULTE LLP

*/s/ Joseph B. Evans*

Joseph B. Evans
M. Elias Berman
Benjamin F. Cooper
Joshua C. Yim
One Vanderbilt Avenue
New York, New York  10017-3852
Telephone: (212) 547-5400
jbevans@mwe.com
eberman@mwe.com
bcooper@mwe.com
jyim@mwe.com

*Attorneys for Plaintiffs Jamie Shiller, Brian Kornrumpf, Halsey Richartz, Amnon Melzer, Ryan Treat, Geoff Frink, Jeremy Grainger, Randy Coran, Brian Dubs, Guy Zilber, Curtis Hale, Dirk Weiler-Thelemenn, Darrell Smith*

-40-

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of New York

| | | |
|---|---|---|
| JAMIE SHILLER, BRIAN KORNRUMPF, HALSEY RICHARTZ, AMNON MELZER, RYAN TREAT, GEOFF FRINK, JEREMY GRAINGER, RANDY CORAN, BRIAN DUBS, GUY ZILBER, CURTIS HALE, DIRK WEILER-THELEMANN, and DARRELL SMITH, | ) ) ) ) ) ) | |
| *Plaintiff(s)* | ) ) | |
| v. | ) ) | Civil Action No.   1:25-cv-10287 |
| CHAD BARRAFORD, JOHN-PAUL THORBJORNSEN, and THORCHAIN, | ) ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

John-Paul Thorbjornsen

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph B. Evans
McDermott Will & Schulte LLP
One Vanderbilt Avenue
New York, NY 10017

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  12/12/2025                                      /S/ V. BRAHIMI

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: